# 23-7272-cv

## United States Court of Appeals

### *for the*

## Second Circuit

PNC BANK, NATIONAL ASSOCIATION, WELLS FARGO CAPITAL
FINANCE, LLC, WELLS FARGO BANK, NATIONAL ASSOCIATION,
BMO HARRIS BANK, HUNTINGTON NATIONAL BANK,
CATHAY BANK, BANK LEUMI, USA,

*Plaintiffs-Appellees,*

— v. —

DANA TRANSPORT, INC., RONALD B. DANA,

*Defendants-Appellants.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

## BRIEF AND SPECIAL APPENDIX
## FOR DEFENDANTS-APPELLANTS

JAMES E. CECCHI
JAN ALAN BRODY
CARELLA, BYRNE, CECCHI, BRODY
& AGNELLO, P.C.
5 Becker Farm Road, 3rd Floor
Roseland, New Jersey 07068
(973) 994-1700

*Attorneys for Defendants-Appellants*

CP COUNSEL PRESS    (800) 4-APPEAL • (326116)

## CORPORATE DISCLOSURE STATEMENT
## PURSUANT TO RULE 26.1 OF THE
## <u>FEDERAL RULES OF APPELLATE PROCEDURE</u>

Pursuant to Rule 26.1 of the Federal Rules of Appellate Procedure, Dana Transport, Inc. and Ronald B. Dana, Defendants-Appellants in this action, state that Dana Transport, Inc. does not have a corporate parent, and there is no publicly held corporation that owns 10 percent or more of the company's stock.

## <u>TABLE OF CONTENTS</u>

**Page**

TABLE OF AUTHORITIES ................................................................. iii

JURISDICTIONAL STATEMENT .......................................................1

STATEMENT OF ISSUES PRESENTED FOR REVIEW ....................1

STATEMENT OF THE CASE............................................................2

SUMMARY OF ARGUMENT ...........................................................3

FACTUAL BACKGROUND .............................................................4

STANDARD OF REVIEW ...............................................................9

LEGAL ARGUMENT......................................................................9

I.     THE DISTRICT COURT COMMITTED REVERSIBLE ERROR IN FINDING IT "UNMISTAKABLY CLEAR" THAT THE INDEMNIFICATION PROVISION OF THE TALA GOVERN LITIGATION BETWEEN THE PARTIES ...........9

II.    THE DISTRICT COURT APPLIED THE WRONG STANDARD AND IMPROPERLY DREW ALL FACTUAL INFERENCES IN FAVOR OF THE MOVING PARTY .................21

A.    The District Court Applied The Wrong Standard On The Lenders' Summary Judgment Motions..............................21

The 2007 Swap Agreement ...........................................24

Ron Dana's Personal Guaranty and the Changing of the Borrowing Base ...................................................27

The Exclusion of Titles from the Appraisals.................29

The Lenders' Secret Conspiracy with RSI ....................31

B.    The District Court Also Failed To Properly Consider Additional Instances Of The Lenders' Willful Misconduct Contained In The Record ......................................36

Omission of Swap Risks.................................................38

The Libor Floor..............................................................40

i

Downgrading of Borrowers' Credit Rating....................41

Wrongfully Jamming Fees on Borrowers.......................42

C.     Issues Of Fact Exist As To What The Parties Understood "Willful Misconduct" To Mean Under The TALA ..................................................................................44

D.     The District Court Erred In Holding That There Were No Issues Of Material Fact In Dispute As To Defendants' Affirmative Defenses ............................................47

1.     Economic Duress .....................................................47

2.     Fraud and Fraudulent Inducement....................................50

3.     Public Policy ............................................................51

4.     Good Faith and Fair Dealing ..........................................54

III.     THE DISTRICT COURT SHOULD HAVE DENIED THE LENDERS' SUMMARY JUDGMENT MOTION BECAUSE THE PRE-CONDITIONS FOR FILING SUCH MOTION HAD NOT BEEN SATISFIED .........................................55

CONCLUSION ..........................................................................................57

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases:**

*511 W. 232nd Owners Corp. v. Jennifer Realty Co.*,
 98 N.Y.2d 144 (2002)............................................................54

*Aboutaam v. El Assaad*,
 2020 WL 1547458 (S.D.N.Y. Mar. 31, 2020)........................49

*Austin Instrument v. Loral Corp.*,
 29 N.Y.2d 124 (1971).............................................................50

*Austro v. Niagara Mohawk Power Corp.*,
 487 N.E.2d 267 (N.Y. 1985) .............................................51-52

*Bank of New York Tr. Co. v. Franklin Advisers, Inc.*,
 726 F.3d 269 (2d Cir. 2013) ..................................................16

*Banks v. GM, LLC*,
 81 F.4th 242 (2d Cir. 2023) ...................................................22

*BNP Paribas Mortg. Corp. v. Bank of Am., N.A.*,
 778 F. Supp. 2d 375 (S.D.N.Y. 2011) ...................................13

*City of San Antonio, Texas v. Hotels.com, L. P.*,
 593 U.S. 330 (2021) ................................................................9

*Cont'l Cas. Co. v. Boughton*,
 695 F. App'x 596 (2d Cir. 2017)............................................49

*Covington Specialty Ins. Co. v. Indian Lookout Country Club, Inc.*,
 62 F.4th 748 (2d Cir. 2023) .....................................................9

*De Vera v. 243 Suydam, LLC*,
 107 N.Y.S.3d 818 (N.Y. Sup. Ct. 2018).................................12

*Emigrant Bank v. SunTrust Bank*,
 2023 WL 2647648 (S.D.N.Y. Mar. 27, 2023)........................18

*Fung-Schwartz v. Cerner Corp.*,
 2023 U.S. Dist. LEXIS 183965 (S.D.N.Y. Oct. 12, 2023) .................23

*Giannullo v. City of New York*,
 322 F.3d 139 (2d Cir. 2003) ..................................................21

iii

*Harkabi v. SanDisk Corp.*,
891 F. Supp. 2d 527 (S.D.N.Y. 2012) ................................................................37

*Hooper Assocs., Ltd. v. AGS Computers, Inc.*,
74 N.Y.2d 487 (1989) ........................................................ 10, 12, 16, 17

*In re Platinum-Beechwood Litig.*,
378 F. Supp. 3d 318 (S.D.N.Y. 2019) ...................................... 10, 18-19

*In re Refco Sec. Litig.*,
890 F. Supp. 2d 332 (S.D.N.Y. 2012) ........................................ 13, 16

*Interpharm, Inc. v. Wells Fargo Bank N.A.*,
655 F.3d 136 (2d Cir. 2011) ...................................................... 47, 48

*Johnson & Johnson v. Guidant Corp.*,
525 F. Supp. 2d 336 (S.D.N.Y. 2007) ........................................ 44, 45

*Kahlon v. Yitzhak*,
270 F. Supp. 3d 583 (E.D.N.Y. 2017) ................................................55

*Kee's Chocolates LLC v. Charles Thompson LLC*,
119 N.Y.S.3d 11 (N.Y. Civ. Ct. 2019) ...............................................12

*KeyBank Nat'l Ass'n v. Franklin Advisers, Inc.*,
616 B.R. 14 (S.D.N.Y. May 4, 2020) ................................................54

*Learning Experience Sys., LLC v. Collins*,
2023 WL 5835034 (E.D.N.Y. Sept. 8, 2023) ...................................16

*Mastrovincenzo v. City of New York*,
435 F.3d 78 (2d Cir. 2006) ...............................................................19

*MBIA Ins. Corp. v. Countrywide Home Loans, Inc.*,
39 Misc. 3d 1220 (N.Y. Sup. Ct. 2013) ............................................17

*McNichol v. Falco*,
2020 WL 5802492 (S.D.N.Y. Sept. 28, 2020) ..................................50

*Metropolitan Life Insurance v. Noble Lowndes International Inc.*,
84 N.Y.2d 430 (1994) ........................................... 45, 47, 52, 53

*Monsour v. N.Y. State Office for People with Developmental Disabilities*,
2017 WL 3972044 (N.D.N.Y. July 7, 2017) ......................................24

*Net2Globe Int'l, Inc. v. Time Warner Telecom of N.Y.*,
273 F. Supp. 2d 436 (S.D.N.Y. 2003) ..............................................51

iv

*Okeke v. N.Y. and Presbyterian Hosp.*,
    2017 WL 1536060 (S.D.N.Y. Apr. 24, 2017) ........................................23

*Pinto v. Allstate Ins. Co.*,
    221 F.3d 394 (2d Cir. 2000) ..................................................................22

*Rodal v. Anesthesia Grp. of Onondaga, P.C.*,
    369 F.3d 113 (2d Cir. 2004) ..................................................................15

*Rothstein v. Balboa Ins. Co.*,
    794 F.3d 256 (2d Cir. 2015) ....................................................................9

*Sage Sys., Inc. v. Liss*,
    39 N.Y.3d 27 (2022) ..............................................................................17

*Sayers v. Rochester Tel. Corp. Supplemental Mgmt. Pension Plan*,
    7 F.3d 1091 (2d Cir. 1993) ....................................................................45

*Schottenstein v. Lee*,
    2023 U.S. Dist. LEXIS 2115928 (S.D.N.Y. Dec. 5, 2023) ..................22

*Sosnoff v. Carter*,
    165 A.D.2d 486 (1st Dep't 1991) ..........................................................50

*Wells Fargo Bank Nat. Ass'n v. Webster Bus. Credit Corp.*,
    113 A.D.3d 513 (2014) .............................................................. 13, 14, 15

*Zyburo v. Continental Cas. Co.*,
    60 F. Supp. 3d 531 (S.D.N.Y. 2014) ....................................................57

*Zilg v. Prentice-Hall, Inc.*,
    515 F. Supp. 716 (S.D.N.Y. June 9, 1981) ..........................................55

**Statutes & Other Authorities:**

28 U.S.C. § 1291 ............................................................................................1

28 U.S.C. § 1332 ............................................................................................1

Fed. R. Civ. P. 12(b)(1) .................................................................................2

Fed. R. Civ. P. 12(b)(6) .................................................................................2

Fed. R. Civ. P. 56(c) ....................................................................................23

Fed. R. Civ. P. 56(c)(A) ..............................................................................23

v

Fed. R. Civ. P. 56(c)(B) ........................................................23

Fed. R. Civ. P. 56(e) ...........................................................23

Fed. R. Civ. P. 56(e)(1) .......................................................23

Fed. R. Civ. P. 56(e)(2) .................................................. 23, 24

Fed. R. Civ. P. 56(e)(3) .......................................................23

Fed. R. Civ. P. 56(e)(4) .......................................................23

Fed. R. Civ. P. 56(f)(1) ........................................................24

Local Rule 56.1 .........................................................4, 21, 22, 23

New York Pattern Jury Instructions – Civil § 2:10A ............................46

## JURISDICTIONAL STATEMENT

Jurisdiction was proper in the District Court pursuant to 28 U.S.C. § 1332 because Defendants-Appellants[1] and Plaintiffs-Appellees[2] were of diverse citizenship and the matter in controversy, exclusive of interests and costs, exceeds $75,000.

Jurisdiction is proper in this Court pursuant to 28 U.S.C. § 1291 as this is an appeal from a final decision of the District Court granting judgment in favor of Plaintiffs-Appellees. The Opinion granting judgment in favor of Plaintiffs-Appellees' was issued on September 5, 2023. (SPA-29). Defendants-Appellants' Notice of Appeal was timely filed on October 4, 2023. (A-5857).

## STATEMENT OF ISSUES PRESENTED FOR REVIEW

- Did the District Court err in denying the Defendants' motion to dismiss for failure to state a valid breach of contract claim for interparty indemnification?

---

[1] Defendants-Appellants are Dana Transport, Inc. and Ronald B. Dana ("Ron Dana"). Defendants-Appellants are referred to herein as "Defendants", "Defendants-Appellants", or "Dana". Dana and Dana Container, Inc., Suttles Truck Leasing Inc., Suttles Truck Leasing, LLC, International Equipment Logistics, Inc., Flagship Services of West Virginia, LLC, Kentucky Flagship Services, LLC, Flagship Services of Ohio, LLC and Liquid Transport, LLC are referred to herein as "Borrowers".

[2] Plaintiffs-Appellees are PNC Bank, National Association ("PNC"); Wells Fargo Capital Finance, LLC; Wells Fargo Bank, National Association (collectively, "Wells Fargo"); BMO Harris Bank; Huntington National Bank; Cathay Bank; and Bank Leumi, USA. Plaintiffs-Appellees are referred to herein as "Plaintiffs", "Plaintiffs-Appellees", or the "Lenders".

- Did the District Court err in granting partial summary judgment in favor of Plaintiffs and finding Defendants liable for Plaintiffs' attorneys' fees?

- Did the District Court err in awarding Plaintiffs attorneys' fees before a final non-appealable judgment on the threshold issue of willful misconduct?

## STATEMENT OF THE CASE

This case concerns a contractual indemnification clause contained in a loan agreement entered into by the parties. (SPA-2). After the lending relationship ended, Defendants filed suit against Plaintiffs in the Southern District of New York ("*Dana I*"), claiming, among other things, that Plaintiffs fraudulently and willfully conspired to damage them. (SPA-7). Defendants subsequently dismissed that action voluntarily and commenced a lawsuit against Plaintiffs and others in New Jersey state court – that lawsuit is ongoing. (SPA-8). After the New Jersey state court suit was initiated, Plaintiffs filed this action in the United States District Court for the Southern District of New York against Defendants seeking indemnification for attorneys' fees incurred in defending *Dana I*. (SPA-8).

Defendants moved to dismiss Plaintiffs' complaint, under Rule 12(b)(6), or alternatively to stay the case under Rule 12(b)(1), in light of the ongoing New Jersey state court action. (SPA-8). The Honorable Ronnie Abrams, U.S.D.J., denied Defendants' motion in an oral ruling on September 22, 2017. (SPA-1). Plaintiffs moved for partial summary judgment as to liability on September 24, 2021. (SPA-

2

9). Judge Abrams issued a written opinion and order on August 26, 2022, granting Plaintiffs partial summary judgment. (SPA-2). Plaintiffs then submitted motions for attorneys' fees in October 2022, and the Honorable Jennifer L. Rochon, U.S.D.J., issued a written opinion and order awarding Plaintiffs attorneys' fees and closing the case on September 5, 2023. (SPA-29).

## SUMMARY OF ARGUMENT

It is a fundamental tenet of American law that each party bears its own costs in litigation. Under governing New York law, litigation costs and attorneys' fees can be shifted between parties to a contract, but only when the parties' intent to do so is unmistakably clear. Here, the parties did not intend to allow for interparty indemnification of attorneys' fees, but the District Court engaged in a strained reading of the relevant contract to find otherwise and grant partial summary judgment in favor of Plaintiffs-Appellees. That reading is incorrect as a matter of law and should be reversed.

The District Court committed numerous other reversible errors, ignoring genuine disputes of material fact in the record and improperly construing the facts in favor of Plaintiffs as to Defendants' evidence (which Plaintiffs elected not to dispute) of willful misconduct, as well as Defendants' affirmative defenses of economic duress, fraudulent inducement, public policy, unconscionability, and good faith and fair dealing. Finally, the District Court erred in awarding attorneys' fees

to Plaintiffs despite ongoing litigation in New Jersey with respect to Plaintiffs' willful misconduct.

The District Court's application of New York indemnity law is incorrect, and if allowed to stand, will create a serious fracture with binding New York State Court of Appeals authority and lead to unintended indemnification obligations for commercial parties. Similarly, the District Court's improper factual inferences and analysis at the summary judgment stage are at odds with prevailing Second Circuit law and must be reversed.

## FACTUAL BACKGROUND

The case arises from a multiple-year scheme carried out by the Lenders, a syndicate of banks, who deceived and stole millions of dollars from Borrowers. In 2006, Borrowers entered into a $135 million term loan and revolving line of credit secured by pledged rolling stock (vehicles and equipment) ("2006 Agreement"). (A-5558, ¶ 319; A-1642).[3] Ron Dana delivered all pledged titles to PNC's counsel. (A-5554, ¶306; A-3046, T170:22-171:4). PNC or its agent lost or misplaced many of these titles. (A-5555, ¶307; A-3046, T172:19-22). At the closing of the 2006

---

[3] Defendants' citations include the relevant paragraph number of Defendants' Local Rule 56.1 Omnibus Statement of Undisputed Material Facts ("SOF"), as well as a pinpoint cite to the relevant exhibit and deposition transcripts quoted in the SOF, where applicable. "A-XXX" refers to the page from the Joint Appendix, ¶XXX refers to the paragraph from the SOF and TXXX:XX refers to the page and line numbers from the relevant transcript.

4

Agreement, the Lenders waived any rights to seek further documentation of their security and titles, and also had UCC liens on all of the pledged collateral. (A-5559, ¶323; A-1642) (A-5560, ¶328; A-3046, T171:25-172-5). Simultaneously with the inception of the 2006 Agreement, PNC marketed and then successfully sold Borrowers a Swap agreement ("2006 Swap") falsely claiming that the 2006 Swap would fix their interest rate. (A-5557, ¶315; A-3401). To Borrowers' detriment, PNC failed to follow regulatory guidelines in its sale of the Swap, including failing to explain to Borrowers the risks associated with the 2006 Swap. (A-5555, ¶310; A-3194-95, T165:17-166:6) (A-5555, ¶311; A-2665).

In June 2007, the 2006 Agreement was amended ("2007 Agreement"). Prior to and in anticipation of the 2007 Agreement, PNC procured an appraisal of Borrowers' pledged rolling stock, but directed the appraiser to exclude 1,031 units of rolling stock under the guise that PNC did not have titles for those units. (A-5565, ¶356-57, A-3520). As a result of PNC's demand, the value of Borrowers' pledged collateral was vastly reduced, and Ron Dana was forced to sign a personal guaranty of $14 million to cover the collateral gap created by PNC's intentional exclusion of the 1,031 units. (A-5569, ¶372; A-4643). Just as they did with the 2006 Agreement, at the closing of the 2007 Agreement, the Lenders waived any rights to seek further documentation of their security and had UCC liens on all of the pledged collateral. (A-5567, ¶363; A-4111). Ron Dana's personal guaranty was considered part of the

5

borrowing base used to calculate Borrowers' access to loan funds. (A-5569, ¶372; A-4643). Contemporaneous with the execution of the 2007 Agreement, the 2006 Swap was amended to match the terms of the 2007 Agreement ("2007 Swap"). (A-5572, ¶379; A-3213, T70:10-14). Ron Dana was told later by PNC's Walter Stillwagon, that PNC never should have sold him a Swap on the entire balance of the 2007 Agreement. (A-5564, ¶351; A-3041, T150:6-16). Again, PNC failed to follow required Swap regulations. (A-5576; ¶409, A-2668).

In July 2008, within thirty days of purchasing participation in the loan, Wells Fargo wanted to see an over-advance. (A-5583, ¶439; A-4758). The 2007 Agreement had proceeded for over a year using a $100 million sublimit to calculate Borrowers' access to loan funds. (A-5584, ¶444; A-4774). Despite this, Wells Fargo initiated a change in the way that access to loan funds was to be calculated (specifically, the removal of Ron Dana's personal guaranty from the formula and a reappraisal of the pledged equipment). (A-5583, ¶439; A-4758) (A-5581, ¶433; A-4733) (A-5581, ¶434; A-4735). PNC acquiesced to these demands and reappraised the rolling stock, again excluding pledged titles despite the pre-existing contractual waiver. The result of this abrupt change in the calculation of the borrowing base created, just as the Lenders had intended, an alleged "deficiency" in collateral, which the Lenders then used to require Borrowers to pledge additional collateral and ultimately execute further loan documents under duress. (A-5585, ¶446; A-4781,

6

A-4783). These new changes ultimately caused Borrowers' interest rate to double (from 7.42% to 14%). (A-5633, ¶661; A-5254).

During the fall of 2008, Ron Dana approached Stillwagon about paying off the 2007 Swap to mitigate its rising cost. Stillwagon lied to Ron Dana and told him that PNC had sold the Swap and that Dana could not pay it off. This was false. (A-5587, ¶459; A-3042, T157:2-8). The uncontested record established that PNC remained the sole counterparty to the 2007 Swap until June 2012. *See infra* Section II.A.

In February 2009, left with no choice, Dana hired Realization Services, Inc. ("RSI") and its principal, Barry Kasoff, at the demand of the Lenders. (A-5596, ¶501; A-3060, T228:17-24). As a consultant to Dana, RSI owed Dana multiple duties, but the record established that RSI was actually secretly working for the benefit of (and at the direction of) the Lenders. RSI and the Lenders hatched a scheme to force Borrowers to pledge $60 million of real estate and pay double the interest rate with no additional funds being lent to them. (A-5602, ¶527; A-4880) (A-5603, ¶528; A-4883). The culmination of the Lenders' and RSI's efforts became the execution of the third amended loan agreement ("TALA"). The Borrowers were forced to sign the TALA under duress and constant threats by the Lenders that they would shut down Borrowers' businesses. (A-5611, ¶562; A-2797, T100:9-19; A-2801, T104:9-18; A-2817, T120:11-15; A-5655). As it turned out, the TALA

7

doubled the all-in interest rate that Borrowers were required to pay, required the pledging of an additional $60 million in collateral, and mandated the implementation of a full-time consultant (to be paid for by Borrowers). (A-5614, ¶571; A-4967; A-5127). Further, the Lenders placed a Libor floor in the TALA stripping Borrowers of the contracted-for benefits of the very expensive 2007 Swap. (A-5614, ¶571; A-4967; A-5127) (A-5615, ¶577; A-3224, T236:19-25) (A-5616, ¶580; A-3041, T150:24-151:22).

For the next 45 months, Borrowers paid the Lenders (i) nearly 14% interest, despite the fact that the 2007 Swap was allegedly entered into to fix Borrowers' interest rate at 7.42%, and (ii) millions of dollars of fees and expenses to comply with the Lenders' never-ending greed for more money. (A-5648, ¶727; A-2668, A-2670, A-2679). During this time, Borrowers had no choice but to grow their business and revenue to pay the Lenders, which they valiantly did despite the actions of the Lenders. (A-5633, ¶661; A-5254).

In June 2012, when the 2007 Swap contractually ended, Borrowers believed they could stop paying the Swap's monthly $400,000 (approximate) fee, only to be informed that the payments were required to continue unabated. (A-5616, ¶579; A-4702) (A-5634, ¶666; A-3037, T135:17-136:5). The Lenders knew that by keeping Borrowers' interest rates unduly high and labeling the loan as "troubled," Borrowers would be unable to escape the Lenders' clutches, despite (i) Borrowers' solid

8

financial condition, and (ii) *the fact that Borrowers never failed to make a loan payment to the Lenders*.  (A-5646, ¶715, A-2673) (A-5646, ¶717; A-3344, T193:16-23) (A-5646, ¶719; A-2987, T88:11-17).

By January 2013, Borrowers were finally able to refinance with a group of new lenders led by CIT and Key Bank.  Still, in the several months leading up to the refinancing, the Lenders "jammed" millions of dollars of fees on Borrowers with the constant threat of shutting down loan funding if such payments were not made.  (A-5642, ¶697; A-5146.  Borrowers were ultimately able to refinance.

## STANDARD OF REVIEW

Review of a district court's ruling on a motion to dismiss and motion for summary judgment is *de novo*.  *See Rothstein v. Balboa Ins. Co.*, 794 F.3d 256, 261 (2d Cir. 2015); *Covington Specialty Ins. Co. v. Indian Lookout Country Club, Inc.*, 62 F.4th 748, 752 (2d Cir. 2023).

## LEGAL ARGUMENT

I. **THE DISTRICT COURT COMMITTED REVERSIBLE ERROR IN FINDING IT "UNMISTAKABLY CLEAR" THAT THE INDEMNIFICATION PROVISION OF THE TALA GOVERN LITIGATION BETWEEN THE PARTIES.**

It is well-settled law that each party generally bears its own costs and fees in litigation.  Indeed, this principle is so well-settled in our judicial system that it is referred to as the "American Rule."  *City of San Antonio, Texas v. Hotels.com, L. P.*, 593 U.S. 330, 332 (2021) ("Civil litigation in the federal courts is often an expensive

9

affair, and each party, win or lose, generally bears many of its own litigation expenses, including attorney's fees that are subject to the so-called American Rule."). While parties may contract around the American Rule, under New York law, the parties' intent to allow for interparty indemnification must be unmistakably clear and a strong presumption *against* such fee-shifting is applied by courts. *See Hooper Assocs., Ltd. v. AGS Computers, Inc.*, 74 N.Y.2d 487, 492 (1989) ("Inasmuch as a promise by one party to a contract to indemnify the other for attorney's fees incurred in litigation between them is contrary to the well-understood rule that parties are responsible for their own attorney's fees, the court should not infer a party's intention to waive the benefit of the rule unless the intention to do so is unmistakably clear from the language of the promise."); *In re Platinum-Beechwood Litig.*, 378 F. Supp. 3d 318, 323 (S.D.N.Y. 2019) ("New York law, however, imposes a strong presumption against reading indemnification provisions to cover expenses incurred in litigation between the parties.").

The District Court properly enunciated the unmistakably clear standard and the presumption against interparty indemnification but failed to (i) properly apply the standard to the relevant contract language which does not unmistakably allow for interparty indemnification, and (ii) conduct any analysis regarding overriding the strong presumption against interparty indemnification. (A-789-90). Under the *de novo* standard of review, this Court should reverse the District Court's decisions

10

below because controlling case law requires a finding that the indemnification provision at issue is ***not*** unmistakably clear in permitting interparty indemnification.

The indemnification provision at issue states, in relevant part:

> Each Borrower shall indemnify Agent, each Lender and each of their respective officers, directors, Affiliates, employees and agents from and against any and all liabilities, obligations, losses, damages, penalties, actions, judgments, suits, costs, expenses and disbursements of any kind or nature whatsoever (including, without limitation, fees and disbursements of counsel) which may be imposed on, incurred by, or asserted against Agent or any Lender in any claim, litigation, proceeding or investigation instituted or conducted by any Governmental Body or instrumentality or any other Person with respect to any aspect of, or any transaction contemplated by, or referred to in, or any matter related to, this Agreement or the Other Documents, whether or not Agent or any Lender is a party thereto . . . .

(A-5070-71).

On its face, the provision requires Borrowers to indemnify the Lenders for any claims brought by a "Governmental Body" or an "instrumentality" or "any other Person."[4] The District Court found that because "Borrower" is defined in the TALA as "hav[ing] the meaning set forth in the preamble to this agreement and shall extend

---

[4] Throughout the TALA, there are numerous different instances where the text refers to "Borrower" or "Borrowers" and "any other Person" (indeed there are over 750 references to "Borrower" in the document), which makes it clear that "Borrowers" are distinct from "any other Person" when referenced in the TALA, and the TALA uses the term "Borrower" or "Borrowers" when it intends to refer specifically to the Dana entities. *See, e.g.*, (A-4978-79) ("any such shares of the Equity Interest of any Borrower or of any other Person may be exchanged"); (A-5007) ("any set-off, counterclaim, recoupment, defense or other right which such Lender may have against Agent, any Borrower or any other Person for any reason whatsoever").

to all permitted successors and assigns of such Persons" and "Person" is defined in the TALA as "any individual, sole proprietorship, partnership, corporation, business trust, joint stock company, trust, unincorporated organization, association, limited liability company, institution, public benefit corporation, joint venture entity or governmental body," it becomes "unmistakably clear . . . that Section 16.5 requires borrowers to indemnify agent and lenders for attorney's fees." (A-790-91).

This analysis is flawed and incomplete and one of the Lenders, Wells Fargo, has in fact successfully argued for the exact *opposite* holding in another matter, as set forth below in greater detail. All that the definitions of the TALA discussed above show is that it is possible, with some creativity, cross-referencing of various defined terms and disregard of others, to construe the indemnification provision to apply to claims brought by Dana against the Lenders. This mere possibility, however, falls far short of the requisite unmistakable clarity that must be demonstrated under New York law. *See De Vera v. 243 Suydam, LLC*, 107 N.Y.S.3d 818, at *7 (N.Y. Sup. Ct. 2018) ("[M]ere rational interpretation of the indemnification provision that it allows for an award of legal fees to the prevailing party is not enough."); *Kee's Chocolates LLC v. Charles Thompson LLC*, 119 N.Y.S.3d 11, at *4 (N.Y. Civ. Ct. 2019) ("The strict standard for interpreting indemnification clauses set forth in *Hooper* requires more than a mere rational interpretation [] – the intent and scope of indemnification must be unmistakably

12

clear."); *In re Refco Sec. Litig.*, 890 F. Supp. 2d 332, 343 (S.D.N.Y. 2012) ("[I]f the indemnity provision in this case is subject to a reasonable interpretation one way or another, the agreement must be construed not to indemnify DPM's legal expenses in defending against SMFF claims.").

To be unmistakably clear, the indemnification provision must exclusively or unequivocally apply to suits between the parties. *BNP Paribas Mortg. Corp. v. Bank of Am., N.A.*, 778 F. Supp. 2d 375, 415 (S.D.N.Y. 2011) ("Unless the indemnification clause refers exclusively or unequivocally to claims between the indemnitor and indemnitee, the court must find the agreement to be lacking evidence of the required intent to cover such claims.") (citation and quotation marks omitted). On its face, the indemnification provision in this case does not "exclusively" apply to interparty suits because it refers to claims brought by a "Governmental Body" or an "instrumentality" and neither term can possibly refer to the parties to this action.

Wells Fargo knows first-hand that this language is not unmistakably clear under New York law, because *nearly identical language* was examined by the First Department Appellate Division in a case where Wells Fargo successfully argued ***against*** interparty indemnification, and the language was found to be "fatal" to the claim for interparty indemnification asserted by the defendant against Wells Fargo. *Wells Fargo Bank Nat. Ass'n v. Webster Bus. Credit Corp.*, 113 A.D.3d 513, 515-16 (2014) ("However, on its face, section 17.7 expressly contemplates third-party

13

litigation against the lenders, including 'any governmental agency or instrumentality or any other Person' without 'clearly impl[ying]' that the parties intended the provision to provide for indemnification in litigation against each other . . . . This provision is fatal to defendant's claim of interparty indemnification for attorneys' fees.").

A comparison between the indemnity provision set forth in Section 16.5 of the TALA in the instant matter and the indemnity provision in *Webster* found in Section 17.7 of that agreement, is as follows:

> TALA Language: "Each Borrower shall indemnify Agent, each Lender *and each of their respective officers, directors, Affiliates, employees and agents*[5] from and against any and all liabilities, obligations, losses, damages, penalties, actions, judgments, suits, costs, expenses and disbursements of any kind or nature whatsoever (including, without limitation, fees and disbursements of counsel) which may be imposed on, incurred by, or asserted against Agent or any Lender in any claim, litigation, proceeding or investigation instituted or conducted by any Governmental **Body** or instrumentality or any other Person with respect to any aspect of, or any transaction contemplated by, or referred to in, or any matter related to, this Agreement or the Other Documents, whether or not Agent or any Lender is a party thereto, except to the extent that any of the foregoing arises out of the willful misconduct of the party being indemnified **(as determined by a court of competent jurisdiction in a final and non-appealable judgment).** (A-5070-71).

---

[5] The italicized language preceding this footnote is the exact language that was replaced by the ellipsis in the *Webster* opinion. *See Wells Fargo Bank v. Webster Business Credit*, Case No. 0601680/2009 (N.Y. Sup. Ct. N.Y. County), NYSEF Doc. No. 11-3 at 74.

> *Webster* Language: Each Borrower shall indemnify Agent, each Lender, [and] each other Lender Party . . . from and against any and all liabilities, obligations, losses, damages, penalties, actions, judgments, suits, costs, expenses and disbursements of any kind or nature whatsoever (including, without limitation, reasonable fees and disbursements of counsel) which may be imposed on, incurred by, or asserted against Agent, or any Lender or any other Lender Party in any litigation, proceeding or investigation instituted or conducted by any governmental agency or instrumentality or any other Person with respect to any aspect of, or any transaction contemplated by, or referred to in, or any matter related to, this Agreement or the Other Documents, whether or not Agent, any Lender or any other Lender Party is a party thereto, except to the extent that any of the foregoing arises out of the willful misconduct or gross negligence of the party being indemnified. *Webster*, 113 A.D. 3d. at 515.

The bolded language is the only difference between the two provisions and the language in the two agreements is substantially identical in all substantive respects. Wells Fargo successfully argued that the indemnification language in *Webster* did *not* call for interparty indemnification and it cannot now pretend that it did not prevail in *Webster* and take a contradictory approach in the instant matter. The doctrine of judicial estoppel bars such changes in position. *See Rodal v. Anesthesia Grp. of Onondaga, P.C.*, 369 F.3d 113, 118 (2d Cir. 2004) ("The doctrine of judicial estoppel prevents a party from asserting a factual position in one legal proceeding that is contrary to a position that it successfully advanced in another proceeding.").

Similarly, the indemnification provision in the TALA does not "unequivocally" refer to suits between the parties. It only can be read to include interparty suits by Dana against the Lenders insofar as it applies to suits brought by any person on earth, which could include, but is not limited to, Dana. Numerous decisions make crystal clear that this incredibly broad language and such interpretation is not unequivocally clear. *See Bank of New York Tr. Co. v. Franklin Advisers, Inc.*, 726 F.3d 269, 283 (2d Cir. 2013) ("Franklin contends that this indemnification provision applies broadly to 'any pending or threatened litigation' and has no language restricting it to third-party actions, which is true enough. But neither does it clearly state that the provision applies to third-party claims; and we are wary of the inference that indemnification clauses apply to litigation between the parties in the absence of express wording. . . . Where, as here, the contract does not exclusively or unequivocally refer to claims between the parties themselves, we will presume that indemnification extends only to third-party disputes.") (citation and quotation marks omitted); *In re Refco Sec. Litig.*, 890 F. Supp. 2d at 343 ("A provision containing only broad language that does not unequivocally indicate that the parties intended to indemnify attorneys' fees in lawsuits between themselves will ordinarily not support a claim for indemnity in suits between the parties.").[6]

---

[6] *See also Learning Experience Sys., LLC v. Collins*, 2023 WL 5835034, at *30 (E.D.N.Y. Sept. 8, 2023) ("Similar to the *Gotham Partners* and *Hooper* cases, the

Additionally, the strong presumption against interparty indemnification of attorneys' fees is unquestionably applicable here. To determine whether the presumption against interparty indemnification has been rebutted under New York law, courts must analyze "(1) whether the provision unequivocally indicates that the parties intended to indemnify attorneys' fees in lawsuits between themselves, or whether it instead contains only broad language, and (2) whether future third-party claims were possible at the time of the contract, or whether it is apparent that no third party claims were contemplated by the parties. Where a provision is subject to a reasonable interpretation one way or another, the agreement must be construed not

---

indemnification clause's list of grounds for claims are more susceptible to third-party claims than exclusively to claims between the parties themselves. The indemnification provision at issue before the Court is broad and covers 'all liabilities accrued' with no explicit indication that the parties are unequivocally indemnifying each other for attorney's fees claims. Therefore, the Court dismisses Defendants' counterclaim regarding indemnification for all attorneys' fees and costs incurred in the defense of this lawsuit."); *MBIA Ins. Corp. v. Countrywide Home Loans, Inc.*, 39 Misc. 3d 1220 (A), at *18 (N.Y. Sup. Ct. 2013) ("Just as in *Hooper*, the provision cited here has the potential to cover third-party actions seeking damages from MBIA in connection with its obligations under the Transaction Documents. Where this potential exists, the Court of Appeals found that the provision was not sufficiently unequivocal as to accommodate reimbursement of attorneys' fees."); *Sage Sys., Inc. v. Liss*, 39 N.Y.3d 27, 32-33 (2022) ("This language is not limited to actions between the partners but encompasses actions involving third parties. It is limited in scope only by the requirement that the partner have committed some misconduct. Indeed, the provision is broader than the indemnity clause in *Hooper* . . . . In sum, nothing in the provision nor the agreement as a whole makes 'unmistakably clear' that the partners intended to permit recovery for attorney's fees in an action between them on the contract.").

17

to indemnify one party's legal expenses in defending against the other party's claims." *Emigrant Bank v. SunTrust Bank*, 2023 WL 2647648, at *13 (S.D.N.Y. Mar. 27, 2023) (citations and quotation marks omitted). The first prong of that analysis has already been emphatically answered above: it is evident that the indemnification provision is incredibly broad and only applies to interparty suits to the extent that it applies to suits brought by "any other Person" on earth.

Turning to the second prong, there are numerous provisions of the TALA that indicate the parties contemplated the indemnification to apply only to lawsuits by third parties, such as the express reference to suits by a Government Body or instrumentality, and suits involving hazardous materials and violations of environmental law. *See, e.g.*, (A-5070-71) ("[T]his indemnity shall extend to any liabilities . . . asserted against or incurred by any of the indemnitees . . . under any Environmental Laws or similar laws by reason of any Borrower's or any other Person's failure to comply with laws applicable to solid or hazardous waste materials. . . ."). Thus, both prongs support application of the presumption against interparty indemnification here. *Emigrant Bank*, 2023 WL 2647648, at *14 ("Given that the Credit Agreement's indemnification provisions do not clearly provide that the Lenders must indemnify the Administrative Agent where the Lenders have sued the Administrative Agent, the presumption against an indemnification obligation is not overcome."); *In re Platinum-Beechwood Litig.*, 378 F. Supp. 3d 318, 325, 326

18

(S.D.N.Y. 2019) ("This language clearly contemplates third-party claims, and in contexts in which contracting parties could have anticipated that they would be subject to third-party claims, courts apply a presumption against concluding that indemnification clauses cover litigation costs incurred in the course of resolving non-third party claims. . . . Based on these considerations, the Court concludes that the language of Paragraph 18 fails to rebut the presumption against indemnification of inter-party litigation expenses.").

There is further evidence that the indemnification provision cannot be read to unmistakably allow for interparty indemnification. For instance, inasmuch as Section 16.5 provides indemnification of not only attorneys' fees but also of "any and all liabilities, obligations, losses, damages . . . [and] suits," the parties could not have understood this provision to apply to lawsuits between the parties. Otherwise, it would then mean that if Defendants (a) sued the Lenders for breach of contract, such as for failing to make loans the Lenders were obligated to make under the Agreement, (b) prevailed in court, and (c) obtained a money judgment against the Lenders, Defendants would then have to indemnify the Lenders for that money judgment Defendants obtained as well as for the Lenders' attorneys' fees in unsuccessfully defending that action. But, the Lenders' broad construction of Section 16.5 results in this absurdity, further confirming it is not unmistakably clear. *See Mastrovincenzo v. City of New York*, 435 F.3d 78, 104 (2d Cir. 2006) ("Unless

19

otherwise indicated, words should be given the meanings ordinarily ascribed to them and absurd results should be avoided.") (citation and quotation marks omitted).

The limitation of liability provision in Section 16.11 is also inconsistent with the Lenders' construction of Section 16.5. Section 16.11 limits any liability of the Lenders to Borrowers, such that the Lenders will not be liable to Borrowers "for indirect, punitive, exemplary or consequential damages arising from any breach of contract, tort or other wrong relating to the establishment, administration or collection of the Obligations or as a result of any transaction contemplated under this Agreement or any Other Document." (A-5074). Thus, under Section 16.11 of the Agreement, if Defendants sued the Lenders, Defendants could only recover for their direct damages and not for "indirect, punitive, exemplary or consequential damages." But, under the Lenders' interpretation of Section 16.5, Defendants must indemnify the Lenders for "*any* . . . damages . . . incurred by, or asserted against Agent or any Lender in any claim [or] litigation." (emphasis added). Accordingly, Defendants could not even collect direct damages from the Lenders for breach of the contract or for tortious activity as any such liability must be indemnified by Defendants, which is inconsistent with Section 16.11.

For all of the reasons stated above, the District Court's holding that the indemnification provision was unmistakably clear as to interparty indemnification for attorneys' fees was incorrect and should be reversed.

20

## II.   THE DISTRICT COURT APPLIED THE WRONG STANDARD AND IMPROPERLY DREW ALL FACTUAL INFERENCES IN FAVOR OF THE MOVING PARTY.

Even assuming, *arguendo*, that the Lenders have established as a matter of law that Section 16.5 of the TALA is applicable to an action commenced by Dana against the Lenders – which it is not – the judgment below must be reversed because the District Court applied the wrong standard to its summary judgment decision, failed to draw factual inferences in the non-moving parties' favor demonstrating Plaintiffs' willful misconduct while making inaccurate factual conclusions, and committed clear legal error in rejecting all of Defendants' affirmative defenses. These reversible errors are discussed below.

### A.   The District Court Applied The Wrong Standard On The Lenders' Summary Judgment Motions.

Defendants, as non-movants, were entitled to all reasonable inferences in their favor.  Nevertheless, the District Court applied a summary judgment standard that placed a greater burden on Defendants than is permitted under federal law.[7]

---

[7] In a footnote to its Opinion, the District Court held that it would disregard legal argument contained in certain portions of Defendants' counterstatement to the Lenders' Rule 56.1 statement. (SPA-3). This holding is improper. First, all of the factual assertions in Defendants' 56.1 statement and counterstatements are supported by specific citations to record evidence which were *not* opposed by the Lenders. Accordingly, those facts must be deemed admitted by the Court. In this Circuit, the party opposing summary judgment must "specifically controvert" the moving party's statement of undisputed facts or they will be deemed admitted. *See, e.g.*, *Giannullo v. City of New York*, 322 F.3d 139, 140 (2d Cir. 2003) ("If the opposing party then fails to controvert a fact so set forth in the moving party's Rule 56.1

Specifically, it is the law in this Circuit that summary judgment is only appropriate when there is no genuine issue as to any material fact challenged. *See, e.g.*, *Banks v. GM, LLC*, 81 F.4th 242, 258 (2d Cir. 2023). Determining whether there is a genuine issue with respect to a material fact requires the motion judge to consider the evidence viewed in the light most favorable to the non-moving parties, here, Defendants. *See, e.g.*, *Schottenstein v. Lee*, 2023 U.S. Dist. LEXIS 2115928, at *2 (S.D.N.Y. Dec. 5, 2023). It is beyond cavil that the court must accept as true all the evidence which supports the position of the party defending against the motion and must accord him or her the benefit of all legitimate inferences which can be deduced therefrom – if reasonable minds could differ, the motion must be denied.

---

statement, that fact will be deemed admitted."). Defendants detailed explanations controverting the Lenders' 56.1 statements, which include myriad record cites, are proper, and indeed necessary, to oppose summary judgment. Second, the District Court's subjective rejection of "legal argument" without any analysis or explanation of exactly what portion of Defendants' statement of facts were "disregarded" is inadequate and ignores the Court's responsibility to draw all inferences in favor of the non-moving party. *See, e.g.*, *Pinto v. Allstate Ins. Co.*, 221 F.3d 394, 398 (2d Cir. 2000) ("The trial court's function in deciding such a motion is not to weigh the evidence or resolve issues of fact, but to decide instead whether, after resolving all ambiguities and drawing all inferences in favor of the non-moving party, a rational juror could find in favor of that party. Summary judgment should not be granted where the record discloses facts that could reasonably support a jury's verdict for the non-moving party.") (citations and quotation marks omitted). The District Court thus erred in disregarding portions of Defendants' counterstatement and Rule 56.1 statement.

*See, e.g.*, *Fung-Schwartz v. Cerner Corp.*, 2023 U.S. Dist. LEXIS 183965, at *8 (S.D.N.Y. Oct. 12, 2023).

For example, in connection with their opposition to the Lenders' motions for summary judgment, Defendants submitted their own Omnibus Statement of Undisputed Material Facts. The Lenders failed to respond to these facts. Under the law of this Circuit, these unrebutted facts were required to have been accepted as true and defeated the Lenders' summary judgment motions. *See Okeke v. N.Y. and Presbyterian Hosp.*, 2017 WL 1536060, at *1 (S.D.N.Y. Apr. 24, 2017) ("Defendant is correct that Local Rule 56.1 does not technically require the moving party to submit a reply to the nonmoving party's statement, and that the rule does not say specifically that failure to reply will constitute an admission of those facts. However, **once the nonmoving party has put material facts into dispute via its additional 56.1 statement, the moving party must rebut them in order for the Court to grant summary judgment in its favor**.") (emphasis added).[8]

---

[8] Rule 56(c) of the Federal Rules of Civil Procedure obligates a response such that "a party asserting that a fact cannot be or is genuinely disputed ***must*** support the assertion" by citing to materials in the record or by showing that the materials cited do not establish a genuine dispute. *See* Fed. R. Civ. P. 56(c)(A)-(B). Nothing in the applicable Local or Individual Rules obviates this requirement. Rule 56(e) addresses the failure to respond stating, "if a party . . . fails to properly address another party's assertion of fact ***as required by Rule 56(c)***," the court may take certain actions. Fed. R. Civ. P. 56(e)(1)-(4) (emphasis added). Here, the Lenders made the strategic choice not to respond to Defendants' Omnibus Statement of Undisputed Material Facts. The District Court should have "consider[ed] [Defendants'] fact[s]

The District Court, however, did not credit all reasonable inferences in favor of Defendants. Indeed, the District Court went one step further, and in several instances noted that Defendants placed evidence in the record, but then disregarded and rejected the evidence instead of viewing it in the light most favorable to Defendants. A few important examples are discussed below.

**The 2007 Swap Agreement.**

Ron Dana testified that in 2008 he approached PNC about paying off or eliminating the 2007 Swap, but he was told by Stillwagon that PNC had sold the counter-party obligation to a third party and that "you can't buy it off." (A-5587, ¶459; A-3042, T157:2-8). Despite this unrebutted evidence, the District Court found just the opposite: that Stillwagon did not commit fraud and did not lie to Ron Dana when he made this statement because PNC had actually sold the 2007 Swap and was no longer the counterparty. (SPA-20). The District Court's factual finding is not true. Moreover, even if PNC had sold the 2007 Swap, which it did not, Stillwagon

---

undisputed for purposes of the motion," Fed. R. Civ. P. 56(e)(2), and granted nonmovant Defendants' summary judgment pursuant to Fed. R. Civ. P. 56(f)(1) on their defenses, including Plaintiffs' willful misconduct. At a minimum, the Lenders have failed to meet their burden to show their entitlement to summary judgment. *Monsour v. N.Y. State Office for People with Developmental Disabilities*, 2017 WL 3972044, *4 n.6 (N.D.N.Y. July 7, 2017) ("To the extent that the Lenders has placed material facts into dispute in this Counter Statement, which have not been rebutted, Defendant has failed to meet its burden of showing its entitlement to summary judgment.").

was still lying to Ron Dana when he told him that the 2007 Swap could not be paid off.

In making this error, the District Court misconstrued a July 30, 2009 email from Stillwagon to Wells Fargo, in which Stillwagon was attempting to conceal information from Wells Fargo (as he had to Ron Dana), and referred misleadingly to an unidentified "counter party" to the Swap. The specific paragraph upon which the District Court relied states: "On July 30, 2009, Stillwagon flat out lied again, this time to Wells Fargo like he had to Ron Dana earlier, about the Swap and the Counterparty thereto:

> The swap is an obligation that doesn't terminate with a default. Again, there is a counter party that chose to take a floating rate when Ron agreed to fix his rate. The swap income that was referred to does not come to PNC. It is the difference between the floating and fixed that Dana owes the other party. If you would like to talk to our capital markets area, I can arrange it. **I have no idea who the counter party is but I am sure I cannot release that information.**"

(A-5621, ¶602; A-5159) (emphasis added).

Instead of construing facts in Defendants' favor, the Court weighed evidence and then made erroneous factual determinations. Indeed, PNC does not dispute that it did not sell the 2007 Swap. A mountain of evidence established that the counterparty to the 2007 Swap was always PNC. For example, in March 2009, months after Ron Dana was told that PNC had sold the Swap and that he could not

pay it off, PNC's Michael Wagner confirmed, "Finally we have an issue with the Swap.  If we release the collateral with the repayment of the term loan we lose our cushion." (A-5603, ¶529; A-4886) (A-5615, ¶578; A-5141) (A-5616, ¶579; A-4702).  On July 16, 2009, Sari Garrick further confirmed PNC continued to receive the Swap income, "I had Guy confirm this several times as I inquired if this equated to double charging of the interest on the notational amount."  (A-5621, ¶600; A-5127).

Further, Defendants submitted evidence from PNC, *after* Stillwagon's fraudulent email, in which PNC acknowledges that PNC always maintained ownership of the 2007 Swap.  Specifically, in 2010, a year after Stillwagon's 2009 email, Garrick explained: "It appears there will not be sufficient availability at closing to completely repay the PNC debt in full, including the swap."  (A-5628, ¶634; A-5189).  "In April 2010, PNC continued to be concerned about potentially suffering a large loss as a result of the 2007 Swap, PNC concluded that a refinance of the facility or a default, 'could put us in a very bad space with the Swap loss.'" (A-5627, ¶630; A-5183).  Moreover, Defendants provided documentary evidence that Swap payments were made to PNC, not some third party, <u>until its termination in 2012</u>.  (A-5616, ¶579; A-4702).[9]

---

[9] Stillwagon's fraudulent misrepresentation to Ron Dana was made to forestall Borrowers from paying off the 2007 Swap so that PNC could continue to receive

26

### **Ron Dana's Personal Guaranty and the Changing of the Borrowing Base.**

The District Court also erroneously disregarded evidence (A-5570, ¶373; A-4688) (A-5570, ¶374; A-4689; A-4614-15; A-4650; A-4681; A-3233-34, T94:18-95-4) (A-5571, ¶376; A-3232, T87:8-12) (A-5581, ¶433; A-4733) (A-5581, ¶434; A-4735) (A-5585, ¶446; A-4783) (A-X5588, ¶464; A-2985-86, T53:10-54:5; A-3258, T87:25-88:11, T88:18-20) that the Lenders changed the way they treated Ron Dana's personal guaranty by suddenly removing the personal guaranty from the borrowing base calculation, thereby instantly, and intentionally, manufacturing a collateral shortfall. While the District Court stated that no evidence supports the proposition that the guarantee was removed from the borrowing base, *see* (SPA-21), this is demonstrably incorrect.

Huntington Bank's Thomas Opie testified that "Ron Dana's personal guarantee was a negotiated part of the borrowing base for the Second Amended Loan Agreement." (A-5571, ¶376; A-3232, T87:8-12). The record presented to the District Court showed that while there was an alleged collateral shortfall caused by the wrongful exclusion by the Lenders of pledged titles from the borrowing base at the inception of the 2007 Agreement, that alleged shortfall was anticipated and reflected in the structure of the Agreement, which provided for a $14 million

---

approximately $400,000 a month for an additional four years. (A-5616, ¶579; A-4702).

27

personal guaranty to be relied upon in calculating the available borrowing base.  (A-5579, ¶374; A-4689; A-4614-15; A-4650; A-4681; A-3233-34, T94:18-95-4).

Given the required inference the District Court should have made, the evidence submitted by Defendants established that the personal guarantee was removed expressly to manufacture a shortfall.  This was intentional.  On July 16, 2008, Wells Fargo's Dan McGonagle wrote to Garrick demanding that the Borrowing Base calculation occur without the inclusion of Ron Dana's personal guarantee creating an overadvance:

> Based on our conversation yesterday, my understanding is that PNC is in receipt of an updated rolling stock appraisal conducted by Great American that provides for a NOLV of $83MM of the Dana Transport fleet.  As reflected in Sections 2.1 and 16.2(b) of the Credit Agreement, the Formula Amount should be reduced accordingly.  In doing so, rolling stock availability falls from $94MM to 70.6MM (NOLV @ $83MM * 85%) thereby resulting in an over advance that is well in excess of these protective advance provisions at 5%.

(A-5581, ¶433; A-4733).

McGonagle then forwarded his e-mail message to a colleague, stating, "Let the games begin."  (*Id.*)  Garrick drafted an email on August 18, 2008, directing Dana to calculate the borrowing base based on the value of the appraised equipment, without consideration for the previously included guarantee or use of the $100 Million sublimit.  (A-5585, ¶446; A-4783).  This "new" borrowing base calculation had a second element:  as opposed to using the $100 million sublimit, which was

28

utilized since the inception of the loan, the Lenders changed the formula, limiting Borrowers' borrowing capacity to 85% of the decreased value the Lenders had created by wrongfully excluding units of collateral. (A-5585, ¶446; A-4783) (A-5584, ¶444; A-4474).

Further, the District Court erroneously ignored evidence that at least as of December 2008, Ron Dana's personal guarantee was no longer included in the borrowing base. (A-5588, ¶464; A-2985-86, T53:10-54:5; A-3258, T87:25-88:11, T88:18-20). This willful manipulation of the borrowing base by the Lenders not only placed Defendants in alleged default, but also tied up collateral that could have been used for other financing, and with the change in the borrowing base calculation decreased Borrowers' availability of funds.

**The Exclusion of Titles from the Appraisals.**

The District Court also disregarded evidence that the Lenders intentionally excluded titles during appraisals of Borrowers' collateral. (SPA-23-24). It held that there is "no evidence that this exclusion was intentional as opposed to inadvertent error." (SPA-24). The evidence presented by Defendants, however, shows that this collateral was intentionally omitted based on the express instructions of PNC. (A-5565, ¶357; A- 3520) ("In order to provide you with the values in this appraisal, we relied on the specification and quantity information that [Garrick and PNC] provided."); (A-5566, ¶359; A-3523, A-4035) ("[A]t the request of Ms. Garrick of

29

PNC Business Credit, qualified employees of Taylor and Martin, Inc. completed a Desktop Summary Appraisal of the Dana Transport Systems et. al.'s equipment outlined on the equipment lists provided by Ms. Garrick."). Significantly, the District Court disregarded the fact that the Lenders had no right to exclude *any* of the pledged collateral from any of the appraisals because PNC was in possession of *all* of the titles for the appraised rolling stock. PNC used a third-party agent (Hahn & Hessen, its counsel) to handle the titles on its behalf. (A-5554, ¶307; A-3046, T170:22-171:4). PNC and its agent misplaced and/or mishandled the titles that Dana had delivered. (*Id.*).

Moreover, the record presented to the District Court established that the Lenders had waived their rights to exclude collateral from the appraisal. (A-5570, ¶374; A-4689; A-4614-15; A-4681; A-4650; A-3233-34, T94:18-95-4) (A-5567, ¶363; A-4111). The initial advances under the 2006 Agreement and then the 2007 Agreement were conditioned on "the satisfaction, or waiver by Lenders" of conditions precedent, which included the provision of further documentation of their collateral, *i.e.*, the titles. (A-5559, ¶323; A-1642) (A-5567, ¶363; A-4111). The District Court improperly disregarded the Lenders' contractual waiver when it erroneously found that these breaches of the contract were merely inadvertent. It completely failed to address the fact the Lenders, by contract, had no right to exclude

collateral from the borrowing base. The Lenders' conduct was willfully wrong, and the District Court erred in concluding otherwise.

### The Lenders' Secret Conspiracy with RSI.

The District Court also disregarded copious evidence that the Lenders conspired with consultant RSI and Kasoff to grab Borrowers' collateral and force them to enter into the TALA or file for bankruptcy, while fraudulently misleading Danas as to RSI's true objectives. RSI was retained by Dana to work for Dana, on Dana's purported behalf, but the Lenders instead used RSI as their mole. According to the evidence presented by Defendants, the Lenders' scheme was to slow play Borrowers and grab collateral piecemeal because they assumed Borrowers would default on the terms of the agreements the Lenders forced upon Borrowers, an outcome the Lenders controlled. (A5590, ¶476; A-4800).

On February 12, 2009, Dana was forced to enter into a consulting agreement with RSI as a result of the Lenders' wrongful demands. (A-5596, ¶501; A-3060, T228:17-24). Wells Fargo, through Wachovia at the time, immediately began engaging in unauthorized and secretive communications with RSI, contrary to the RSI consulting agreement, which limited RSI's communications to only Dana and PNC. (A-5596, ¶499; A-4816). The record established that on March 6, 2009, RSI's Jeff Betz provided Kasoff with an updated memorandum for the scope of RSI's work, suggesting staffing of six employees for the following 12 to 14 weeks. (A-

31

5601, ¶519; A-4843).  On March 7, 2009, Kasoff forwarded the Betz memorandum to Wells Fargo's John Brady, not PNC as the Agent bank, requesting his input before discussing it with Ron Dana:

> Attached is a schedule which identified accounting controls that RSI believes should be addressed at Dana Trucking.  After these controls are implemented, the next step is to develop a 13-week cash flow.  My plan is to share this document with Ron and his outside professionals tomorrow.

(A-5601, ¶520; A-4847).

Brady responded within hours setting forth nine different suggestions for Kasoff.  (*Id.*).  On March 11, 2009, Garrick forwarded real estate appraisals to RSI, "for RSI review only.  Please do not share report with company."  (A-5601, ¶521; A-4850).  On March 12, 2009, in response to an invite to a telephone conference call between the Lenders and RSI, McGonagle noted: Meeting next week to discuss additional collateral grab/expanded role of Realizations Services."  (A-5601, ¶522; A-4853).  While RSI was supposed to be Dana's consultant, allegedly loyal to and working for Dana, it turned out that RSI was covertly acting for the Lenders, *all at the Lenders' request*.

On March 18, 2009, RSI had a secret telephone conference call with the Lenders, to which Dana was deliberately not invited, and which Kasoff took steps to make sure Dana did not know of:  "You and Jeff should "NOT" be at the Company, when the call occurs.  Dana will "NOT" be on the call." (A-5602, ¶525;

32

A-4856). An internal BMO document confirmed RSI's true role: "The overall strategy of the bank group and the consultant is to shore up the collateral position and not provide any additional liquidity. (A-5602, ¶526; 4859). On March 20, 2009, Duerfeldt wrote to the Wells Fargo team and explained: "[W]e are proposing an extension in order to give the lenders' consultants more time to fully assess operations. . . . As mentioned, the consultant for the bank group (Realization Services) is in the process of evaluating all aspects of the Company, and has suggested this structure to Wachovia and Wells as a way to get Ron Dana to commit a great deal of personal assets to facility." (A-5602, ¶527; A4880). The structure that Duerfeldt was referring to was a lender-imposed real estate term loan in which Ron Dana would pledge "a great deal of personal assets," along with a doubling of Borrowers' interest rate. (*Id.*)

Kasoff and RSI became covert informants for the Lenders, helping them find the critical assets belonging to Ron Dana individually. (A-5603, ¶532; A-3056). As Wells Fargo's Guy Fuchs confirmed, RSI was engaged solely for the benefit of the Lenders and the Lenders dictated the scope of RSI retention. (A-5604, ¶534; A-3326, T208:10-16, T209:1-15; A-3330, T237:16-21; A-4839). On March 20, 2009, McGonagle articulated to the Wells Fargo/Wachovia team the strategy with regard to the Lenders' imposed term sheet for the contemplated loan amendment: "Attached is our mark-up of the term sheet for your review. Obviously, the main

33

objective is an immediate collateral grab with buy-in from Ron Dana on an expanded role for RSI." (A-5604, ¶535; A-4888). On March 20, 2009, Wells Fargo's Laurence Forte explained to Wells Fargo's Kevin Coyle and Wachovia's Mark Fagnani the role being played by the "consultant":

> The Consultant RSI, i[s] not only known to us, they are our recommendation. However, the initial scope was not as deep an assignment as we would have liked though it was a step in the right direction. A significantly modified retention arrangement satisfactory is being executed in conjunction with proposed amendment. This, in itself is a huge benefit for us given our strong relationship with the consultant.

(A-5604, ¶536; A-4892).

Wells Fargo's strategy, as explained by Brady in his March 21, 2008 email, was as follows:

> Now if this does not work as Kevin raised to Kurt and the rest of the team, then we have Barry [Kasoff] to run the company through bankruptcy, we have more collateral to cover our exposure and we have Ron Dana personally tied to us which I believe will ultimately align his interest with ours.

(A-5605, ¶537; A-4891)

On April 2, 2009, Dana, under economic duress, was forced to sign the Lenders' proposed term sheet for the TALA. When the revised term sheet had been provided by RSI to PNC, Kasoff also forwarded it to Brady and McGonagle, to which McGonagle asked, "Has this been signed?" Kasoff, who was retained by and was supposed to be working for Dana, responded to those whom Borrowers were

34

negotiating against: "I am walking to Ron's office with the agreement now." (A-5606, ¶544; A-4915). On the next day, Brady reached out to Kasoff, stating: "Thank you for your tireless effort to get all parties on the same page as it relates to the Dana restructuring." Brady instructed Kasoff to "focus on getting the amendment closed." (A-5607, ¶547; A-4940). On April 26, 2009, Wells Fargo's Mark Bradford directed his colleague Jeff Royston: "Get it [TALA] signed or else Barry will have been the biggest wast[e] of time and money." (A-5610, ¶560; A-4965). On May 4, 2009, McGonagle expressed Wells Fargo's support for RSI to remain Dana's consultant "very much so," given the successful "collateral grab." (A-5619, ¶592; A-5143).

These undisputed facts establish that the Lenders met with RSI behind Dana's back and plotted with RSI against Dana, despite the evidence in the record of RSI's duties and obligations it owed to Dana. At the very minimum, there is a genuine material issue of fact regarding whether the Lenders fraudulently conspired with RSI to harm Dana. (A-5596, ¶499; A-4816); *see also* (A-5590, ¶476; A-4800) (A-5595, ¶495; A-3269, T204:19-23) (A-5601, ¶518; A-4841; A-3049, T183:2-11) (A-5601, ¶519; A-4843) (A-5601, ¶520; A-4847) (A-5601, ¶521; A-4850) (A-5601, ¶522; A-4853) (A-5602, ¶525; A-4856) (A-5602, ¶526; A-4859) (A-5602, ¶527; A-4880) (A-5603, ¶528; A-4883) (A-5603, ¶529; A-4886) (A-5603, at ¶530; A-3049, T183:2-11) (A-5603, ¶531; A-3056, T210:4-8, T211:13-16) (A-5604, ¶532; A-3056, T211:17-18) (A-5604, ¶533; A-3054, T203:7-12) (A-5604, ¶534; A-3326,

T208:10-16, 209:1-15; A-3330, T237:16-21; A-4839) (A-5604, at ¶535; A-4888)
(A-5604, ¶536; A-4892) (A-5605, ¶537; A-4891) (A-5605, ¶538, A-4894) (A-5605,
¶539; A-4896) (A-5606, ¶540; A-3221, T195:1-6) (A-5606, ¶544; A-4915) (A-
5607, ¶545; A-4929, A-4938) (A-5607, ¶547; A-4940) (A-5609, ¶555; A-4949-50)
(A-5610, ¶560; A-4965) (A-5611, ¶562; A-4968; A-2797, T100:9-19; A-2801,
T104:9-18; A-2817, T120:11-15); (A-5655); (A-5619, ¶592; A-5143).

Under the governing summary judgment standard, which the District Court
misapplied, all inferences in favor of Defendants' evidence of a conspiracy and a
fraudulent scheme between RSI and the Lenders should have been credited to
Defendants. Instead, the District Court erroneously found that such conduct "speaks
to the consultant's conduct, not Lenders'." (SPA-25).

**B.** **The District Court Also Failed To Properly Consider Additional Instances Of The Lenders' Willful Misconduct Contained In The Record.**

The District Court also improperly ignored other instances of the Lenders'
wrongful conduct highlighted by Defendants in their submissions.

For example, the District Court excused much of the Lenders' willful
misconduct because it accepted the Lenders' evidence (disputed by the Defendants)
that Defendants defaulted on their loan obligations, and therefore the Lenders were
permitted to extort, lie to, and conspire with others to injure the Defendants. (SPA-
22). But the District Court failed to properly consider, and credit, the evidence

36

submitted by Defendants that showed that it was the Lenders who *first* breached the loan agreements by, among other things, ignoring titles provided by Borrowers (A-5555, ¶307; A-3134.11-.12, T54:23-55:5), declaring a collateral shortfall even though they had waived the right to seek further collateral documentation from Borrowers for those titles (A-5559, ¶323; A-1642), wrongfully removing Ron Dana's personal guaranty from the borrowing base calculation (A-5581, ¶433; A-4733), and violating law in connection with the sale of the Swaps (A-5555, ¶311; A-2665). The District Court reached its finding despite acknowledging that there was evidence of wrongdoing in connection with the missing titles, but once again excused the Lenders' behavior on the basis that the exclusion may have been "inadvertent error." (SPA-23-24). This is wrong. Defendants' evidence showed that the Lenders used the missing titles to grab more collateral from Defendants contrary to the terms of the loan agreements. Moreover, intentionality is irrelevant to the question of whether the Lenders committed a breach of contract first. *See Harkabi v. SanDisk Corp.*, 891 F. Supp. 2d 527, 546 (S.D.N.Y. 2012) ("Proof of motive or state of mind is not necessary to prevail on a breach of contract claim."). What matters for purposes of the Lenders' motions for summary judgment is that there are genuine disputes of material fact (which were presented to the District Court) regarding which party breached first.

37

The District Court also ignored that the Lenders contemporaneously conceded that the claimed defaults attributed to Dana were not true defaults. (A-5625, ¶623; A-5179) (A-5647, ¶724; A-3145, T56:8-15) (A-5647, ¶725; A-3146, T58:17-23). Finally, even if Defendants were in default, this did not give the Lenders the right to perpetrate multiple frauds on Defendants. At minimum, there are genuine disputes of material fact regarding whether the Lenders participated in the RSI fraudulent scheme. Based on this contested factual record, it was improper for the District Court to grant summary judgment to the Lenders. Further, as set forth above, the District Court simply dismissed the mountain of evidence that the Lenders used RSI as part of a fraudulent scheme to grab collateral and force different loan terms on Dana by stating, "that speaks to the consultant's conduct, not Lenders.'" (SPA-25)

Similarly, the District Court did not credit or substantively analyze the several unlawful acts committed by the Lenders discussed below.

**Omission of Swap Risks.**

PNC, as the Agent, failed to (i) provide Borrowers with disclosures regarding the Swap agreements, (ii) provide Borrowers with a full explanation of the risks associated with the Swap agreements, and (iii) follow applicable law before entering into the Swap agreements with Borrowers. *See, e.g.*, (A-5555, ¶311; A-2665; A-3149, T80:13-18; A-3184, T119:3-25, T121:10-15; A-3186, T126:3-8; A-3162-63, T309:7-310:5) (A-5575, ¶401; A-3174, T217:7-14). For example, despite being 16

38

pages long, the December 2, 2005 Swap PowerPoint presentation created by PNC for Borrowers contained half-truths. It contained virtually no discussion of the risks of entering into a Swap, but only touted the supposed benefits, stating: "Fixed Rate Swaps may accrue positive value to Clients as interest rates rise, and can potentially be terminated prior to maturity, with such positive value that exists being paid to the Client (At best, traditional fixed rate products may be terminated with no penalty)." (A-5557, ¶312; A-3398). The PNC PowerPoint presentation contained no disclosure of what would happen if interest rates declined. Only the upside was represented. (A-5557, ¶312; A-3389).

The projection of future Libor Rates contained in the PNC PowerPoint presentation was accompanied by the following disclaimer: "Regardless the direction of Libor, the borrower has locked in an All-in Fixed Rate = 7.45%." (A-5557, ¶315; A-3401). The presentation did not disclose what would happen to the "All-in Fixed Rate" if the Lenders later unilaterally changed the terms of the underlying loan – which they did – by putting in a Libor floor, which increased the interest rate spread. At the time the 2007 Swap was entered into by Borrowers and PNC, PNC's internal modeling showed a credit exposure of approximately $10 million (A-5576, ¶406; A-3184, T120:18-121:15; A-3185-86, T125:16-126:8), which PNC failed to disclose to Borrowers. (A-5576, ¶407; A-3185-86, T125:16-126:8). PNC also failed to advise Borrowers of alternatives to Swap agreements. (A-

39

5576, ¶409; A-3171, T161:12-17; A-3172-73, T162:22-163:3; A-2668). *See also* (A-5557, ¶313; A-3158, T137:6-11) (A-5557, ¶314; A-3389) (A-5558, ¶316; A-3389) (A-5558, ¶317; A-3184, T121:4-9; A-3184-85, T121:22-122:10) (A-5555, ¶311; A-2665; A-3149, T80:13-18; A-3184, T119:3-25, T121:10-15; A-3186, T126:3-8; A-3162-63, T309:7-310:5) (A-5575, ¶401; A-3174, T217:7-14) (A-5575, ¶402; A-3404) (A-5575, ¶403; A-2990-91, T152:15-153:3) (A-5575, ¶405; A-2667) (A-5576, ¶407; A-3185-86, T125:16-126:8) (A-5576, ¶408; A-2668 n.9) (A-5576, ¶409; A-2668; A-3171, T161:12-17; 3172-73, T162:22-163:3).

## The Libor Floor.

As a direct result of the Lenders' fraudulent scheme with RSI, the Lenders forced Borrowers to execute the TALA by using threats of ceasing all funding and forcing the shutdown of Borrowers' operations. The TALA contained the following terms: (a) a reduction of the Loan amount from $135 million to $125 million; (b) a reduction in the advance rate from 85% to 75%; and (c) significantly higher interest rates (Prime + 4% or Libor + 4.25%) and a 3% Libor floor. (A-5611, ¶562; A-4968). The combination of the increase in spread and 3% Libor floor effectively doubled Borrowers' interest rate in one day. Ron Dana explained the fraud and duress surrounding the TALA: "Yeah; with a gun to my head. Sign it or we don't fund. They told me I was going to get liquidity. I got nothing. Never did I ever get cash. They reduced my advance rate. They - - they misrepresented the appraisal." (A-

40

5611, ¶562; A-2797, T100:9-19; A-2801, T104:9-18; A-2817, T120:11-15; A-4968).

"I was going to use the real estate to generate cash and they - - they took anything that had value. They took additional collateral. They took the real estate. (A-5611, ¶562; A-2801, T104:9-18).

The was because the insertion of a Libor floor of 3% (despite 30-day Libor being a mere 0.45% at the end of April 2009) into the TALA "double billed" Borrowers for the same interest obligation they had already been paying because Borrowers were already obligated under the 2007 Swap to cover the difference between the starting Libor base rate (5.17%) versus the market 30-day Libor rate (which had fallen to 0.45% by mid-2009). (A-5614, ¶571, A-4968; A-5127). By 2009, Borrowers were paying almost 8% for their Libor obligation, despite actual Libor being around 0.25%. (A-5615, ¶573). PNC was aware of the impact of double billing that resulted from the imposition of the Libor floor. Upon learning of this development, PNC's James Isler sent Kossuth an email message congratulating him and stating, "nice job on selling a swap with an embedded floor – that's no easy task!" (A-5615, ¶574; A-5132).

### Downgrading of Borrowers' Credit Rating.

In order to maintain control of Borrowers, their cash flow, and their ability to escape the Lenders' grasp, the Lenders downgraded Borrowers' credit rating to make it appear that it was a problem loan when it was not. Just as the Lenders planned,

increasing Borrowers' debt service decreased their ability to meet their financial covenants. (A-5646, ¶715; A-2673) (A-5646, ¶716; A-3259, T186:6-10). The Lenders took these actions despite their recognition that the ultimate collection of unpaid principal and interest was *not in question*. (A-5609, ¶555; A-4949-50). Notwithstanding the evidence presented by Defendants, the District Court held that Defendants were unable to explain how these actions breached any agreement or were otherwise wrongful. This was incorrect and constituted reversible error.

### **Wrongfully Jamming Fees on Borrowers.**

As Borrowers were on the cusp of refinancing the loan in late 2012, the Lenders "jammed" Borrowers with "obnoxious" fees just to make the refinancing more difficult and get their last chunk of cash from Borrowers despite their continual representations that they wanted the loan paid off. (A-5642, ¶697; A-5146) (A-5631, ¶652; A-5247). On January 7, 2013, after receiving news that Focus Management, a second consultant forced on Borrowers by Lenders, was reporting that the loan would be paid off the following Monday, PNC CEO Bill Kosis responded: "Good news….time to get off it. Any fees left to collect?" to which Stillwagon responded, "I think so. We jammed so many fees on him the last few extensions and some were back ended if I remember right." (A-5642, ¶697; A-5146). *See, e.g.*, (A-5631, ¶652; A-5247), A-5645, ¶711; A-3036, T132:13-17; A-3037, T134:6-12; A-5461; A-2670).

Throughout the lending relationship, the Lenders engaged in a continuous pattern of economic duress, strangling Borrowers, to force Borrowers to cede to their unjustified demands, despite the fact that the Lenders acknowledged repeatedly that the loan was over collateralized and that Borrowers' economic performance remained better than its competitors and had improved markedly. On January 10, 2012, Focus Management's Michael Grau explained Borrowers' financial performance since the execution of the TALA in April 2009:

- Since we became involved [May of 2009], Dana has made every monthly principal payment. (22.3M)

- During the same time, Dana has also covered all default interest + above market swap interest;

- Monthly revenues ([year over year]) have increased for 25 consecutive months. Revenues for 11 mos. Ended 11/30 are up $27mm over same prior period (although some id fuel surcharge pass-through; net normalized increase of 5%).

(A-5632, ¶659; A-5252). Regardless, the Lenders continued to pound Dana with unjustified fees. *See, e.g.*, (A-2669-70; A-5655).

The District Court improperly took it upon itself to explain away these acts of willful misconduct stating that they were allegedly "unsupported by the record or irrelevant to willful misconduct because they do not suggest intentional breaches of any contract." (SPA-18). In so holding, the District Court ignored that (i) each alleged act of willful misconduct was supported by largely undisputed evidence, (ii)

43

Defendants, as non-movants, were entitled to all reasonable inferences in their favor, (iii) the Lenders' conduct, in part, did intentionally breach the contract (seeking further title documentation despite waiving the right to do so and manufacturing an alleged collateral shortfall by excluding pledged collateral from the borrowing base), and (iv) with the proper application of the summary judgment standard, there are genuine disputes of fact as to whether the Lenders' actions were willfully wrong.

### C. Issues Of Fact Exist As To What The Parties Understood "Willful Misconduct" To Mean Under The TALA.

The District Court held: "While there is some uncertainty as to the full scope of behavior that is captured by the term 'willful misconduct' under New York law, that law also makes clear that 'willful misconduct,' as used in a contractual limitation of liability provision, is frequently capable of interpretation by courts - and that such 'willful misconduct' requires, at the very least, an intentional breach of contract." (SPA-15). This is reversible error because there is a genuine dispute of material fact regarding the parties' understanding of that term.

Defendants rebutted the Lenders' arguments regarding the Lenders' proposed meaning of the term. The Defendants showed that while the TALA includes an extensive definition section, it does not define "willful misconduct." "'Willful' is a notoriously ambiguous word, which can indicate any of a number of mental states." *Johnson & Johnson v. Guidant Corp.*, 525 F. Supp. 2d 336, 349 (S.D.N.Y. 2007). The very fact that the parties are vigorously disputing the meaning of the term

44

"willful misconduct" due to its ambiguity and the lack of a definition in the TALA, makes it clear that whether the Lenders acted with willful misconduct is, at minimum, an issue that is not at all ripe for summary judgment in favor of the Lenders. *See Sayers v. Rochester Tel. Corp. Supplemental Mgmt. Pension Plan*, 7 F.3d 1091, 1094 (2d Cir. 1993) ("In a contract dispute a motion for summary judgment may be granted only where the agreement's language is unambiguous and conveys a definite meaning. . . . If the language is susceptible to different reasonable interpretations . . . then the contract's meaning becomes an issue of fact precluding summary judgment.").

In *Metropolitan Life Insurance v. Noble Lowndes International Inc.*, 84 N.Y 2d 430 (1994), the term "willful" was, like here, not defined in the relevant agreement. The New York Court of Appeals held that to determine the meaning of "willful misconduct," a court does "***not*** [look] to how we and other courts have construed 'willful' in other contexts," but "[r]ather, . . . what the parties intended by 'willful [misconduct]' as an exception to their contractual provision," here, limiting indemnity. *Id.* at 435. Thus, "[t]he question in this case is what the parties meant when they used 'willful' in the Agreement." *Johnson & Johnson*, 525 F. Supp. 2d at 351.

The Lenders failed to point to any evidence that demonstrates what the parties meant by the term "willful misconduct." The Lenders deposed Ron Dana and Rudy

45

Deseo (Borrowers' CFO) over the course of two days each and did not ask them a single question related to their understanding of the term or the scope of the exclusion in the indemnity provision in the TALA.  Throughout the TALA (*see, e.g.*, TALA §§ 2.13, 2.16, 2.17, 14.2, 14. 7, and 15.1), willful misconduct is discussed in conjunction with the term "gross negligence."   Section 14.7 is particularly instructive because it deals with indemnification as between the Lenders (Participant Banks) and the Agent Bank, PNC, and provides, in relevant part, that "Lenders shall not be liable for any portion of such liabilities . . . resulting from Agent's gross (not mere) negligence or willful misconduct."  While gross negligence is also undefined in the TALA, the New York Pattern Jury Instructions – Civil §2:10A defines the term as "a failure to use even slight care, or conduct that is so careless as to show complete disregard for the rights and safety of others."  *Accord* BMO Br. (ECF No. 153) at 16 n.17; PNC Br. (ECF No. 160) at 16 n.7; Wells Br. (ECF No. 162) at 12 n.8.  To equate willful misconduct with gross negligence as between the Lenders and the Agent, but to require a higher standard of willful misconduct requiring malice (defined as unjustifiable intent to commit a wrong or ill will) as between the Lenders and Defendants – as the Lenders argued to the District Court – is patently unfair and contrary to fundamental tenets of contract law.  "A court will endeavor to give the [contract] construction most equitable to both parties instead of the construction

46

which will give one of them an unfair and unreasonable advantage over the other." *Metropolitan*, 84 N.Y.2d at 438.

### D. The District Court Erred In Holding That There Were No Issues Of Material Fact In Dispute As To Defendants' Affirmative Defenses.

The Lenders failed to demonstrate that there are no genuine disputes of material fact as to Defendants' affirmative defenses.

#### 1. Economic Duress

The District Court relied on *Interpharm, Inc. v. Wells Fargo Bank N.A.*, 655 F.3d 136, 142 (2d Cir. 2011), for the proposition that economic duress as an affirmative defense requires: "(1) a threat, (2) which was unlawfully made, and (3) caused involuntary acceptance of contract terms, (4) because the circumstances permitted no other alternative." (SPA-12).

The record presented to the District Court contained substantial evidence of all four elements. Defendants showed that the Lenders unlawfully threatened to immediately stop funding the existing loan if Borrowers did not sign multiple loan documents and guarantees, thereby irreparably destroying Borrowers' businesses. While the District Court stated that "[t]his theory fails because Dana describes nothing more than the Lenders' threats to exercise their legal rights," this ignored the ample evidence in the record that such threats were unlawful as they were premised on, *inter alia*, (i) intentional breaches by the Lenders of their agreements with Borrowers (such as the Lenders' unlawful actions in connection with the

47

appraisals of Borrowers' collateral and exclusion of collateral to falsely claim the existence of a shortfall), and (ii) fraudulent misrepresentations and omissions related to the 2007 Swap, including the identity of the counterparty and the risks associated with the Lenders' insertion of a Libor floor into the loan.  *See supra* Sections II.A and II.B.

Moreover, *Interpharm* is distinguishable.  There, the bank simply exercised its *legal* rights under the agreement.  *Interpharm*, 655 F.3d at 142-147.  As the Second Circuit held, threatening conduct constitutes duress only when it is "wrongful," which means it is "outside a party's legal rights." *Id.* at 142.  Here, the existence of ample disputes of material fact should have precluded the District Court from finding that the Lenders' threats were not wrongful.

The District Court also improperly found that Dana ratified the TALA and, thus, could not assert economic duress. (SPA-11).  The record, however, established that Borrowers signed the loan documents presented to them under economic duress arising from the Lenders' wrongful unlawful threats and did not have adequate legal remedies and alternatives to signing these documents.  For example, Ron Dana testified that filing for bankruptcy would not have been a viable option for his companies because Borrowers would immediately have lost their largest clients. (A-5652, ¶730; A-2816-17).  This testimony was uncontroverted.

Also, Borrowers were unable to obtain an alternative source of financing until 2013. As a direct result of the Lenders' continued misconduct, other potential lenders declined to enter into loan transactions with Borrowers because of Borrowers' low credit ratings, lack of liquidity, and inability to explain why they were paying an all-in interest rate of more than 14%. (A-5652, ¶731; A-2808; A-2812-13). Additionally, Borrowers could not have operated their businesses if the Lenders ceased financing while a lawsuit for breach of contract against the Lenders was pending. Moreover, the District Court ignored that ratification is not a bar against asserting fraud or fraud in the inducement. *See Aboutaam v. El Assaad*, 2020 WL 1547458, at *12 (S.D.N.Y. Mar. 31, 2020) ("Ratification is not a defense to fraudulent inducement.").

The Lenders also argued before the District Court that Defendants should have asserted economic duress more promptly. (SPA-11). But, the Lenders ignore the fact that the wrongful economic duress imposed by them on Defendants lasted until Borrowers were finally able obtain alternative financing and begin to recover from the extortionist scheme perpetrated by the Lenders (and RSI).[10] Thus, the Lenders

---

[10] *See*, *e.g.*, *Cont'l Cas. Co. v. Boughton*, 695 F. App'x 596, 598 (2d Cir. 2017) (ratification occurs only where, "after having the requisite knowledge" of fraud, a party affirms the agreement despite such knowledge).

49

cannot demonstrate, as a matter of law, that Defendants did not have a good reason not to bring their action in this court until 2015.[11]

## 2. Fraud and Fraudulent Inducement

The District Court held that Defendants' fraud and fraudulent inducement affirmative defenses fail primarily because they have "not identified any material false representation by Lenders on which Dana relied." (SPA-26). This is incorrect. As set forth above, the District Court erred in its factual finding that the 2007 Swap was sold to a counterparty and that Stillwagon did not lie to Ron Dana about the inability pay it off. *See supra*, Section II.A. Defendants provided the District Court with facts supporting numerous material misrepresentations and omissions that the Lenders made, and Defendants relied upon. For example, the Lenders concealed from Defendants the material fact that the Lenders were directly responsible for the decreased appraisal based on their direction to the appraiser to exclude certain collateral. The Lenders also misrepresented their covert relationship and

---

[11] *See, e.g., Austin Instrument v. Loral Corp.*, 29 N.Y.2d 124, 133 (1971) (finding duress continued in effect during parties' contractual relationship); *Sosnoff v. Carter*, 165 A.D.2d 486, 492 (1st Dep't 1991) (finding there may have been continuous duress such that repudiation was not feasible); *McNichol v. Falco*, 2020 WL 5802492, at *9 (S.D.N.Y. Sept. 28, 2020) ("Repudiation generally is an issue of fact, and New York courts have not established a bright line rule regarding what constitutes timely repudiation before a party will be deemed to have ratified an agreement.").

communications with RSI.  Moreover, the District Court wrongfully drew inferences in favor of the Lenders – *the movants* – and held that "to the extent Lenders may have erred in appraising the value of Dana's collateral or in failing to disclose the full risks of the swap agreements, Dana has failed to establish these constituted intentional misstatements or that Dana relied on those misstatements in executing the TALA." (SPA-26).  The Court made this reversible error despite the fact that (i) the 2007 Swap misrepresentation related to an obligation for Borrowers to make Swap payments included under the TALA (A-5611, ¶562; A-4990-91), (ii) the collateral "misstatement" caused Borrowers to provide tens of millions of additional and unnecessary collateral  (A-5611, ¶562; A-4968; A-2797, T100:9-19; A-2801, T104:9-18; A-2817, T120:11-15), and (iii) both misstatements wrongfully cost Borrowers millions of dollars (A-5651, ¶728; A-2682; A-2668, A-2670).  Further, in determining whether actions were intentional, the District Court drew all inferences in favor of the Lenders, despite the fact that intent should be determined by the fact-finder.  *See Net2Globe Int'l, Inc. v. Time Warner Telecom of N.Y.*, 273 F. Supp. 2d 436, 450 (S.D.N.Y. 2003).

### 3.   Public Policy

In support of its position that the indemnification provision does not violate public policy, the District Court cited two cases – *Austro v. Niagara Mohawk Power*

*Corp.*, 487 N.E.2d 267 (N.Y. 1985), and *Metropolitan*, 643 N.E.2d at 509. These cases, however, are inapplicable here.

In *Austro*, the court was not dealing with whether the injured party can recover from the party that caused the injury but whether the party who caused the injury can then be indemnified by another party for the payment made to the injured party. Here, based on the Lenders' position that this indemnification provision applies to interparty claims, the Lenders are using the indemnification provision to attempt to absolve themselves of *all* liability vis-a-vis the party (or parties) injured by their unlawful activities – Borrowers. This distinction was explicitly recognized in *Austro* where the New York Court of Appeals *overruled* the Appellate Division because it "failed to distinguish between the exculpatory clause which typically deprives a contracting party of the right to recover for damages suffered as the result of the exonerated party's tortious act, and indemnity contracts that simply shift the source of compensation without restricting the injured party's ability to recover." *Austro*, 66 N.Y.2d at 676. The District Court's reliance on *Austro* is thus misplaced.

Likewise, in *Metropolitan*, the defendant was not seeking to absolve itself of all liability to the plaintiff. There was no dispute that the defendant would be liable for direct (or out of pocket) damages. Rather, the dispute related to a clause *limiting liability* to those direct damages such that the defendant would not be liable for "loss of profit, loss of business, or other financial loss" unless such damage arose out of

"intentional misrepresentations" or from "willful acts or gross negligence." 84 N.Y.2d at 433-34. In that case, the court held that "*limiting defendant's liability for consequential damages* to injuries to plaintiff caused by intentional misrepresentations, willful acts and gross negligence does not offend public policy." *Id.* at 438 (emphasis added). In this case, the Lenders are seeking to hide behind the indemnification clause to protect themselves against *all* liability for their misconduct, as the Lenders are arguing that the indemnification provision, *assuming it applies to interparty claims*, would absolve them of all liability for their actions directed towards the Borrowers.

In any event, even if one measures the Lenders' conduct against the conduct at issue in *Austro* and *Noble*, the Lenders have still failed to carry their burden. As explained above, the Lenders knew that their unlawful scheme to extort millions of dollars of unearned payments and fees from Borrowers inflicted damages to Borrowers. (A-5642, ¶697; A-5146). As such, public policy prevents the Lenders from recovering the attorneys' fees they incurred in defending claims asserted by Borrowers that were based on such intentional misconduct.[12]

---

[12] For the same reasons, the indemnification provision *as interpreted by the Lenders* is unconscionable because it would allow the Lenders to secure indemnification for their purposefully committed wrongful actions aimed at extorting millions of dollars of unlawful fees and payments from Borrowers.

53

### 4.    Good Faith and Fair Dealing

 "In New York, all contracts imply a covenant of good faith and fair dealing in the course of performance." *511 W. 232nd Owners Corp. v. Jennifer Realty Co.*, 98 N.Y.2d 144, 153 (2002).  As such, the Lenders had a duty of good faith and fair dealing, which included an obligation not to take any action that would frustrate the purpose of the contracts they had entered into with Borrowers.  Evidence was presented to the District Court that the Lenders did just that.

The Lenders breached this duty by threatening to cease funding unless Borrowers signed the TALA that doubled Borrowers' interest payments.  The Lenders inserted into the TALA a 3% Libor floor despite the fact that, under the 2007 Swap, there was no such floor.  The imposition of the Libor floor resulted in an effective "double billing" of Borrowers.  (A-5652, ¶729; A-2671).  Realizing this stunning event, PNC's internal emails congratulated the marketer for a "nice job on selling a swap with an embedded floor – that's no easy task!"  (A-5615, ¶574; A-5132).  The marketer (Kossuth) then responded that the Libor floor was a great "way to skin a cat – Rock on"—with Dana presumably being "the cat."  (A-5615, ¶576; A-5136).  The law, however, does not permit a party to enter into a contract and then intentionally frustrate the other party's purpose for entering into the contract.[13]  Here,

---

[13] *See, e.g., KeyBank Nat'l Ass'n v. Franklin Advisers, Inc.*, 616 B.R. 14, at 41-42 (S.D.N.Y. May 4, 2020) (denying motion to dismiss based on allegation that the

the imposition of the 3% Libor floor breached the Lenders' duty of good faith and fair dealing. The Lenders also intentionally frustrated the purpose of the contract by excluding collateral and guaranties from the borrowing base in an unlawful attempt to force Borrowers to pledge additional collateral. *See supra*, Section II.A.

Finally, "[g]enerally whether a party to a contract has failed to act in good faith will be a question of fact, not to be resolved by motion unless viewing the evidence most favorably to the nonmoving party no reasonable trier of the fact could find otherwise." *Zilg v. Prentice-Hall, Inc.*, 515 F. Supp. 716, 719 (S.D.N.Y. June 9, 1981). The District Court, in error, decided this question as a matter of law even though the evidence was to the contrary.

### III. THE DISTRICT COURT SHOULD HAVE DENIED THE LENDERS' SUMMARY JUDGMENT MOTION BECAUSE THE PRE-CONDITIONS FOR FILING SUCH MOTION HAD NOT BEEN SATISFIED.

It is the Lenders' burden to establish that they are entitled to fees. *See Kahlon v. Yitzhak*, 270 F. Supp. 3d 583, 589 (E.D.N.Y. 2017). Here, the Lenders' motions should have been denied because the Lenders were unable to satisfy their burden that pre-conditions for entitlement to recovery had been satisfied.

---

"defendants breached an implied covenant of good faith and fair dealing by withholding stock to which [the plaintiff was] entitled and by requiring that [the plaintiff] release its claims against the other [l]enders as a condition to receiving that which the plaintiff was entitled to receive under the parties' underlying agreement").

The indemnification provision in Section 16.5 of the TALA expressly states that it will not apply "to the extent that any of the foregoing arises out of the willful misconduct of the party being indemnified (*as determined by a court of competent jurisdiction in a final and non-appealable judgment*)." (A-5070). This Section does not state what court needs to make this determination. In opposition to the Lenders' motion for partial summary judgment, Defendants presented evidence to the District Court establishing that the Lenders' misconduct was willful. However, the District Court disregarded that evidence and held that, at least with respect to the TALA, the Lenders' conduct was not willful. The District Court, ignored, however, that another court of competent jurisdiction was in the midst of deciding whether the Lenders' conduct was "willful."

As set forth above, Borrowers filed an action in the Superior Court of New Jersey alleging, *inter alia*, that the actions of the Lenders and others as they relate to the TALA and other loan-related agreements constituted willful misconduct. *See* District Court Docket, ECF No. 76-3. In 2022, after six years of litigation, the New Jersey trial court judge entered an order granting-in-part and denying-in-part the Lenders' summary judgment motions finding that disputes as to material issues of fact exist as to Defendants' claims for breach of fiduciary duty, tortious interference with prospective business relations, fraudulent concealment, and fraudulent inducement. *See* District Court Docket, ECF No. 230-1. The Lenders

are now appealing (on an interlocutory basis) one issue related to that order: whether a portion of the forum selection clause in the TALA required the New Jersey action to be brought in New York. Thus, unless modified in the future, the Superior Court of New Jersey is (and has been found to be) "a court of competent jurisdiction" to hear Defendants' willful misconduct claims. Therefore, it was premature for the District Court to grant Plaintiffs' motion.

New York law provides that the determination by a "court of competent jurisdiction in a final and non-appealable judgment" is a substantive requirement and a condition precedent to standing for bringing forth a cause of action where the contract contains such a provision. *See Zyburo v. Continental Cas. Co.*, 60 F. Supp. 3d 531, 534-35 (S.D.N.Y. 2014). Accordingly, the Lenders' applications for fees and costs were premature and should have been denied because a contractually-agreed upon precondition had not been satisfied.

## CONCLUSION

For all of the reasons set forth herein, the decisions and orders of the District Court should be reversed.

Dated: January 17, 2024
          */s/ Jan Alan Brody*
          **CARELLA, BYRNE, CECCHI,**
          **BRODY & AGNELLO, P.C.**
          James E. Cecchi, Esq.
          Jan Alan Brody, Esq.
          5 Becker Farm Road

Roseland, New Jersey 07068
(973) 994-1700
jcecchi@carellabyrne.com
jbrody@carellabyrne.com

## **<u>CERTIFICATE OF COMPLIANCE</u>**

Pursuant to Rule 32(a)(5) of the Federal Rules of Appellate Procedure, the foregoing brief is in 14-Point Times New Roman proportional font and contains 13,928 words and thus is in compliance with the type-volume limitation set forth in Rule 32(a)(7)(B) of the Federal Rules of Appellate Procedure.

**Dated**: January 17, 2024
       Roseland, New Jersey

*/s/ Jan Alan Brody*

**CARELLA, BYRNE, CECCHI, BRODY & AGNELLO, P.C.**
James E. Cecchi, Esq.
Jan Alan Brody, Esq.
5 Becker Farm Road
Roseland, New Jersey 07068
(973) 994-1700
jcecchi@carellabyrne.com
jbrody@carellabyrne.com

# Special Appendix

**i**

## SPECIAL APPENDIX
## TABLE OF CONTENTS

| | Page |
|---|---|
| Order, dated September 22, 2017 | SPA-1 |
| Opinion and Order, dated August 26, 2022 | SPA-2 |
| Opinion and Order, dated September 5, 2023 | SPA-29 |

SPA-1

USDC-SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC#:
DATE FILED: 9/22/2017

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

PNC BANK, NATIONAL ASSOCIATION,
WELLS FARGO CAPITAL FINANCE,
LLC, WELLS FARGO BANK, NATIONAL
ASSOCIATION, BMO HARRIS BANK,
HUNTINGTON NATIONAL BANK,
CATHAY BANK, and BANK LEUMI, USA,

                 Plaintiffs,

           v.

DANA TRANSPORT, INC. and RONALD
B. DANA,

                 Defendants.

No. 16-CV-7797 (RA)

ORDER

RONNIE ABRAMS, United States District Judge:

     For the reasons stated today on the record, Defendants' Motion to Dismiss Plaintiffs'

Complaint or Alternatively to Stay this case is denied.  The parties shall submit a joint letter and

proposed case management plan by October 6, 2017.

     The Clerk of Court is respectfully requested to terminate the motion pending at docket

number 33.

SO ORDERED.

Dated:   September 22, 2017
         New York, New York

Ronnie Abrams
United States District Judge

SPA-2

USDC-SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC#:
DATE FILED: 08/26/2022

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

PNC BANK, N.A. et al.,

                 Plaintiffs,

      v.

DANA TRANSPORT, INC. and
RONALD B. DANA,

                 Defendants.

---

No. 16-CV-7797 (RA)

OPINION AND ORDER

RONNIE ABRAMS, United States District Judge:

      Plaintiffs PNC Bank, National Association; Wells Fargo Capital Finance, LLC; Wells Fargo Bank, National Association; BMO Harris Bank; Huntington National Bank; Cathay Bank; and Bank Leumi, USA (collectively, "Plaintiffs" or "Lenders") are a syndicate of banks that had varying participation interests in a loan facility that was provided to Ronald B. Dana and his company, Dana Transport, Inc. (collectively, "Defendants" or "Dana"). Pursuant to the terms of the loan agreement between the parties, Dana is obligated to indemnify Plaintiffs for attorneys' fees that Plaintiffs incur in any action initiated by Dana that is related to the loan agreement.

      Plaintiffs filed this suit in 2016, alleging that Dana owed them attorneys' fees that they had incurred in defending an action Dana had brought in this District in 2015. Now before the Court are three motions for partial summary judgment, in which Plaintiffs seek a ruling that Dana is liable for those fees. For the reasons that follow, the motions are granted.[1]

---

[1] The Court also grants the parties' joint request to seal Exhibits 6, 7, and 8 to the Declaration of Joshua Peles for the reasons expressed in the parties' letter motion.

## BACKGROUND

The Court assumes the parties' familiarity with the factual and procedural history of this case, and therefore discusses only those facts that are necessary to resolve the instant motions.

### I.    Factual Background

Ron Dana is the founder, president, and sole owner of Dana Transport, Inc., a company that transports bulk liquid materials. Dana's 56.1 ¶ 302.[2] Around March 15, 2004, Dana Transport entered into a $20 million line of credit and security agreement with PNC Credit (the asset-based lending group of PNC Bank, N.A.), which was secured by Dana's trade receivables. PNC's 56.1 ¶ 1. Around January 26, 2006, this line of credit was superseded by a syndicated $135 million loan facility (the "2006 Loan Agreement"). *Id.* ¶ 2. PNC served as the agent for the lending group in connection with the 2006 Loan Agreement. *Id.* ¶ 4. Advances under the 2006 Loan Agreement were to be secured by, among other things, Dana's rolling stock (including the vehicles in the company's fleet). *Id.* ¶ 8. In connection with the 2006 Loan Agreement, PNC and Dana entered into a fixed interest rate swap transaction. Dana's 56.1 ¶ 332.[3] Also in connection with the 2006

---

[2] Unless otherwise noted, citations to paragraphs of a party's Rule 56.1 statement encompass citations to the exhibits cited in those paragraphs.

Additionally, while the Court declines to strike Dana's Rule 56.1 statement, as Lenders request, Dana's legal arguments that are made in that statement and in its counterstatements to Lenders' 56.1 statements are impermissible and will thus be disregarded. *See Simmons v. Woodycrest Ctr. for Human Dev., Inc.*, No. 10-CV-5193 (JSR), 2011 WL 855942, at *1 n.1 (S.D.N.Y. Mar. 9, 2011) (disregarding a Rule 56.1 statement in part because several of its purported facts were "legal conclusions"). Specifically, Dana either denies or admits with clarification many statements of fact in Lenders' 56.1 submissions—but disputes those facts solely on the basis of legal arguments, rather than based on competing evidence. *See, e.g.,* Dana's Counterstatement to PNC's 56.1 ¶¶ 17, 20, 21, 22, 25, 26, 64, 65, 66, 67, 68, 69, 70, 71, 72, 73, 74, 77, 82, 83, 84, 87, 88, 89, 90, 91, 92, 93, 94, 95, 97, 98, 99, 101, 102, 104, 105, 107, 108, 116, 122, 127, 128, 130, 132, 133, 134, 135, 136, 137, 138, 144, 147, 153, 155, 157, 158, 160, 163, 164, 166, 167, 168, 170, 171, 172, 174, 176, 178, 179, 180, 181, 182, 183, 185, 186, 187, 188, 190, 191, 192, 193, 195, 196, 197, 198, 200, 201, 202, 203, 205, 206, 207, 208, 210, 211, 212, 213, 215, 216, 217, 221, 223, 236, 237, 238, 239, 241, 244 (disputing statements regarding the contents of or circumstances surrounding various agreements solely on the basis that the agreements are not binding on grounds of duress or on other legal grounds); *id.* ¶¶ 40, 41, 42, 43, 44, 45, 46, 47, 49, 50, 51, 53, 54, 59, 61, 62 (disputing whether Dana defaulted under certain agreements based solely on legal arguments regarding the materiality of the default). Such arguments will be disregarded for the purpose of deeming whether a particular fact is admitted.

[3] According to Dana, a "fixed-rate Swap is a form of a derivative contract wherein floating rate debt is 'swapped' for

Loan Agreement, Ron Dana signed a personal guaranty for $12 million; it appears that this guaranty was intended to cover a collateral shortfall that resulted from purported deficiencies in Dana's motor vehicle titles that were discovered following a third-party appraisal.  PNC's 56.1 ¶ 6; *see* Cecchi Dec. Ex. 6 at 2 (PNC memorandum dated January 23, 2006 explaining that "Ron Dana will personally guaranty the deficiency until all titles are delivered and in proper form").  Dana's CFO testified both personally and in his capacity as Dana's 30(b)(6) representative that he did not find any terms of the 2006 Loan Agreement to be unusual or unfair.  PNC's 56.1 ¶¶ 11, 12; *id.* Ex. 4 at 41:14-25; 43:3-17; *id.* Ex. 6 at 56:25-58:20.

On June 29, 2007, the parties signed a Second Amended Loan Agreement that superseded the 2006 Loan Agreement.  PNC's 56.1 ¶ 13.  At some point during this period, PNC again appraised the value of Dana's rolling stock through a third party's services.  Following this second appraisal, PNC determined that over 1,000 units of stock with an approximate liquidation value of $26 million did not have proper title documentation and thus excluded them from the appraisal.  *See id.* ¶ 55.  As will be discussed later, the parties dispute whether the title deficiencies and resulting collateral shortfall were the result of PNC's errors, Dana's errors, or PNC's deliberate actions.  Ron Dana executed an amended personal guaranty to compensate for this additional shortfall, which increased his maximum personal obligation to $14 million.  *Id.* ¶¶ 17, 24.  The guaranty held him liable for all sums for which Dana Transport might become liable under the loan agreement, and provided that it would remain in effect until all Dana's obligations under the loan agreement were paid in full.  *Id.* ¶¶ 23, 26.  In connection with the Second Amended Loan

---

a fixed rate.  In simple terms, the borrower's interest payment obligation is fixed for a specific term of months (in this case, 60 months).  If, during the term of the loan, the underlying Libor index rises above the start rate, the investor or purchaser of the Swap contract (the 'Counterparty') covers the difference—allowing the borrower to maintain a fixed rate payment.  In the alternative (as predominantly was the case here), if the underlying floating index falls below the start rate, the borrower covers both the indexed floating rate in addition to paying the Counterparty the difference in spread—thus, maintain the fixed payment amount."  *Id.* ¶ 309.

Agreement, on May 17, 2007 the parties entered into a new swap transaction. *Id.* ¶ 32. Dana's CFO testified both personally and in his capacity as Dana's 30(b)(6) representative that he did not find any terms of the Second Amended Loan Agreement to be unusual. *Id.* ¶¶ 27, 28; *id.* Ex. 4 at 85:15-87:19; *id.* Ex. 6 at 77:17-79:22.

According to Lenders, Dana failed to comply with certain financial covenants in the Second Amended Loan Agreement by not maintaining a specified fixed charge coverage ratio and by not maintaining a specified ratio of funded debt to EBITDA (earnings before interest, taxes, depreciation, and amortization). *Id.* ¶¶ 37-38, 43-46, 49-50, 53-54, 61-62. Under the contract, these failures constituted an event of non-monetary default, *id.* ¶ 40—and thus allowed Lenders to raise the interest rate to a default interest rate, declare all obligations immediately due, cease making advances, and terminate the agreement, *id.* ¶¶ 41-42. According to Dana, Lenders' assertions of default were "based on a miscalculation which ignored the return to the Borrowers of $10 million as part of the Second Amended Loan Agreement," Dana's Counterstatement to PNC's 56.1 ¶ 43; Dana thus maintains that it was "in fact in compliance during this period," *id.* The pages of the deposition transcript to which Dana cites in support of this assertion, however, do not appear in the corresponding exhibit. *See* LaSala Dec. Ex. W (excerpted deposition transcript that does not contain pages 135-36). PNC notified Dana of its noncompliance with the Second Amended Loan Agreement for the periods ending on December 31, 2007, March 31, 2008, June 30, 2008, and September 30, 2008 in at least three separate communications; each time, PNC notified Dana that Lenders were reserving their rights and remedies under the agreement. PNC's 56.1 ¶¶ 47, 51, 59.

On February 27, 2009, the parties entered into a Forbearance and Amendment Agreement. *Id.* ¶ 64. In that agreement, Dana acknowledged it had defaulted, that any cure periods had expired,

that Dana was obligated to pay all obligations owed, and that Lenders had no obligations to make further advances.  *Id.* ¶¶ 69-70.  Dana also agreed to hire a turnaround consultant.  *Id.* ¶ 72. Lenders, for their part, agreed to forbear from exercising their rights and remedies until March 31, 2009, at which point they would exercise their rights unless another agreement between the parties was established.  *Id.* ¶ 74.

On April 27, 2009, the parties entered into the Third Amended Loan Agreement (the "TALA").  *Id.* ¶ 77.  The TALA set Dana's credit limit at $125 million; increased Dana's interest rate by setting an additional rate of 4.25% above a 3% Libor floor on top of the interest rate set in the 2007 swap agreement; reiterated Dana's obligation to hire a consultant; demanded additional collateral from Dana in the form of real estate; and required Dana to maintain similar financial covenants as those in the Second Amended Loan Agreement starting March 31, 2010.  *Id.* ¶¶ 84, 86, 88, 89, 90; Dana's Counterstatement to PNC's 56.1 ¶ 86.  Ron Dana reaffirmed his personal guaranty on April 27, 2009.  PNC's 56.1 ¶ 102.

The TALA also contains the indemnification provision at the heart of this case.  That provision reads, in pertinent part, as follows:

> Indemnity. Each Borrower shall indemnify Agent, each Lender and each of their respective officers, directors, Affiliates, employees and agents from and against any and all liabilities, obligations, losses, damages, penalties, actions, judgments, suits, costs, expenses and disbursements of any kind or nature whatsoever **(including, without limitation, fees and disbursements of counsel)** which may be imposed on, incurred by, or asserted against Agent or any Lender in any claim, litigation, proceeding or investigation instituted or conducted by any Governmental Body or instrumentality or any other Person with respect to any aspect of, or any transaction contemplated by, or referred to in, or any matter related to, this Agreement or the Other Documents, whether or not Agent or any Lender is a party thereto, **except to the extent that any of the foregoing arises out of the willful misconduct of the party being indemnified** (as determined by a court of competent jurisdiction in a final and non-appealable judgment).

McTernan Dec. Ex. WF006 ("TALA") § 16.5 (emphases added).

5

SPA-7

Under the TALA, Dana was required to provide PNC with various documents concerning the new real estate collateral, including title policies, appraisals, and studies and reports. PNC's 56.1 ¶ 91. Dana failed to provide those documents by the designated date, which, as Lenders informed Dana, constituted an event of default under the TALA. *Id.* ¶¶ 92, 117-21, 122, 127. Additionally, Dana continued to fail to maintain the financial covenants that had been carried over into the TALA (*i.e.*, maintaining a specified fixed charge coverage ratio and specified funded debt to EBITDA ratio) and failed to deliver other required documentation. PNC issued at least eleven notices to Dana regarding such noncompliance with the TALA between June 2009 and March 2012. *Id.* ¶¶ 140-44, 149-53, 155, 157-58, 160-61, 163-64, 166-68, 170-72. Between June 2010 and January 2013, the parties also entered into multiple waivers, forbearances, and/or amendments to the TALA in which Lenders agreed, among other things, to waive certain events of default in exchange for certain concessions and releases from Dana. *See id.* ¶¶ 130, 132-35, 174-76, 178-80, 183-85, 188-90, 193-95, 198-200, 203-05, 208-10, 213-15.

On January 29, 2013, the lending relationship ended when Dana refinanced its debt with non-party lenders, and the parties executed a payoff letter that day. *Id.* ¶¶ 218, 221.

It is undisputed that both Dana Transport and Ron Dana consulted with counsel in connection with the various contracts executed between the parties, and that counsel performed nearly 500 hours of work in connection with the transactions described above solely during the period spanning March 10, 2009 to April 30, 2009. *Id.* ¶¶ 15, 19, 66, 95, 96, 104, 107, 136, 181, 186, 191, 196, 201, 211, 216, 223.

## II.    Procedural History

On October 8, 2015, Dana filed an action in this District against Lenders ("*Dana I*"), raising RICO claims, contract claims, and tort claims arising from the lending relationship between the

6

parties. Nicholas Dec. ¶ 3; *see Dana Transport, Inc. et al. v. PNC Bank, N.A. et al.*, No. 15-CV-7954 (CM). Dana voluntarily dismissed *Dana I* in December 2015, before any motion practice or merits rulings had occurred. Despite the short lifespan of *Dana I*, Lenders incurred least $246,704.38 in defending that action before it was dismissed. Nicholas Dec. ¶ 7. On September 1, 2016, counsel for PNC, on behalf of Lenders, sent a demand letter requesting that Dana indemnify Lenders against those fees pursuant to the TALA and that Ron Dana honor his personal guaranty. *Id.* ¶ 6. To date, neither Dana Transport nor Ron Dana have indemnified Lenders. *Id.* ¶ 8. Lenders thus filed the instant action on October 5, 2016.

On April 6, 2016, Dana filed a second lawsuit against Lenders and several other entities, this time in New Jersey state court ("*Dana II*"). BMO's 56.1 ¶ 45; *see Dana Transport, Inc., et al. v. PNC Bank, N.A., et al.*, No. MID-L-2095-16. In *Dana II*, Dana again raised contract and tort claims arising from the parties' lending relationship. One of Lenders' counterclaims in that suit is for indemnification pursuant to the TALA. *See* Dec. 20, 2021 Letter at 3. *Dana II* remains pending, but it is unclear if and when the New Jersey court will rule on the enforceability of the indemnification provision, either as applied to the fees incurred in *Dana II* or as applied to fees incurred in any other litigation.

On September 22, 2017, this Court denied Dana's motion to dismiss or, in the alternative, to stay the case pending resolution of *Dana II*. As relevant here, the Court held that it was "unmistakably clear" that section 16.5 of the TALA required Dana to indemnify Lenders for "attorneys' fees incurred by them in litigation instituted by Dana Transport Incorporated, as was *Dana I*." 2017 Oral Ruling Tr. at 42:24-43:2. In so doing, it found that Dana qualified as a "person" under the TALA, such that litigation that was "instituted or conducted by" Dana qualified as litigation that was subject to the indemnification provision. *See id.* at 42:9-22. The Court also

declined to stay proceedings, concluding that neither the *Colorado River* doctrine nor concerns of judicial economy justified such a stay given the differences between the claims in this case and those in *Dana II*. *See id.* at 44:10-47:4.

Following the Court's 2017 ruling, Lenders moved for judgment on the pleadings. In addressing this motion, the Court noted that it was "sympathetic to Plaintiffs' position especially in light of [its prior] ruling that the language of the loan agreement is so clear." 2018 Oral Ruling Tr. at 20:15-17. But notwithstanding Plaintiffs' "very strong case," the Court felt compelled to deny judgment on the pleadings because Dana had raised "bare-boned" affirmative defenses of duress and willful misconduct—either of which, if proven true, would render the indemnification provision unenforceable. *See id.* at 20:19-24, 21:24-25. The Court also rejected the argument that the relevant finding of willful misconduct could have been made only by the court in *Dana I*. *See id.* at 21:15-22.

These motions for partial summary judgment followed.

**LEGAL STANDARD**

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). An issue of fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A fact is material if it "might affect the outcome of the suit under the governing law." *Id.* Once the moving party has met its initial burden, the burden shifts to the opposing party to "set forth specific facts demonstrating that there is a genuine issue for trial." *Wright v. Goord*, 554 F.3d 255, 266 (2d Cir. 2009).[4] Accordingly, the non-movant must come forward with enough evidence "on

---

[4] Unless otherwise indicated, case quotations omit all internal citations, quotation marks, alterations, and footnotes.

which the jury could reasonably find [in their favor]." *Scotto v. Almenas*, 143 F.3d 105, 114 (2d Cir. 1998).  "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Anderson*, 477 U.S. at 249-50.  The Court must "constru[e] all the evidence in the light most favorable to the non-movant and draw[] all reasonable inferences in that party's favor." *Rivera v. Rochester Genesee Reg'l Transp. Auth.*, 743 F.3d 11, 19 (2d Cir. 2014).

## DISCUSSION

To prevail on their motions for partial summary judgment, Lenders must show that there is no genuine issue of fact as to the existence of a contract that imposes on Dana an indemnification obligation; Lenders' performance under that contract; and Dana's failure to pay Lenders for fees they incurred and paid to third parties that are subject to the indemnification obligation.  *See Lehman XS Tr., Series 2006-GP2 by U.S. Bank Nat'l Ass'n v. GreenPoint Mortg. Funding, Inc.*, 916 F.3d 116, 126 (2d Cir. 2019).  There is no dispute in this action as to the existence of the TALA, which contains the relevant indemnification provision; that Lenders performed under the TALA by advancing funds to Dana; and that Dana has failed to indemnify Lenders for attorneys' fees they incurred in connection with *Dana I*, notwithstanding this Court's prior ruling that those fees are subject to the indemnification provision.  Rather, Dana's sole defenses to liability consist of its challenges to the enforceability of the TALA and its indemnification provision; namely, its arguments that the TALA is unenforceable in its entirety because Dana signed it under duress, and that Dana has no duty to indemnify Lenders because they committed "willful misconduct," as that term is defined in the indemnification provision's carveout clause.  Neither argument has merit.[5]

---

[5] In opposing summary judgment, Dana also attempts to relitigate issues this Court has already decided by arguing that Dana is not a "person" as that term is used in the indemnification provision such that any litigation Dana institutes is not subject to indemnification, and that it is not "unmistakably clear" that the indemnification provision requires Dana to pay Lenders' fees incurred in *Dana I* (absent the presence of an affirmative defense).  The Court already rejected these arguments when it denied Dana's motion to dismiss and finds no reason to revisit its rulings.

**I.     There Is No Genuine Issue of Material Fact as to Whether Dana Was Under Duress**

Dana argues that the TALA—and, indeed, virtually every contract that was signed during the parties' lending relationship—was signed under duress and is thus not enforceable. This argument fails, both because Dana has waived a duress defense and because Dana has failed to present evidence that Lenders ever made a wrongful threat.

As an initial matter, any available duress defense Dana may have had has been waived by its failure to promptly repudiate the TALA. "A party may ratify a contract or release entered into under duress by intentionally accepting benefits under the contract, by remaining silent or acquiescing in the contract for a period of time after he has the opportunity to avoid it, or by acting upon it, performing under it, or affirmatively acknowledging it." *VKK Corp. v. Nat'l Football League*, 244 F.3d 114, 123 (2d Cir. 2001). Here, Dana signed the TALA, and Ron Dana signed the personal guaranty, in April of 2009, and both accepted those contracts' benefits. Even accepting Dana's argument that it was under continuous duress and thus not in a position to repudiate the agreement until it had exited the lending relationship, *see* Opp. MOL at 53, Dana refinanced with other lenders in January 2013—but failed to raise duress until it filed its complaint in *Dana I* on October 8, 2015. This two-year gap, without any explanation for such delay, constitutes a forfeiture of any duress defense. *See, e.g., VKK Corp.*, 244 F.3d at 123 (noting that "[d]elays as short as six months have been held to constitute forfeiture of the claim" of economic duress); *Dirose v. PK Mgmt. Corp.*, 691 F.2d 628, 633-34 (2d Cir. 1982) (collecting cases in which delays ranging from six months to two years constituted waiver).

Nor could any duress defense, even if not waived, succeed on the merits. "To void a contract on the ground of economic duress, the complaining party must show that its agreement was procured by means of (1) a wrongful threat that (2) precluded the exercise of its free will."

10

*Interpharm, Inc. v. Wells Fargo Bank, Nat. Ass'n*, 655 F.3d 136, 142 (2d Cir. 2011). *See also Kamerman v. Steinberg*, 891 F.2d 424, 431 (2d Cir. 1989) ("New York law . . . establishes the following elements of economic duress: (1) a threat, (2) which was unlawfully made, and (3) caused involuntary acceptance of contract terms, (4) because the circumstances permitted no other alternative."). A "mere demonstration of financial pressure or unequal bargaining power will not, by itself, establish economic duress." *Interpharm*, 655 F.3d at 142. Rather, "[t]he law demands threatening conduct that is wrongful, *i.e.*, outside a party's legal rights." *Id.* Accordingly, "a threat to exercise a legal right" in order to "compel the other party to submit to new demands" cannot constitute a wrongful threat. *Id.*

Dana argues that virtually the entire lending relationship between the parties was infected by duress because "Lenders unlawfully threatened Defendants that if they did not sign multiple loan documents and guarantees, Lenders immediately would stop funding the loans, which would have irreparably destroyed the Borrowers' businesses." Opp. MOL at 51. This theory fails, because Dana describes nothing more than Lenders' threats to exercise their legal rights.

The Second Circuit's decision in *Interpharm* is not only instructive, but conclusive, on this issue. In that case, a plaintiff borrower defaulted on a credit agreement with a lender. "Rather than exercise its default remedies," which included termination of funding and acceleration of the borrower's obligations, the lender "entered into a new agreement" with the borrower that increased the line of credit available "in exchange for additional fees and higher interest rates." 655 F.3d at 138. The borrower defaulted on that amended agreement; in response, the lender increased the borrower's "obligations to the default rate and assess[ed] other default penalties," as it was entitled to do under the amended agreement. *Id.* at 139. The borrower's financial situation continued to deteriorate such that the lender refused to advance further funds unless the borrower signed a third

agreement, in which the borrower acknowledged default, agreed to pay additional fees, released all claims, agreed to restrict its borrowing base, and promised to retain a restructuring officer that was acceptable to the lender. *See id.* In exchange, the lender would forbear on exercising its legal rights. *See id.*

After the lending relationship ended, the borrower sued the lender, and argued that the release provisions in their various contracts were unenforceable on the basis of duress. The Second Circuit disagreed, "conclud[ing] that these allegations cannot, as a matter of law, plausibly support a wrongful threat" because the lender never "exceed[ed] its contract rights." *Id.* at 144-45. So too here: when Dana defaulted on the Second Amended Loan Agreement, Lenders had the right to raise the interest rate, cease funding, demand immediate repayment, and terminate the agreement. PNC's 56.1 ¶¶ 41, 42. They cannot be faulted for threatening to exercise those rights unless Dana signed the February 2009 forbearance agreement, and later, the TALA, even if those contracts had terms that were unfavorable to Dana, such as higher interest rates, the obligation to retain a consultant, and burdensome requirements to deliver titles and documents. *Cf.* 655 F.3d at 146 ("[F]aced with a borrower in continued default of its financial covenants, there appears to [be] nothing wrongful in a lender exercising its right to increase its level of security as its borrower becomes less creditworthy.").

Dana's arguments to the contrary are unpersuasive. It contends that Lenders pressured Dana into committing in the TALA to deliver titles by a certain date, despite Dana's protestations to Lenders that it would not be able to meet those deadlines. But *Interpharm* answers this question as well: the Circuit rejected similar allegations by the borrower that it had "little choice" but to sign a contract when it had unsuccessfully "communicated" to the lender that the contract's financial covenants were "unrealistic," "highly uncertain[,] and unreasonable." *See id.* at 144.

Dana also asserts that Lenders' conclusion that Dana had defaulted on the Second Amended Loan Agreement was "based on a miscalculation which ignored the return to the Borrowers of $10 million as part of the Second Amended Loan Agreement," and that "Borrowers were in fact in compliance during this period." Dana's Counterstatement to PNC's 56.1 ¶ 43. But even putting aside the fact that Dana has failed to provide evidentiary support for this proposition, there is no indication that Dana ever communicated its belief that it was not in default—to the contrary, Dana affirmed in the February 2009 forbearance agreement that it was in default on its obligations under the Second Amended Loan Agreement, *see* PNC's 56.1 ¶ 69.[6] Moreover, "[u]nder New York law, threats to enforce a party's legal rights under a contract—*or even that party's interpretation of its rights*—cannot constitute a wrongful threat." *Cooper Dev. Co. v. Friedman*, No. 92-CV-7572 (JSM), 1994 WL 62846, at *4 (S.D.N.Y. Feb. 22, 1994) *aff'd sub nom. Cooper Dev. v. Friedman*, 43 F.3d 1458 (2d Cir. 1994) (emphasis added). In other words, even if Lenders' position that Dana was in default was mistaken, its threatened exercise of its rights based on that interpretation—an interpretation that Dana explicitly communicated its agreement with—cannot, without more, be wrongful.

Dana argues more broadly that *Interpharm* does not control because Lenders' threats were unlawful to the extent they were "premised on, *inter alia*, (i) intentional breaches by Lenders of their agreements with the Borrowers . . . and (ii) fraudulent misrepresentations related to the 2007 Swap Agreement." Opp. MOL at 51. These arguments, however, implicate Dana's willful misconduct defense—which, as discussed below, also fails.

---

[6] Dana also relies on a New York Appellate Division case stating that while "[a]greements providing for the acceleration of the entire debt upon the default of the obligor are often enforced in accordance with their terms," "where the breach asserted as the basis for the acceleration is trivial or inconsequential, the forfeiture may be viewed as an unconscionable penalty and equitable principles come into play." *Tunnell Pub. Co. v. Straus Commc'ns, Inc.*, 169 A.D.2d 1031, 1032 (N.Y. App. Div. 1991). But Dana's repeated breaches of its financial covenants cannot reasonably be characterized as "trivial" or "inconsequential." And, in any event, Lenders never actually accelerated the debt; they simply declared default.

## II.  There Is No Genuine Issue of Material Fact as to Whether Lenders Committed Willful Misconduct

Dana's second argument against liability is that it is not required to pay the fees that Lenders incurred in *Dana I* because that action, and the fees incurred in defending it, arose "out of the willful misconduct of" Lenders. TALA § 16.5. Dana invokes the term "willful misconduct" as a talisman against summary judgment, arguing that determining what the parties to the TALA intended "willful misconduct" to mean is a factual question that cannot be resolved at this stage. Dana is incorrect. While there is some uncertainty as to the full scope of behavior that is captured by the term "willful misconduct" under New York law,[7] that law also makes clear that "willful misconduct," as used in a contractual limitation of liability provision, is frequently capable of interpretation by courts—and that such "willful misconduct" requires, at the very least, an intentional breach of contract.

For instance, in *Process America, Inc. v. Cynergy Holdings, LLC*, 839 F.3d 125 (2d Cir. 2016), the Second Circuit considered a carveout provision very similar to the one at issue here, which stated that a damages cap would apply "[e]xcept for . . . liability arising from gross negligence, recklessness, or willful misconduct." *Id.* at 137. In affirming the district court's holding on summary judgment that this carveout did not apply, the Circuit relied on a New York Court of Appeals case interpreting similar language, which concluded that "that the term willful acts as used in [that] contract was intended by the parties to subsume conduct which is tortious in nature, *i.e.*, wrongful conduct in which defendant willfully intends to inflict harm on plaintiff at least in part through the means of breaching the contract between the parties." *Id.* at 138 (quoting *Metro. Life Ins. Co. v. Noble Lowndes Int'l, Inc.*, 643 N.E.2d 504, 508 (N.Y. 1994)). Guided by

---

[7] The TALA contains a valid choice-of-law provision stating that New York law governs any dispute over its interpretation or enforcement. TALA § 16.1; *see 19 Recordings Ltd. v. Sony Music Ent.*, 97 F. Supp. 3d 433, 438 n.4 (S.D.N.Y. 2015).

this authority, the Circuit held that appellant had failed to present evidence of willful misconduct because it failed to raise a question of fact as to whether a party's conduct "extended well beyond a simple breach of the contract," much less whether it "willfully intended to inflict harm" through any such breach. *See id.* at 140. Other courts have similarly emphasized the strong showing that is necessary to establish willful misconduct. *See, e.g., Gardner v. Owasco River Ry., Inc.*, 142 A.D.2d 61, 64 (N.Y. App. Div. 1988) (explaining that to prove willful misconduct under the state's general obligations law, a party must show "an intentional act of unreasonable character performed in disregard of a known or obvious risk so great as to make it highly probable that harm would result"); *Net2Globe Int'l, Inc. v. Time Warner Telecom of New York*, 273 F. Supp. 2d 436, 454 (S.D.N.Y. 2003) (discussing the "far higher mark at which New York courts place the bar [for wrongful conduct sufficient as a matter of law to nullify a limitations of liability clause in contract]—demanding nothing short of . . . a compelling demonstration of egregious intentional misbehavior evincing extreme culpability: malice, recklessness, deliberate or callous indifference to the rights of others, or an extensive pattern of wanton acts").

To be sure—as the Circuit observed in *Cynergy*—New York law may be inconsistent as to whether an intentional breach, without more, could ever be sufficient to establish willful misconduct resulting in the non-enforcement of an exculpatory clause. *Compare Noble Lowndes*, 643 N.E.2d at 508 (explaining that a "willful acts" exception to damages immunity under a contract exceeded "mere[] intentional nonperformance of [a contract] motivated by financial self-interest"), *with Banc of Am. Sec. LLC v. Solow Bldg. Co. II*, 47 A.D.3d 239, 247-48 (N.Y. App. Div. 2007) (suggesting that an intentional breach is sometimes sufficient, particularly when a party "with[eld] performance unless the other party agree[d] to some further demand"). But it is settled that at least an intentional breach is required. *See, e.g., In re Lyondell Chem. Co.*, 544 B.R. 75, 88 (Bankr.

15

S.D.N.Y. 2016) ("New York courts have . . . clarified that to invalidate an exculpatory clause, it is insufficient for the plaintiff to allege or show that the defendant acted with malice or reckless indifference *in the general course of conduct* between the parties. Rather, the defendant must have acted with malice or reckless indifference *in breaching the contract specifically.*") (citing *Noble Lowndes*). Moreover, even under the arguably more lenient standard in *Solow*, actions taken out of "legitimate economic self-interest," as opposed to "the intent to inflict economic harm," do not amount to willful misconduct. *See Solow*, 47 A.D.3d at 250.

In arguing that it has shown willful misconduct, Dana urges the Court to interpret that term as equivalent to "gross negligence." Opp. MOL at 45-47. Although this approach has been endorsed by some courts, it is a distinction without much difference. *See, e.g.*, *Colnaghi, U.S.A., Ltd. v. Jewelers Prot. Servs., Ltd.*, 611 N.E.2d 282, 284 (N.Y. 1993) (defining the "gross negligence" that is necessary to invalidate a contractual limitation of liability as "conduct that evinces a reckless disregard for the rights of others or smacks of intentional wrongdoing"); *Deutsche Lufthansa AG v. Boeing Co.*, No. 06-CV-7667 (LBS), 2007 WL 403301, at *3 (S.D.N.Y. Feb. 2, 2007) (explaining that "[w]hen the setting is, as here, a contract between two sophisticated parties the conduct must evince a reckless disregard for the rights of others, or be of a kind that smacks of intentional wrongdoing" to nullify a limited liability provision). Regardless of which precise standard the Court uses here—and, in particular, even if the Court were to agree with Dana that "willful misconduct" as the term is used in the TALA does not require a showing of malice and may be satisfied through gross negligence—none of the conduct of which Dana accuses Lenders meets any of these standards of willful misconduct, because Dana has failed to raise a genuine dispute that Lenders intentionally breached any contract between the parties, or committed any other conduct that amounts to intentional infliction of harm or gross negligence. *Cf. Shepley*

16

*v. New Coleman Holdings Inc.*, 174 F.3d 65, 72 n.5 (2d Cir. 1999) (explaining that summary judgment is appropriate even if the contractual language is ambiguous when "the extrinsic evidence creates no genuine issue of material fact and permits interpretation of the agreement as a matter of law").[8]

In its Rule 56.1 statement, Dana cites a host of actions and statements by Lenders that purportedly show their intentional breach of the various contracts between the parties and concomitant willful misconduct. In brief, these actions and statements are either unsupported by the record or are irrelevant to willful misconduct because they do not suggest intentional breaches of any contract, including the TALA.[9] New York law instructs that without such an intentional breach, a willful misconduct claim cannot lie. This finding is sufficient to defeat Dana's willful misconduct defense. Out of an abundance of caution, however, the Court will review each category of alleged conduct that Dana characterizes as "willful misconduct" in its Rule 56.1 statement, many of which are unsupported by the record.[10]

---

[8] Dana relies on *Noble Lowndes*, in which the New York Court of Appeals declined to interpret the term "willful acts" in a contract based on "how we and other courts have construed 'willful' in other contexts, such as in interpreting statutes using that term or in formulating or applying legal principles in tort or contract law," 643 N.E.2d at 506. "Rather," the court explained, the proper course of action was to determine "what the parties intended by 'willful acts' as an exception to their contractual provision limiting defendant's liability for consequential damages." *Id.* But, in the same breath, the court explained that "the law of contracts is pertinent" to answering that question, and when that law was "applied to this contractual dispute" it resolved the issue as a matter of law. *Id.* at 507. So too here: even if there is some ambiguity as to the precise contours of the term "willful misconduct," the Court is able to decide as a matter of law that none of Lenders' alleged conduct falls within any reasonable interpretation of that term.

Moreover, one district court in this Circuit has held that the contractual term "willful misconduct" is not ambiguous, even when the term was not defined in the contract at issue. *See Sabella v. Scantek Med., Inc.*, No. 08-CV-0453 (CM) (HBP), 2009 WL 3233703, at *31 (S.D.N.Y. Sept. 25, 2009) ("The parties to the Escrow Agreement do not define 'willful misconduct.' But there is no suggestion that the term is ambiguous. Accordingly, 'willful misconduct' will be given its ordinary meaning, which is 'Misconduct committed voluntarily and intentionally.' Misconduct is defined as 'A dereliction of duty; unlawful or improper behavior.'") (quoting Black's Law Dictionary (8th ed. 2004))).

[9] Indeed, Ron Dana was unable, during his deposition, to identify a single action Lenders took that breached any of the loan agreements. PNC's 56.1 Ex. 16 at 96:16-99:5.

[10] Although Dana's Rule 56.1 statement spans over 400 paragraphs, Dana restates each category of Lenders' alleged willful misconduct in paragraph 727 while cross-referencing other portions of its statement; the Court draws from that summary paragraph.

*Allegations That Are Unsupported by the Record*

The Court begins with Dana's assertions that have insufficient factual support to survive summary judgment. First, Dana argues that Lenders "[w]rongfully, willfully and fraudulently misrepresented to Dana that the 2006 Swap Agreement had to be terminated and a new Swap Agreement . . . had to be entered into in connection with the execution of the Second Amended Loan Agreement," and that this violated 12 U.S.C. § 1972(1), which precludes a financial institution from tying the availability or price of a product or service to the purchase of another product or service offered by the institution. *See* Dana's 56.1 ¶ 727 (citing *id.* ¶¶ 379-80). But while the cited deposition testimony could support the proposition that the 2006 swap agreement was terminated because the associated loan agreement was amended, it does not support the proposition that PNC *made any representations* to Dana that the swap agreement had to be terminated for that reason. And, in any event, any such misrepresentation would be irrelevant to willful misconduct that might implicate the carveout clause in the TALA, a contract that postdated the 2007 swap agreement by two years.[11]

Second, Dana argues that Lenders acted wrongfully in failing to release Ron Dana from his personal guaranty until the loan was paid off. Dana's 56.1 ¶ 727 (citing *id.* ¶¶ 323, 324, 325, 326, 327, 355, 462, 463, 464). But both Dana's 2006 and 2007 personal guaranties provided that "[t]his is a continuing irrevocable guaranty and shall remain in full force and effect and be binding

---

[11] *See* LaSala Dec. Ex. F (deposition of PNC employee) at 204:16-205:04 ("Q. If redoing this swap in 2007 was necessary to match the new loan terms, would it also have been necessary to do that in redoing the—in redoing that after the 2009 amendment was put in place? . . . A. I think—I don't think 'necessary' is the word. It's a client decision based on conversations with the client whether they want to move forward with that or not. So it would be up to them whether they restructured it as they did in 2007 and whether or not they discussed or contemplated looking at restructuring in 2009."); *id.* Ex. J (deposition of Dana's CFO) at 70:5-14 ("Q. So one of these is a Termination of Rate Swap Transaction dated May 14, 2007, and the other is a Confirmation of a new transaction that day. Do you have any knowledge of how this came, these documents came to be? A. My understanding is that they had to terminate the previous one because the loan agreement was amended, there was an amendment done, and they also amended to correspond, the Swap to correspond with that new amendment.").

upon the undersigned . . . until all of the Obligations have been paid in full." Cecchi Dec. Ex. 7 at 6; McTernan Dec. Ex. WF022 at 6.  At argument, PNC urged the Court to consider the "totality of the circumstances"—namely, that the initial purpose of the guaranty was to cover a collateral shortfall, and that an internal PNC document stated that the guaranty would remain in place only "until: 1) the Company provides sufficient additional collateral to eliminate the shortfall or 2) a reappraisal of the fleet occurs that illustrates the sub-limit is fully collateralized by existing collateral on hand," Cecchi Dec. Ex. 25 at 9-10—but this extrinsic evidence cannot overcome the plain terms of the guaranties.

Third, Dana's argument that Lenders "[w]rongfully, willfully and fraudulently misrepresented to Dana that the 2007 Swap Agreement had been sold to another counterparty," Dana's 56.1 ¶ 727 (citing *id.* ¶¶ 412, 459), is unsupported by evidence; indeed, a July 2009 email from PNC to Wells Fargo evinces the existence of a third party that was earning income on the swap.[12]

Fourth, Dana's argument that Lenders "[w]rongfully and willfully refused to provide to Dana the $25 million real estate term loan set forth in the [TALA] after the Agent acknowledged in writing that the terms of the Mortgage Delivery Date have been met as defined in the Loan Agreement," Dana's 56.1 ¶ 727 (citing *id.* ¶¶ 616-17), is similarly unsupported.  Dana admitted both that it would receive that real estate loan only if PNC had received certain documentation by June 26, 2009, and that Dana had not delivered that documentation by that date.  *See* Dana's Counterstatement to PNC's 56.1 ¶¶ 91, 93, 117-21.[13]

---

[12] *See* Cecchi Dec. Ex. 166 at 1 (email from a PNC employee to a Wells Fargo employee explaining: "[T]here is a counter party that chose to take a floating rate when Ron agreed to fix his rate.  The swap income that was referred to does not come to PNC.  It is the difference between the floating and fixed that Dana owes the other party . . . I have no idea who the counter party is but I am sure I cannot release that information.").

[13] Indeed, when asked, "did [Dana] comply with all of the terms and conditions required for the issuance of a real estate term loan?" Ron Dana answered: "No, because it was part of the scam and I wasn't falling into the trap."  Peles

19

Fifth, Dana asserts that "Wells Fargo, wrongfully, willfully and using underhanded tactics, usurped PNC's role as Agent of the syndicated loan and improperly and negatively impacted Dana's rights under the Remedy provisions of the Second and Third Amended Loan Agreements." Dana's 56.1 ¶ 727 (citing *id.* ¶¶ 433, 434, 435, 436, 437, 438, 439, 440, 441, 442, 445, 466, 472, 474, 484, 486, 568, 608, 635). But, as Lenders rightly note, Dana describes no actions by Wells Fargo that "usurped" PNC's agent role: while Wells Fargo certainly exercised its rights as a participant in the loan facility, including its voting rights with respect to amendments, *see* Cecchi Dec. Exs. 57, 58, 96, there is no evidence that it took any action that only the agent had the authority to take, such as declaring a default. Nor does Dana explain why any such usurpation would have constituted willful misconduct toward Dana, or how any of Wells Fargo's conduct "negatively impacted Dana's rights" under either contract.

Finally, Dana contends that Lenders "[w]rongfully, willfully and fraudulently changed the manner in which Lenders to the Second Amended Loan Agreement treated Ron Dana's personal guarantee by removing the personal guarantee from the borrowing base calculation, thereby instantly creating a collateral shortfall." Dana's 56.1 ¶ 727 (citing *id.* at 376, 433-36, 444-45). Even assuming the guaranty was originally part of the borrowing base, *see* LaSala Dec. Ex. K at 87:08-12 ("Q. [C]an you explain to me how the $14 million guarantee by Ronald Dana was figured into the borrowing base? A. It was a negotiated item as part of the borrowing base."), Dana's cited evidence fails to support the proposition that it was subsequently removed from the borrowing base calculation.[14]

---

Dec. Ex. 2 (Ron Dana Dep.) at 118:22-119:08.

[14] As Lenders note, an email on which Dana relies, in which the author proposes that the personal guaranty would be "boot collateral only," is a draft email that was never sent. *See* Cecchi Dec. Ex. 53.

*Allegations That Do Not Describe an Intentional Breach or Otherwise Suggest Wilful Misconduct*

Turning to the conduct Dana describes that may have some support in the record, Dana has failed to meet its burden of showing that it could meet the standard for willful misconduct—or that it is even relevant to that question. First, Dana reiterates its duress theory by arguing that Plaintiffs "[w]rongfully and willfully charged (or as described by PNC, . . . 'jammed') Dana with exorbitant fees (or as described by BMO as an 'obnoxious interest rate') in order to reap unjust profit from Dana and reduce Dana's liquidity, thereby making harder for Dana to refinance its loan." Dana's 56.1 ¶ 727 (citing *id.* ¶¶ 652, 697, 711). But, as discussed in the context of Dana's duress defense, imposing fees and charges on Dana as a condition of certain forbearance agreements or amended agreements following Dana's prior defaults was entirely within Lenders' rights. Conduct that advances legitimate economic self-interest, even when it is "commercially unreasonable," "self-serving[,] and aimed at maximizing . . . profits," does not constitute "a compelling demonstration of egregious intentional misbehavior." *Morgan Stanley & Co. Inc. v. Peak Ridge Master SPC Ltd.*, 930 F. Supp. 2d 532, 545 (S.D.N.Y. 2013) (finding that such allegations did not plead "willful misconduct").[15]

Second, citing a declaration from its expert, Dana argues that PNC "willfully and wrongfully failed to (i) provide Dana with disclosures regarding the . . . [2006 and 2007] Swap

---

[15] Putting the words "obnoxious" and "jammed" in context only reinforces this conclusion. A March 2011 email exchange among certain Lenders indicated that an over-advance on the TALA would be needed to allow Dana to pay payroll and fuel. *See* Cecchi Dec. Ex. 203. In response, one lender wrote that it might be willing to allow such an over-advance, but that if this option were taken, "a meaningful fee would need to be charged, along with an obnoxious interest rate on the [over-advance], to let Ron know we should not be his first option if/when this happens again." *Id.* Given that Lenders were not obligated to authorize an over-advance in the first instance, the decision to charge high fees and rates in connection with such a discretionary choice does not constitute misconduct. Similarly, in a January 2013 email, a PNC employee explained that there were likely several outstanding fees to collect from Dana because the lending group had "jammed so many fees on [Dana] the last few extensions and some of them were back ended." Cecchi Dec. Ex. 161. This is a simple factual narrative, and is not transformed into misconduct through the use of a particular verb.

Agreement[s], (ii) provide Dana with a full explanation of the risks associated with the . . . Swap Agreement[s], and (iii) follow Office of the Comptroller of Currency ["OCC"] guidelines and applicable law before entering into the . . . Swap Agreement[s] with Dana." Dana's 56.1 ¶ 727 (citing *id.* ¶¶ 311-14, 316-17).[16] But even assuming that Lenders' conduct in connection with the swap agreements is relevant to "willful misconduct" in connection with the TALA, this argument is belied for at least the 2007 swap agreement, as Dana signed a contract in connection with that agreement in which both Dana and PNC affirmed that each party was "fully informed of and capable of evaluating, and has evaluated, the potential financial benefits and risks" of the transaction and that "[n]either party holds itself out as advising, or any of its employees or agents as having the authority to advise, the other party as to whether or not it should enter into this transaction, and neither party shall have any liability whatsoever in respect of any advice of such nature given, or views expressed, by it or any such persons to the other party." PNC's 56.1 Ex. 10 at 1. Separately, Dana fails to explain how failure to follow OCC guidelines or provide full disclosures exceeds ordinary error or negligence—particularly under these circumstances, when Dana was a sophisticated counterparty represented by counsel.

Third, Dana contends that Lenders "[w]rongfully and willfully excluded [vehicle] titles [that comprised Dana's collateral]" during the appraisals, thereby causing Ron Dana's 2007 personal guaranty to be higher than otherwise would have been required. Dana's 56.1 ¶ 727 (citing *id.* ¶¶ 356-57, 363, 367, 378, 425). But while there is certainly evidence that titles may have been incorrectly excluded during the third-party appraisals of Dana's collateral that PNC ordered, Dana

---

[16] According to Defendants' expert, PNC failed to follow the OCC's requirements that a bank: (1) have comprehensive written policies and procedures to govern its use of derivatives such as swap agreements; (2) assess a customer's sophistication and familiarity with derivative products before recommending a customer enter into such an agreement; (3) determine whether a derivative instrument is appropriate for a customer; (4) analyze the impact of proposed derivatives activities on the financial condition of the customer; and (5) make sure its counterparty understands the general market risk profile of the derivative transaction. *See* Kelley Dec. at 2-3.

raises no evidence that this exclusion was intentional, as opposed to inadvertent error. To the contrary, Ron Dana testified that Lenders' counsel had "forgot[ten]" to provide certain materials to state motor vehicle departments, *id.* ¶¶ 330-31, and a third-party consultant testified that PNC "didn't know" certain details about the collateral "problem" and that neither PNC nor Dana had "a good record on the assets," PNC's 56.1 Ex. 13 (Youngling Dep.) at 156:14-22—suggesting that any appraisal error was due solely to mistake or ordinary negligence.

Fourth, Dana argues that Lenders "[w]rongfully, willfully and fraudulently required Dana to retain" a consultant "under the guise that [it] would assist Dana, but that Lenders "covertly communicated with [the consultant] behind Dana's back in order to accomplish the Lenders' objective of securing a collateral grab from Dana," and that the consultant "charged Dana approximately $1.5 million." Dana's 56.1 ¶ 727 (citing *id.* ¶¶ 499, 520-22, 525-28, 530-34, 536, 538, 551, 560, 598). But the terms of the February 2009 forbearance agreement and April 2009 TALA expressly required Dana to hire a consultant, PNC's 56.1 Ex. 14 § 6.12; TALA § 6.13; moreover, Dana interviewed three consultants and hired its choice, *see* McTernan Dec. Ex. WF37 (Ron Dana Dep.) at 95:06-96:12. As to payment, Dana negotiated the consultant's retainer fee, including a reduction of that fee. *See* Well Fargo Reply Ex. WF060 (Deseo Dep.) at 260:22-261:1. Finally, the consulting agreement allowed the consultant to "communicate . . . with representatives of the Secured Lender and other lenders that are participants to the Secured Facility to keep such representatives informed of: (i) the Consultant's progress in performing the Services, and (ii) information relating to the Client and its operations," and further provided that "[t]he Consultant shall keep the Client apprised of such communications, and to the extent practicable, will consult with the Client regarding any such communications prior to such communication." Cecchi Dec. Ex. 132-A at 6; *see also id.* Ex. 105 at 5. At best, Dana has established that the consultant failed

to keep Dana apprised of communications—but that speaks to the consultant's conduct, not Lenders'.

Fifth, Dana asserts that "Wells Fargo wrongfully and willfully cut off credit for related (non-borrower) [Dana] entities . . . that separately had been lent funds by Wells Fargo in order to improperly push Dana towards bankruptcy." Dana's 56.1 ¶ 727 (citing *id.* ¶ 432). Although Ron Dana's deposition testimony supports this statement, *see* LaSala Dec. Ex. A (Ron Dana Dep.) at 46:6-47:16, Dana fails to establish how such conduct was not authorized under the various loan agreements following its repeated defaults.

Finally, Dana faults Lenders for rating Dana a "credit risk" following its defaults, conditioning the January 2013 payoff letter on agreeing to a release, and increasing Dana's monthly amortization payment after Dana made the last payment on the 2007 swap agreement, Dana's 56.1 ¶¶ 727-28 (citing *id.* ¶¶ 572, 666-68, 673, 700-02, 711-12, 714-15)—but, once again, it does not explain how any of these actions breached any agreement or were otherwise wrongful.

Having exhausted the substance of the evidentiary record, Dana turns to rhetoric, pointing to various communications in which Lenders expressed disapproval of other Lenders' conduct in connection with the loan agreements, or in which Lenders used certain language when discussing their options under the loan agreements. *See, e.g.,* Cecchi Dec. Ex. 123 (email from PNC employee, in response to Wells Fargo's request that PNC impose the default rate when Dana's real estate fair market value came in at $8 million rather than $12 million, that stated: "[D]efault rate for side collateral values. These people are unreal."); *id.* Ex. 163 (email from third-party consultant explaining that "Ron [Dana] thinks the banks screwed him" on certain terms in the TALA and commenting that "[h]is view is not without some merit"); *id.* Ex. 96 (email from Wells Fargo employee explaining that a PNC employee had "suggested" that Lenders "were putting a gun to

Ron Dana's head" through the negotiations on the 2009 forbearance agreement and TALA).  Dana

provides no support, however, for the inference that "hard bargaining" of this sort rises to the level

of willful misconduct.  *Cf. Interpharm*, 655 F.3d at 145.

### III.   Dana Has Failed to Raise a Genuine Issue of Material Fact on Its Other Affirmative Defenses

In opposing summary judgment, Dana relies on several additional affirmative defenses:

lack of consideration for the payoff letter; fraud and fraudulent inducement; public policy;

unconscionability; and violation of the covenant of good faith and fair dealing.  None of these

defenses shield Dana against summary judgment.[17]

First, the validity of the January 2013 payoff letter is irrelevant, as Dana's indemnification

obligation arises from the TALA and "survive[s] termination of" that contract.  TALA § 16.7.

Second, Dana's fraud defenses fail because it has not identified any material false

representation by Lenders on which Dana relied in connection with the TALA.  Again, although

Dana contends that Lenders' assertions that Dana defaulted on the Second Amended Loan

Agreement were based on a "miscalculation," it produces no evidence that such miscalculation

constituted an intentional misrepresentation, or that Dana attempted to disabuse Lenders of any

such mistake before entering the TALA.  Further, to the extent Lenders may have erred in

appraising the value of Dana's collateral or in failing to disclose the full risks of the swap

agreements, Dana has failed to establish either that these constituted intentional misstatements or

that Dana relied on those misstatements in executing the TALA.

Third, New York's public policy regarding limitations of liability under these

circumstances is already encompassed in the state's willful misconduct doctrine.  *See, e.g., Austro*

---

[17] To the extent Dana continues to rely on its other affirmative defenses in opposing summary judgment, each of those defenses fail for the reasons stated in Lenders' motions.

*v. Niagara Mohawk Power Corp.*, 487 N.E.2d 267, 267 (N.Y. 1985) (explaining that indemnification agreements "are unenforceable as violative of public policy only to the extent that they purport to indemnify a party for damages flowing from the intentional causation of injury"); *accord Noble Lowndes*, 643 N.E.2d at 509 (clarifying that "limiting . . . liability for consequential damages to injuries . . . caused by intentional misrepresentations, willful acts and gross negligence does not offend public policy"). That is, the Court's finding that Lenders have not committed willful misconduct is consistent with New York's public policy on indemnification agreements.

Fourth, Dana has failed to rebut the "presumption of conscionability" that arises "when businessmen contract in a commercial setting," largely for the reasons expressed above. *Am. Tel. & Tel. Co. v. N.Y. City Human Res. Admin.*, 833 F. Supp. 962, 989 (S.D.N.Y. 1993).

Finally, there is no evidence that Lenders breached the covenant of good faith and fair dealing in connection with the TALA. The covenant "embraces a pledge that neither party shall do anything which will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract." *Dalton v. Educ. Testing Serv.*, 663 N.E.2d 289, 291 (N.Y. 1995). Dana has not asserted that it failed to receive the fruits of the TALA, namely, continued funding, or that Lenders' actions "directly violate[d] an obligation that may be presumed to have been intended by the parties" in executing the TALA, *Thyroff v. Nationwide Mut. Ins. Co.*, 460 F.3d 400, 407-08 (2d Cir. 2006). Rather, it argues only that Lenders effectively eliminated the benefit of the 2007 swap agreement's interest rate by imposing a certain Libor floor on the interest rate set out in the TALA, thus "double billing" Dana. *See* Opp. MOL at 62-63. Even if true, however, this did not affect Dana's receipt of benefits from the *TALA*: the additional interest Dana was compelled to pay under the TALA was clearly contemplated by that contract, and Dana does not argue that it did not receive a benefit it was promised under the TALA, such as continued

26

SPA-28

funding.[18]   At best, Dana contends that Lenders exercising their rights under the TALA lessened the benefits Dana hoped or expected to receive from another contract.   Nonetheless, it is well settled that the covenant "does not extend so far as to undermine a party's general right to act on its own interests in a way that may incidentally lessen the other party's anticipated fruits from [a] contract." *Thyroff*, 460 F.3d at 408.

## CONCLUSION

For the foregoing reasons, Plaintiffs' motions for partial summary judgment are granted. Within two weeks from the date of this Order, the parties shall submit a joint letter proposing next steps in this action.

The Clerk of Court is respectfully directed to terminate the motions at docket numbers 151, 157, 161, and 189.

SO ORDERED.

Dated: August 26, 2022
New York, New York

Hon. Ronnie Abrams
United States District Judge

---

[18] Indeed, internal PNC communications show that PNC employees consulted with each other to confirm that the higher interest rate Dana would pay following the TALA was proper, belying any inference of bad faith. *See* Cecchi Dec. Ex. 151 (PNC employee explaining: "Dana pays Business Credit its all-in rate of 7.25% (LIBOR floor of 3% plus 4.25% spread) on the entire outstanding loan balance.  On the notional amount of the swap, $116MM, Dana pays a fixed rate of 5.17% less the current 30-day LIBOR floating rate, .43%, for an all-in swap rate of 4.74%.  The 7.25% to Business Credit, plus the 4.74% for the swap equals 11.99% or 12%, as the company indicated.  *I had [another PNC employee] confirm this several times as I inquired if this equated to a double charging of the interest on the notional amount.  He said this was how the swap contract works.*") (emphasis added).

27

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| PNC BANK, NATIONAL ASSOCIATION, ET AL., | |
| Plaintiffs, | |
| -against- | No: 1:16-CV-07797 (JLR) (JW) |
| DANA TRANSPORT, INC. and RONALD B. DANA, | **OPINION & ORDER** |
| Defendants. | |

JENNIFER L. ROCHON, United States District Judge:

Plaintiffs PNC Bank, National Association; Wells Fargo Capital Finance, LLC; Wells

Fargo Bank, National Association; BMO Harris Bank; Huntington National Bank; Cathay

Bank; and Bank Leumi, USA (collectively, "Plaintiffs") previously prevailed on a summary

judgment motion against Defendants Ronald B. Dana and his company, Dana Transport, Inc.

(collectively, "Defendants" or "Dana"), on the claim that Dana is obligated to indemnify

Plaintiffs for attorneys' fees incurred in any action initiated by Dana related to a loan

agreement between the parties. *See generally* ECF No. 209 ("SJ Op."). Plaintiffs thereafter

filed motions to recover the attorneys' fees expended by their respective counsel and costs.

*See generally*, ECF Nos. 215, 218, 222. Defendants oppose the award of fees, and in the

alternative, urge the Court to reduce the attorneys' fees amounts requested by Plaintiffs. ECF

No. 225 ("Opp."). The Court GRANTS the motions for attorneys' fees for the reasons stated

below.

## BACKGROUND

The Court assumes familiarity with the parties' relationship and previous history as

comprehensively described in the Court's opinion granting partial summary judgment. SJ Op.

For ease of reference, the Court will recount the relevant details below.

Plaintiffs and Defendants had a longstanding financial relationship that revolved around a series of credit and security agreements. *Id.* at 2-6. The most recent credit agreement, the Third Amended Loan Agreement (the "TALA"), was entered into on April 27, 2009. *Id.* at 5. The TALA contains the indemnification provision at issue in this case:

> Each Borrower shall indemnify Agent, each Lender and each of their respective officers, directors, Affiliates, employees and agents from and against any and all liabilities, obligations, losses, damages, penalties, actions, judgments, suits, costs, expenses and disbursements of any kind or nature whatsoever (including, without limitation, fees and disbursements of counsel) which may be imposed on, incurred by, or asserted against Agent or any Lender in any claim, litigation, proceeding or investigation instituted or conducted by any Governmental Body or instrumentality or any other Person with respect to any aspect of, or any transaction contemplated by, or referred to in, or any matter related to, this Agreement or the Other Documents, whether or not Agent or any Lender is a party thereto, except to the extent that any of the foregoing arises out of the willful misconduct of the party being indemnified (as determined by a court of competent jurisdiction in a final and non-appealable judgment).

*Id.* (quoting ECF No. 225-1, Cecchi Decl., Ex. 1 ("TALA") § 16.5). On January 29, 2013, the lending relationship between the parties ended because Dana refinanced its debt with non-party lenders and executed a payoff letter. SJ Op. at 6.

On October 8, 2015, Dana sued Plaintiffs in this district for RICO claims, contract claims, and tort claims arising from the lending relationship between the parties. *Id.* at 6-7. Dana voluntarily dismissed this initial action ("*Dana I*") in December 2015. *Id.* at 7. Plaintiffs, through counsel for PNC, sent a demand letter to Dana requesting indemnification pursuant to the TALA and Ron Dana's personal guaranty. *Id.* at 7. Dana refused to indemnify Plaintiffs. *Id.* Accordingly, Plaintiffs filed the present action seeking indemnification on October 5, 2016. ECF No. 1 ("Compl.").

Prior to the filing of this action, Dana filed a second lawsuit ("*Dana II*") against Plaintiffs and others on April 6, 2016 in New Jersey state court raising contract and tort claims stemming from the lending relationship. SJ Op. at 7. Plaintiffs filed a counterclaim seeking indemnification under the TALA. *Id.* The Court has been informed that *Dana II* is still pending before the New Jersey Superior Court. ECF No. 230.

Turning back to the indemnification action before this Court, the Court denied a motion to dismiss on September 22, 2017, holding that "the TALA required Dana to indemnify Lenders for []attorneys' fees incurred by them in litigation instituted by Dana Transport Incorporated, as was *Dana I.*" *Id.* at 7. The Court also considered, and denied, a motion for judgment on the pleadings from Plaintiffs. ECF No. 107.

On August 26, 2022, the Court granted partial summary judgment in favor of Plaintiffs. SJ Op. at 27. The Court concluded that there were no issues of fact as to whether the TALA contains an indemnification provision, that Plaintiffs performed under the TALA, and that Dana failed to indemnify Plaintiffs for attorneys' fees incurred with respect to *Dana I. Id.* at 9. The Court next considered whether the TALA was unenforceable because Dana signed the agreement under duress and/or that Dana had no duty to indemnify because Plaintiffs committed "willful misconduct," as set forth in a carve out provision of the indemnification clause. *Id.* at 9. The Court rejected both of these arguments and ruled in favor of Plaintiffs on their partial summary judgment motion. *Id.* at 9-25.

The Court directed the parties to file a joint letter proposing next steps in the action. *Id.* at 27. In that letter, Plaintiffs proposed that the Court would decide the attorneys' fees and costs to be awarded given the jury waiver in the loan agreement, and proposed a briefing schedule for their fee application. *See* ECF No. 210. Defendants took issue with Plaintiffs' suggestion that they may seek fees for the present indemnification action instituted by

Plaintiffs, and stated that if Plaintiffs sought fees incurred only with respect to *Dana I*, the 2015 action, they would agree to the briefing schedule proposed by Plaintiffs. *Id.* at 2-4. Plaintiffs agreed that they would only seek fees and costs associated with *Dana I* and the mutually-agreed -upon briefing schedule was thereafter ordered by the Court. ECF Nos. 211, 212. The case was reassigned to the undersigned on September 26, 2022. ECF No. 213. The parties confirmed in a joint letter to the Court dated October 10, 2022 that "no trial on Plaintiffs' fee applications is necessary for the fee applications" in this case. ECF No. 221.

Pursuant to the next steps agreed upon by the parties, Plaintiffs BMO Harris Bank and Huntington National Bank (collectively, "BMO and HNB") filed a motion for attorneys' fees on October 7, 2022. ECF No. 215 ("BMO and HNB Mot."). That motion was supported by a declaration with exhibits, ECF No. 216 ("Dollar Decl."), and a memorandum of law in support, ECF No. 217 ("BMO and HNB Br."). On the same day, Wells Fargo Bank, National Association and Wells Fargo Capital Finance LLC (collectively, "Wells Fargo") filed their motion for attorneys' fees, ECF No. 218 ("Wells Fargo Mot."), with a declaration and exhibits, ECF No. 219 ("Haddad Decl."), and a memorandum of law in support of their motion, ECF No. 220 ("Wells Fargo Br."). The remaining Plaintiffs, Cathay Bank, Bank Leumi, USA, and PNC Bank, National Association (collectively "PNC") filed a motion for attorneys' fees on October 24, 2022. ECF No. 222 ("PNC Mot.").[1] PNC also submitted a memorandum of law in support, ECF No. 223 ("PNC Br.") and a declaration, ECF No. 224 ("Nicholas Decl."). Defendants filed an omnibus brief in opposition on November 4, 2022, ECF No. 225 ("Opp. Br."), with a supporting declaration and exhibits (ECF No. 225-1)

---

[1] The PNC motion was initially filed on October 7, 2022 with the other motions (ECF No. 214) but rejected by the Clerk of Court due to a filing error. It was thereafter refiled on October 24, 2022.

4

("Cecchi Decl."). Each group of Plaintiffs filed a reply brief on November 18, 2022. ECF No. 226 ("PNC Reply"); ECF No. 227 ("Wells Fargo Reply"); ECF No. 228 ("BMO and HNB Reply").

**DISCUSSION**

Plaintiffs seek the following amounts as reasonable attorneys' fees and expenses for which they are entitled to be indemnified by Defendants.

| BMO Application[2] | | | |
|---|---|---|---|
| **Timekeeper** | **Requested Rate** | **Hours Billed** | **Total** |
| Stephen Mark Dollar | $770.00 | 4.1 | $3,157.00 |
| Mark Thomas Oakes | $720.00 | 7.0 | $5,040.00 |
| William Patrick Courtney | $380.00 | 10.0 | $3,800.00 |
| **Additional** | | | |
| Expenses | | | $350.25 |
| Client Discount | | | -$1,623.30 |
| **Total** | | **21.1** | **$10,723.95** |

| HNB Application[3] | | | |
|---|---|---|---|
| **Timekeeper** | **Requested Rate** | **Hours Billed** | **Total** |
| Stephen Mark Dollar | $770.00 | 3.3 | $2,541.00 |
| Mark Thomas Oakes | $720.00 | 8.1 | $5,832.00 |
| William Patrick Courtney | $380.00 | 1.8 | $684.00 |
| **Additional** | | | |
| Expenses | | | $381.34 |
| Client Discount | | | -$1,620.72 |
| **Total** | | **13.2** | **$7,817.62** |

| Wells Fargo Application[4] | | | |
|---|---|---|---|
| **Timekeeper** | **Requested Rate** | **Hours Billed** | **Total** |
| Richard G. Haddad | $750.00 | 13.0 | $9,750.00 |
| Andrew Kramer | $750.00 | 19.8 | $14,850.00 |
| Pauline McTernan | $520.00 | 5.6 | $2,912.00 |
| Meaghan Millan | $250.00 | 0.5 | $125.00 |
| **Total** | | **38.9** | **$27,637.00** |

---

[2] *See* BMO and HNB Br. at 6; Dollar Decl. ¶ 14; ECF No. 216-3.
[3] See BMO and HNB Br. at 6.  Dollar Decl. ¶ 15; ECF No. 216-4.
[4] *See generally* Haddad Decl. and attached exhibits.

5

| PNC Application[5] | | | |
|---|---|---|---|
| Timekeeper | Requested Rate | Hours Billed | Total |
| Robert A. Nicholas | $400.00 | 155.2 | $62,080.00 |
| Evan K. Farber | $400.00 | 118.6 | $47,440.00 |
| Anne E. Rollins | $275.00 | 145.2 | $39,930.00 |
| Joshua M. Peles | $275.00 | 65.6 | $18,040.00 |
| Rebecca D. Maller | $275.00 | 39.5 | $10,862.50 |
| Marguerita T. Young-Jones | $120.00 | 0.3 | $36.00 |
| **Additional** | | | |
| Expenses | | | $1,568.52 |
| **Total** | | **524.4** | **$179,957.02** |

Defendants oppose this application on two grounds. First, they argue that Plaintiffs are not entitled to any award of attorneys' fees at this juncture under the terms of the TALA. Opp. Br. at 2-4. Second, they assert that the requested fees should be rejected as unreasonable because the billing records contain redactions and block billing. *Id.* at 4-8. The Court will address each objection in turn.

## I.   ENTITLEMENT TO FEES

Defendants first argue that the Plaintiffs are not entitled to attorneys' fees pursuant to the TALA at this time. Section 16.5 of the TALA states, in relevant part, as follows:

> Each Borrower shall indemnify Agent, each Lender . . . from and against any and all liabilities, obligations, losses, damages, penalties, actions, judgments, suits, costs, expenses and disbursements of any kind or nature whatsoever (including, without limitation, fees and disbursements of counsel) which may be imposed on, incurred by, or asserted against Agent or any Lender in any claim, litigation, proceeding or investigation instituted or conducted by any Governmental Body or instrumentality or any other Person with respect to any aspect of, or any transaction contemplated by, or referred to in, or any matter related to, this Agreement …, except to the extent that any of the foregoing arises out of the willful misconduct of the party being indemnified (<u>as determined by a court of competent jurisdiction in a final and non-appealable judgment</u>).

---

[5] *See* Nicholas Decl. ¶ 23 and attached exhibits at ECF No. 224.

6

TALA at 95 (emphasis added).  Defendants argue that because a necessary condition of the

indemnification provision has not been met – a "court of competent jurisdiction" has not

rendered "a final and non-appealable judgment" regarding whether there has been willful

misconduct – attorneys' fees cannot be granted.  Opp. Br. at 2-3.  Defendants contend that the

April 26, 2022 summary judgment decision providing that Plaintiffs are entitled to

indemnification from Defendants "will be, but has not yet been, appealed" and therefore the

contractual trigger for indemnification set forth in Section 16.5 of the TALA has not been

met.  *Id.* at 3.  In addition, Defendants argue that *Dana II*, which alleges willful misconduct

including fraudulent concealment with respect to the TALA, is still pending in New Jersey

Superior Court and until appeals are exhausted in that case, it is premature to grant the

application for fees and costs here.  *Id.* at 3-4.

In response, Plaintiffs point out that the Court has already granted summary judgment

on whether Defendants were liable for Plaintiffs' attorneys' fees, and found that there was no

willful misconduct.  *See* BMO and HNB Reply at 1-2; PNC Reply at 2-3.  Plaintiffs contend

that Defendants have waived their new argument that an award of fees is premature.  *See*

BMO and HNB Reply at 1, 4; PNC Reply at 3.  Finally, Plaintiffs maintain that Defendants

are misinterpreting the language of the TALA's indemnification provision.  *See* BMO and

HNB Reply at 1-2; PNC Reply at 4.  The Court agrees with Plaintiffs that the present

application is appropriate.

Section 16.5 of the TALA provides for indemnification "except" if the actions arise

out of "the willful misconduct of the party being indemnified (as determined by a court of

competent jurisdiction in a final and non-appealable judgment)."  TALA § 16.5.  This Court

has already rejected a finding of willful misconduct here and ordered that Plaintiffs are

entitled to indemnification from Defendants. *See* SJ Op. That is law of the case. *See Perreca v. Gluck*, 262 F. Supp. 2d 269, 272 (S.D.N.Y. 2003) (internal citation and quotation marks omitted) ("[A] decision on an issue of law made at one stage of a case becomes binding precedent to be followed in subsequent states of the same litigation[.]"). Therefore, the provision of the Section 16.5 of the TALA that carves out indemnification for willful misconduct is inapplicable. It also necessarily follows that there has been no final and non-appealable judgment that there was willful misconduct. TALA § 16.5. Thus, this exception does not apply, and it is appropriate for the Court to determine the amount of attorneys' fees and costs due.

Defendants' argument that the present summary judgment decision must proceed through all appeals before attorneys' fees can be determined does not make sense. Defendants have not sought to appeal the Court's summary judgment decision on indemnification liability since it was issued over a year ago. They are presumably waiting to appeal until a final award of attorneys' fees are entered. *See Honeywell Int'l, Inc. v. Purolator Prods. Co.*, 468 F.3d 162, 164 (2d Cir. 2006) (award of attorneys' fees is "not an appealable final order until the amount of fees and costs has been set by the district court"). Given the Court's prior order that Plaintiffs are entitled to indemnification, determining the amount of those attorneys' fees and costs is now appropriate.

Indeed, such a determination is the very next step agreed upon by the parties. The Court expressly asked the parties after granting summary judgment for a joint proposal regarding next steps in this case. SJ Op. at 27. The parties jointly proposed briefing on the application for attorneys' fees for *Dana I*. ECF No. 212. The only dispute that was previewed to the Court was that Defendants disagreed that Plaintiffs could seek fees for this indemnification action brought by Plaintiffs, in addition to the attorneys' fees related to *Dana*

8

*I.* ECF No. 210.  Plaintiffs ultimately agreed to only seek attorneys' fees related to *Dana I*, and therefore Defendants agreed to the briefing schedule that included Plaintiff's fee application with supporting documents to be filed on October 7, 2022.  ECF No. 211.  At no time did Defendants suggest that such a motion needed to wait until a not-yet-filed appeal was concluded.

The Court is not persuaded by Defendants' reliance on *Zyburo v. Continental Cas. Co.*, 60 F. Supp. 3d 531 (S.D.N.Y. 2014).  In *Zyburo*, the court found that New York Insurance Law Section 3420 did not permit a non-party to an insurance contract to seek a declaratory judgment against the insurer to establish coverage for the insured until it had a judgment against the insured that was outstanding for thirty days.  *Id.* at 534-35.  That the plaintiff in *Zyburo* did not have standing yet to sue the insured under New York insurance law does not speak at all to whether the attorneys' fee application that follows the grant of summary judgment on indemnification under the TALA is appropriate here.

The Court further rejects Defendant's argument that this Court cannot grant Plaintiffs' application for fees and costs until there is a final judgment from the New Jersey Appellate Division or Supreme Court in *Dana II*.  Opp. Br. at 4.  This Court has already rejected Defendants' claim that there was any willful misconduct that excuses Defendants from indemnifying Plaintiffs for *Dana I*.  SJ Op. at 14-25.  In opposing summary judgment before this Court, Defendants previously argued that the New Jersey Court was "a court of competent jurisdiction" that should decide whether the lenders acted with willful misconduct, as opposed to this Court.  ECF No. 181 at 32-33.  Noting its earlier holding that it would not stay or defer ruling on this matter because another action was pending in *Dana II*, SJ Op. at 7-8, this Court, undeniably a court of competent jurisdiction, then went on to rule that there was no willful misconduct excusing indemnification, *id.* at 14-25.  That a court in New Jersey in *Dana II* is

adjudicating claims, some of which sound in fraud, ECF No. 230-1, and the judgment of which eventually may be appealed, does not nullify the fact that in this case, the Court has expressly rejected a claim of willful misconduct and ordered that indemnification is appropriate for the 2015 action. *See generally* SJ Op.

For all of these reasons, the Court rejects Defendants' argument that the present fee application is premature and moves on to determine the reasonableness of the fees requested.

## II.    REASONABLE ATTORNEYS' FEES

In evaluating the present motion, the Court must assess the reasonableness of the attorneys' fees and costs requested by each Plaintiff. In summary, BMO and HNB seek a total of $18,541.57. *See* BMO and HNB Br. at 6. Wells Fargo seeks $27,637.00. *See* Wells Fargo Br. at 9. Finally, PNC seeks $179,637.02. *See* PNC Br. at 2.

To determine appropriate attorneys' fees, the Court calculates a "'presumptively reasonable fee' by determining the appropriate billable hours expended and 'setting a reasonable hourly rate, taking account of all case-specific variables.'" *Lilly v. City of New York*, 934 F.3d 222, 229-30 (2d Cir. 2019) (quoting *Arbor Hill Concerned Citizens of Elections*, 522 F.3d 182, 189-90 (2d Cir. 2008)). "[T]he fee applicant . . . bear[s] the burden of documenting the hours reasonably spent by counsel, and the reasonableness of the hourly rates claimed." *Allende v. Unitech Design, Inc.*, 783 F. Supp. 2d 509, 512 (S.D.N.Y. 2011) (internal quotation marks and citation omitted).

To determine a reasonable hourly rate, courts look to the "prevailing [rate] in the community for similar services by lawyers of reasonably comparable skill, experience and reputation." *Blum v. Stenson*, 465 U.S. 886, 895 n.11 (1984). To determine what a reasonable client would pay, courts consider the "*Johnson* factors":

> (1) the time and labor required; (2) the novelty and
> difficulty of the questions; (3) the level of skill required to
> perform the legal service properly; (4) the preclusion of
> employment by the attorney due to acceptance of the case;
> (5) the attorney's customary hourly rate; (6) whether the fee
> is fixed or contingent; (7) the time limitations imposed by
> the client or the circumstances; (8) the amount involved in
> the case and the results obtained; (9) the experience,
> reputation, and ability of the attorneys; (10) the
> "undesirability" of the case; (11) the nature and length of
> the professional relationship with the client; and (12)
> awards in similar cases.

*Arbor Hill*, 493 F.3d at 186 n.3 (citing *Johnson v. Ga. Highway Exp., Inc.*, 488 F.2d 714, 717-19 (5th Cir. 1974)). The Court will also consider that "a reasonable, paying client wishes to spend the minimum necessary to litigate the case effectively." *Id.* at 190.

Turning to reasonable hours billed, a claimant is only to be compensated for "'hours reasonably expended on the litigation,' and not for hours 'that are excessive, redundant, or otherwise unnecessary.'" *Thor 725 8th Ave. LLC*, No. 14-cv-04968 (PAE), 2015 WL 8784211, at *9 (S.D.N.Y. Dec. 15, 2015) (citing *Hensley v. Eckerhart*, 461 U.S. 424, 433-34 (1983)). Requests must be documented by contemporaneous time records that "specify, for each attorney, the date, the hours expended, and the nature of the work done." *Id.* (quoting *N.Y. Ass'n for Retarded Children, Inc. v. Carey*, 711 F.2d 1136, 1148 (2d Cir. 1983)). If the court identifies excessive billing, it "has discretion simply to deduct a reasonable percentage of the number of hours claimed as a practical means of trimming fat from a fee application." *Rodriguez ex rel. Kelly v. McLoughlin*, 84 F. Supp. 2d 417, 425 (S.D.N.Y. 1999) (internal citation and quotation marks omitted). In sum, "the determination of fess 'should not result in a second major litigation.'" *Restivo v. Hessemann*, 846 F.3d 547, 591 (2d Cir. 2017) (quoting *Fox v. Vice*, 563 U.S. 826, 828 (2011)).

11

### A. Hourly Rates

Defendants do not object to the hourly rates each party requested for their counsel. However, the Court will evaluate the reasonableness nonetheless. To calculate a reasonable fee, courts must rely on the "prevailing [hourly rate] in the community." *Arbor Hill*, 522 F.3d at 190 (internal citation and quotation marks omitted). The community is "the district where the district court sits." *Id.* Plus, "the district court should consider, among others, the *Johnson* factors; it should also bear in mind that a reasonable, paying client wishes to spend the minimum necessary to litigate the case effectively." *Id.*

The community in this case is the Southern District of New York. Each party has also represented that their requested rates stem from what their clients agreed to pay. *See* BMO and HNB Br. at 7; Wells Fargo Br. at 8-9; PNC Br. at 4. The Court also takes into account that *Dana I* "raised complex issues including RICO, contract and tort claims arising from the years-long lending relationship between the parties . . . ." Wells Fargo Br. at 9. The Court also notes that for commercial matters, the rate for partners is often between $500 and $850 per hour, and the rate for associates between $300 and $500 per hour. *See Genger v. Genger*, No. 14-cv-5683 (KBF), 2015 WL 1011718, at *2 (S.D.N.Y. Mar. 9, 2015) (determining that courts have awarded experienced law firm partners between $500 and $800 per hour and associates $300 and $500 per hour); *U.S. ex rel. Nichols v. Comput. Scis. Corp.*, 499 F. Supp. 3d 32, 41 (S.D.N.Y. 2020) (awarding $850 for partners after noting that "the average partner billing rate" in the Southern District of New York was $942 in 2015 and between $425 and $500 for associates). With the *Johnson* factors in mind,[6] the Court finds that the requested rates for all counsel here are reasonable.

---

[6] While the Court does not specifically address each *Johnson* factor in this opinion, it has considered these factors in determining the appropriate hourly rate for counsel. *See C.D. v.*

12

Plaintiffs BMO and HNB seek a rate of $770 for Stephen Mark Dollar, $720 for Mark Thomas Oakes, and $380 for William Patrick Courtney.  ECF No. 216-3 at 3; ECF No. 216-4 at 3.  BMO and HNB assert that the rates for their counsel are reasonable because they represent the rate a client would be willing to pay.  BMO and HNB Br. at 7.  BMO and HNB have also demonstrated that these rates are consistent with those the firm charges to clients for matters in this district for "the same or similar services by attorneys with comparable experience, reputation, and ability." *Id.* at 8.  These rates are also consistent with rates in this district for work done on commercial matters by large law firms as stated above.

Wells Fargo seeks fees of $750 for partners, $520 for a senior associate with 7 years of experience; and $250 an hour for a junior associate.  Wells Fargo Br. at 7. With no objection from Defendants, the Court finds these hourly rates reasonable and within the range normally awarded in this district.  *See* supra at 12.

PNC Bank, Cathay Bank, and Bank Leumi request an hourly rate for their attorneys of $400 for partners and $275 for associates.  PNC Br. at 4.  These rates are within the range, or below, those normally charged within this district and are reasonable.  *See* supra at 12.

**B.  Reasonable Hours**

Defendants raise two issues with the amount of time billed: (1) Plaintiffs' counsel has redacted their billing records so that the records are "so vague and ambiguous that neither Defendants nor this Court can determine whether they are reasonable," Opp. Br. at 4-7; and (2) Plaintiffs' counsel has improperly "bulk billed" their time entries in several instances, *id.*

---

*Minisink Valley Cent. Sch. Dist.*, No. 17-cv-07632 (PAE), 2018 WL 3769972, at *4 (S.D.N.Y. Aug. 9, 2018) ("A district court need not recite and make separate findings as to all twelve *Johnson* factors, provided that it takes each into account in setting the attorneys' fee award." (citation omitted)).

13

at 7-8.  Other than objecting to the foregoing, Defendants do not otherwise take issue with the reasonableness of the time that was expended by Plaintiffs in particular entries.

*1. Redactions*

The Court will consider the redactions first.  Courts have found that time entries that are too vague "prevent the Court from determining whether the time expended was reasonable."  *Miroglio S.P.A. v. Conway Stores, Inc.*, 629 F. Supp. 2d 307, 314 (S.D.N.Y. 2009).

Defendants BMO and HNB redacted only irrelevant information such as an internal matter number, client accounting information and financial account numbers, and time entries for which BMO and HNB are not seeking fees.  *See* ECF No. 216-3; ECF No. 216-4; BMO and HNB Reply at 3.  These redactions are minimal and do not prevent this Court from evaluating the reasonableness of the time billed.

The billing records for counsel for Wells Fargo include limited redactions.  Of the 71 entries, the only redactions remove the names of 6 former and current employees of Wells Fargo with whom counsel spoke, for privacy reasons.  Wells Fargo Reply at 6-7; Haddad Decl. ¶ 1; ECF No. 219-1.  These redactions do not prevent the Court from assessing the reasonableness of the time expended, and the Court rejects Defendants' objection to these records.

The records submitted by PNC contain more redactions.  Some of the redactions do not pertain to relevant information for purposes of assessing reasonable fees such as time and fees that are not being sought in this action, ECF No. 224-2 at 3, ECF No. 224-3 at 3, and wiring and instructions and client file number, ECF No. 224-2 at 4.  But Counsel for PNC also redacted some privileged descriptions of their work, including certain topics they researched.  *See* ECF Nos. 224-2, 224-3.  The Court has closely reviewed these records and, despite the

14

redactions, sufficient text remained in many of the entries from which to evaluate the

reasonableness of the billing records.  For example, one entry for 1.3 hours from 10/15/15

states: "Strategy and planning meeting with Bob Nicholas and Evan Farber.  Reviewed Evan's

analysis [redacted.]"  It is not necessary to scrutinize the particular legal issue contained in the

analysis; the Court can determine that 1.3 hours of time for a strategy and planning meeting

between the lawyers, where one of the lawyer's legal analysis was reviewed, at the time the

lawyers were considering a potential motion to dismiss (ECF No. 224-2 at 4, 10/15/15 Rollins

entry), is reasonable.  *See also* ECF No. 224-4 at 6 (Rollins' entries redacting topics contained

in the motion to dismiss still provide sufficient information to conclude that the 1.20 and 3.80

hours spent on reviewing information for the motion to dismiss is reasonable).  Similarly, the

5.9 hours of research conducted on 11/13/15 by Peles, with the block billing broken down to

show that various topics were researched (ECF No. 224-3 at 7-8), is reasonable.  As noted in

the 11/12/15 entry of Rollins, the lawyers were researching the complicated area of RICO at

this time.  *Id.* at 6.  Finally, it is not unreasonable for Rollins to bill 5.3 and 10.10 hours for

drafting a motion to dismiss in this complicated case on 11/21/15 and 11/22/15 respectively,

even if the particular legal topics in the proposed motion to dismiss are redacted from the time

entries.  *See* ECF No. 224-3 at 15; *see, e.g.*, *Hitachi Data Sys. Credit Corp. v. Precision*

*Discovery, Inc.*, 2020 WL 5731953, at *3 (S.D.N.Y. Sept. 24, 2020) (refusing reduction for

redacted records because the "[c]ourt can still determine the nature of the work performed"

based on the context).  Indeed, "[c]ourts in this circuit have awarded attorneys' fees despite

the redaction of privileged information in attorneys' time records."  *CDO Plus Master Fund*

*Ltd. v. Wachovia Bank, N.A.*, No. 07-cv-11078 (LTS), 2011 WL 4526132, at *4 (S.D.N.Y.

Sept. 29, 2011).

In an abundance of caution, and because some of the entries provided more limited

information as redacted, the Court requested and reviewed the unredacted portions of the

billing records to review *in camera*. ECF No. 231. This review confirms that the topics for

the research and discussions were relevant to this dispute, and that most of the time expended

was reasonable. *See Internet Law Library, Inc. v. Southridge Capital Mgmt. LLC*, No. 01-cv-

00877 (JSR), 2010 WL 3290965, at *3 (S.D.N.Y. Aug. 11, 2010) (reviewing billing records *in

camera* to assess tasks conducted and reasonableness of fess requested); *Major League

Baseball Props., Inc. v. Corporacion de Television y Microonda Rafa, S.A.*, No. 19-cv-08669

(MKV), 2020 WL 5518361, at *4 (S.D.N.Y. Sept. 14, 2020) (rejecting objection to in camera

review of billing records in order to assess reasonable attorneys' fees because "courts often

review invoices and billing records *in camera* when calculating awards of attorneys' fees and

costs") (collecting cases).[7]

In its review, the Court did determine that there were two entries that were

unreasonable and should be subtracted from the fee award: 10/27/15 Farber entry for 0.3

hours for $400 (ECF No. 224-2 at 11); 10/30/15 Rollins entry for 0.9 hours for $275 (ECF

No. 224-2 at 16). Therefore, recoverable fees will be reduced by $675.

   *2. Block Billing*

Defendants' second objection is to some of PNC's counsel's entries where Defendants

assert that block billing obfuscates the amount of time spent on particular tasks and introduces

---

[7] The Court will permit the billing records to remain redacted, as filed. While they are judicial
documents and important to the subject matter of this dispute to recover fees, they contain
privileged information that reflects litigation strategy and the particular areas of research
conducted by counsel. *See Flatiron Acquisition Vehicle, LLC v. CSE Mortg. LLC*, No. 17-cv-
8987-GHW, 2021 WL 4481853, at *1-2 (S.D.N.Y. Sept. 29, 2021) (reviewing *in camera*
charts detailing legal work performed by counsel and permitting filing of redacted billing
records given privileged nature of redacted narratives).

vagary. Opp. Br. at 7. "Block billing . . . – the practice of lumping multiple distinct tasks into a single billing entry – is generally disfavored because it can complicate the district court's task of determining the reasonableness of the billed hours." *Raja v. Burns*, 43 F.4th 80, 87 (2d Cir. 2022). Despite this admonition, block billing is not impermissible when "the district court is still able to conduct a meaningful review of the hours for which counsel seeks reimbursement." *Id.* (internal citation and quotation marks omitted). Courts generally allow block billing when the blocked amount of time is short and the billing entry contains "enough detail and specificity so as to afford reasonable confidence that the time billed was productively spent, even if it is impossible to reconstruct the precise amounts of time allocable to each specific task listed in the block entry." *Beastie Boys v. Monster Energy Co.*, 112 F. Supp. 3d 31, 54 (S.D.N.Y. 2015).

While some of PNC's counsel's records reflect a degree of block billing, the Court finds the records sufficiently detailed to allow counsel and the Court to determine whether the time billed was reasonable. *See* ECF No. 224-3. Most of the blocked billing entries bill times within 1 to 2 hours. *Cf. Beastie Boys*, 112 F. Supp. 3d at 53 (finding block billing most problematic when "large amounts of time (e.g., five hours or more) are block billed"). Entries reflecting five hours and longer generally are broken down into the time spent on each task, averting the lack of specificity that is created by block billing. *See* ECF No. 224-3 at 6 (11/4/2015 Peles Entry; 11/13/2015 Peles Entry). However, some entries are long, over 5 hours and sometimes over 7 hours, and do not break down the time spent on tasks. *See id.* at 12, 16 (11/18/2015 Farber Entry; 11/18/2015 Rollins Entry; 11/23/2015 Rollins Entry). Accordingly, the Court will apply a 5% reduction to the hours sought by PNC's counsel to account for the vague entries that obfuscate how much time was actually spent on certain tasks.

17

Defendants raise no other objections to Plaintiffs' billing records or expenses. The Court has closely reviewed the billing records and finds the hours spent to be reasonable, subject to the reductions above.

### C. Calculation of Reasonable Attorneys' Fees and Costs

Based on the foregoing, the Court finds the following attorneys' fees and costs to be reasonable and appropriate here:

| BMO Award[8] | | | |
|---|---|---|---|
| **Timekeeper** | **Requested Rate** | **Hours Billed** | **Total** |
| Stephen Mark Dollar | $770.00 | 4.10 | $3,157.00 |
| Mark Thomas Oakes | $720.00 | 7.00 | $5,040.00 |
| William Patrick Courtney | $380.00 | 10.00 | $3,800.00 |
| **Additional** | | | |
| Expenses | | | $350.25 |
| Client Discount | | | -$1,623.30 |
| **Total** | | **21.1** | **$10,723.95** |

| HNB Award[9] | | | |
|---|---|---|---|
| **Timekeeper** | **Requested Rate** | **Hours Billed** | **Total** |
| Stephen Mark Dollar | $770.00 | 3.30 | $2,541.00 |
| Mark Thomas Oakes | $720.00 | 8.10 | $5,832.00 |
| William Patrick Courtney | $380.00 | 1.8 | $684.00 |
| **Additional** | | | |
| Expenses | | | $381.34 |
| Client Discount | | | -$1,620.72 |
| **Total** | | **13.2** | **$7,817.62** |

| Wells Fargo[10] | | | |
|---|---|---|---|
| **Timekeeper** | **Requested Rate** | **Hours Billed** | **Total** |
| Richard G. Haddad | $750.00 | 13 | $9,750 |
| Andrew Kramer | $750.00 | 19.8 | $14,850 |
| Pauline McTernan | $520.00 | 5.6 | $2,912 |
| Meaghan Millan | $250.00 | .5 | $125 |
| **Total** | | **38.9** | **$27,637.00** |

---

[8] *See* Dollar Decl. ¶ 14; ECF No. 216-3.
[9] *See* Dollar Decl. ¶ 15; ECF No. 216-4.
[10] *See generally* Haddad Decl. and attached exhibits.

18

| PNC Adjusted Award[11] | | | |
|---|---|---|---|
| **Timekeeper** | **Requested Rate** | **Hours Billed** | **Total** |
| Robert A. Nicholas | $400 | 147.44 | $58,976.00 |
| Evan K. Farber | $400 | 112.67 | $45,068.00 |
| Anne E. Rollins | $275.00 | 137.94 | $37,933.50 |
| Joshua M. Peles | $275.00 | 62.32 | $17,138.00 |
| Rebecca D. Maller | $275.00 | 37.525 | $10,319.38 |
| Marguerita T. Young-Jones | $120.00 | 0.285 | $34.20 |
| **Additional** | | | |
| Expenses | | | $1,568.52 |
| Court deduction | | | -$675.00 |
| **Total** | | **524.4** | **$170,362.60** |

## CONCLUSION

For the foregoing reasons, the Court GRANTS the Plaintiffs' motions for attorneys' fees at ECF Nos. 215, 218, and 220.  BMO and HNB are awarded $18,541.57 in attorneys' fees and expenses.  Wells Fargo is awarded $27,637.00 in attorneys' fees and expenses.  PNC is awarded $170,362.60 in attorneys' fees and expenses.  The Clerk of the Court is respectfully requested to CLOSE this case.

Dated:   September 5, 2023
      New York, New York

SO ORDERED.

*Jennifer Rochon*

JENNIFER L. ROCHON
United States District Judge

---

[11] *See* Nicholas Decl. ¶ 23 and attached exhibits.  A 5% reduction has been applied to the hours billed.

19