# No. 23-7272

## United States Court of Appeals

### FOR THE SECOND CIRCUIT

PNC BANK, NATIONAL ASSOCIATION, WELLS FARGO CAPITAL
FINANCE, LLC, WELLS FARGO BANK, NATIONAL ASSOCIATION,
BMO HARRIS BANK, HUNTINGTON NATIONAL BANK,
CATHAY BANK, and BANK LEUMI USA

*Plaintiffs-Appellees,*

– v. –

DANA TRANSPORT, INC. and RONALD B. DANA

*Defendants-Appellants.*

On Appeal from the United States District Court
for the Southern District of New York (No. 16-cv-7797)

## BRIEF FOR PLAINTIFFS-APPELLEES

Robert A. Nicholas
Anne Rollins Bohnet
Joseph J. Mahady
Joshua M. Peles
REED SMITH LLP
Three Logan Square,
1717 Arch Street, Suite 3100
Philadelphia, Pennsylvania 19103
(215) 851-8100

James C. Martin
REED SMITH LLP
225 Fifth Avenue, Suite 1200
Pittsburgh, PA 15222
(412) 288-3131

*Attorneys for Plaintiffs-Appellees
PNC Bank, National Association,
Cathay Bank, and Bank Leumi USA*

*Additional counsel on next page*

Stephen M. Dollar
Felice B. Galant
NORTON ROSE FULBRIGHT
US LLP
1301 Avenue of the Americas
New York, New York 10019
Tel: (212) 318-3000

*Attorneys for Plaintiffs-Appellees*
*BMO Bank, N.A. (f/k/a BMO Harris*
*Bank) and The Huntington National*
*Bank*

Richard Haddad
Pauline McTernan
OTTERBOURG P.C.
230 Park Avenue, 30th Floor
New York, New York 10169
Tel: (212) 661-9100

*Attorneys for Plaintiffs-Appellees Wells*
*Fargo Bank, National Association and*
*Wells Fargo Capital Finance, LLC*

## CORPORATE DISCLOSURE STATEMENTS

Pursuant to Rule 26.1 of the Federal Rules of Appellate Procedure, the undersigned Plaintiffs-Appellees make the following disclosures:

### PNC BANK, NATIONAL ASSOCIATION

Plaintiff-Appellee PNC Bank, National Association, certifies that it is an indirect, wholly owned subsidiary of The PNC Financial Services Group, Inc., which is publicly traded. No publicly held company owns 10% or more of The PNC Financial Services Group, Inc.'s stock.

### WELLS FARGO BANK, NATIONAL ASSOCIATION

Plaintiff-Appellee Wells Fargo Bank, National Association certifies that it is an indirect, wholly owned subsidiary of Wells Fargo & Company, which is publicly traded. No publicly held company owns 10% or more of Wells Fargo & Company's stock.

### WELLS FARGO CAPITAL FINANCE, LLC

Plaintiff-Appellee Wells Fargo Capital Finance, LLC certifies that Wells Fargo Bank, National Association, is its parent and sole member. Wells Fargo Bank, National Association is an indirect, wholly owned subsidiary of Wells Fargo & Company, which is publicly traded. No publicly held company owns 10% or more of Wells Fargo & Company's stock.

## BMO BANK, N.A.

Plaintiff-Appellee BMO Bank, N.A. (f/k/a BMO Harris Bank) certifies that BMO Bank, N.A. is wholly owned by BMO Financial Corp, a Delaware holding company that is not publicly traded. BMO Financial Corp. is wholly owned by the Bank of Montreal, Toronto, Canada, which is publicly traded. No publicly traded company owns 10% or more of the parent.

## HUNTINGTON NATIONAL BANK

Plaintiff-Appellee The Huntington National Bank, a private non-governmental entity, certifies that The Huntington National Bank is wholly owned by Huntington Bancshares Incorporated. No publicly traded company owns 10% or more of the parent.

## CATHAY BANK

Plaintiff-Appellee Cathay Bank certifies that Cathay Bank is a wholly owned subsidiary of Cathay General Bancorp, which is publicly traded. The Vanguard Group, Inc. and BlackRock, Inc. each owns at least 10% of the stock of Cathay General Bancorp.

## BANK LEUMI USA

Plaintiff-Appellee Bank Leumi USA (n/k/a Valley National Bank) certifies that Valley National Bank is a wholly owned subsidiary of Valley National Bancorp, which is publicly traded. Bank Leumi Le-Israel B.M., which is a publicly traded

Israeli bank, and BlackRock, Inc., which is publicly traded, each owns at least 10%
of the stock of Valley National Bancorp.

# TABLE OF CONTENTS

Page

PRELIMINARY STATEMENT ..................................................................1

THE ISSUES PRESENTED FOR REVIEW ...............................................3

STATEMENT OF THE CASE.....................................................................3

I.      THE PARTIES' LENDING RELATIONSHIP .....................................3

     A.      2004 to 2009: The Lenders Provide More Than $100 Million in Financing and The Lending Terms Are Renegotiated as a Result of Dana's Multiple Defaults........................................................4

     B.      April 2009: The Defaults Persist and the Lenders and Dana Enter into Their Operative Third Amended Loan Agreement That Includes a Broad Indemnification Provision ................................6

     C.      January 2013: Following Further Events of Default, the Parties' Relationship Ends When Dana Pays Off the Loan and Releases the Lenders from All Liability ......................................................8

II.      THE DISTRICT COURT'S COMPREHENSIVE LEGAL RULINGS RELATING TO THE PARTIES' INDEMNIFICATION AGREEMENT ....9

     A.      The District Court Holds that the Negotiated Indemnification Provision Applies to Fees Incurred in Inter-Party Litigation..............10

     B.      The District Court Grants Summary Judgment and Holds that the Indemnification Provision Is Enforceable Notwithstanding Dana's Purported Defenses ..................................................................13

SUMMARY OF THE ARGUMENT .........................................................16

ARGUMENT .............................................................................................17

I.      STANDARD OF REVIEW.................................................................17

II.      THE CONTROLLING INDEMNIFICATION PROVISION REQUIRES DANA TO INDEMNIFY THE LENDERS FOR FEES INCURRED IN DEFENDING *DANA I*...............................................19

     A.      The Indemnification Provision Plainly Applies to Inter-Party Disputes ........................................................................................20

     B.      There Is No Colorable Basis to Reverse the Indemnification Ruling ............................................................................................24

         1.      The Indemnification Provision "Unmistakably" and "Clearly" Applies to *Dana I* ....................................................24

2. Judicial Estoppel Does Not Support Reversal of Any Ruling in this Case ................................................................27

III. DANA'S PURPORTED DEFENSES TO THE ENFORCEABILITY OF THE INDEMNIFICATION AGREEMENT ARE MERITLESS...........28

A. Dana's Duress Defense Has Been Waived and Is Factually and Legally Unsupported ........................................................29

B. Dana's Willful Misconduct Defense Is Factually and Legally Unsupported ........................................................................33

1. The Court Applied the Correct Standard for Willful Misconduct ................................................................33

2. The Court Applied the Correct Standard for Summary Judgment ..................................................................37

3. The Court Correctly Found that There Are No Material Disputes of Fact on Willful Misconduct....................39

C. Dana's Remaining Affirmative Defenses Also Are Factually and Legally Unsupported ................................................45

IV. THE PENDENCY OF *DANA II* IS IRRELEVANT TO THIS PROCEEDING .................................................................46

CONCLUSION .................................................................48

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*Austin Instrument v. Loral Corp.*,
 29 N.Y.2d 124 (1971) ........................................................................30

*Austro v. Niagara Mohawk Power Corp.*,
 66 N.Y.2d 674 (1985) ........................................................................46

*Banc of Am. Sec. LLC v. Solow Bldg. Co. II, L.L.C.*,
 47 A.D.3d 239 (1st Dep't 2007) .......................................................33

*Berk v. St. Vincent's Hosp. & Med. Ctr.*,
 380 F. Supp. 2d 334 (S.D.N.Y. 2005) ........................................18, 38

*Bethlehem Contracting Co. v. Lehrer/McGovern, Inc.*,
 800 F.2d 325 (2d Cir. 1986) .............................................................19

*In re Bridge Constr. Servs. of Fla.*,
 12 Civ. 3526, 2016 U.S. Dist. LEXIS 120088 (S.D.N.Y. Sep. 5,
 2016) ..................................................................................................21

*Carbonyx License & Lease LLC v. Carbonyx Inc.*,
 No. 19-cv-1540, 2019 U.S. Dist. LEXIS 212158 (S.D.N.Y. Dec. 8,
 2019) ..................................................................................................26

*Casciani v. Nesbitt*,
 392 F. App'x 887 (2d Cir. 2010) .................................................18, 38

*Crossroads ABL LLC v. Canaras Capital Mgmt., LLC*,
 105 A.D.3d 645 (1st Dep't 2013) ......................................................22

*Dana Transport, Inc. et al. v. PNC Bank, Nat'l Assoc. et al.*,
 No. A-000295-23 (N.J. Sup. Ct. App. Div.).....................................10

*Di Rose v. PK Mgmt. Corp.*,
 691 F.2d 628 (2d Cir. 1982) ........................................................14, 29

*Garcia v. Hartford Police Dep't*,
 706 F.3d 120 ......................................................................................19

*Gardner v. Owasco River Ry., Inc.*,
  142 A.D.2d 61 (3d Dep't 1988) .......................................................... 34

*Goshawk Dedicated Ltd. v. Bank of N.Y.*,
  2010 WL 1029547 (S.D.N.Y. Mar. 15, 2010) ................................... 11

*Gramercy Advisors, LLC v. Ripley*,
  13 Civ. 9070, 2014 U.S. Dist. LEXIS 118233 (S.D.N.Y. Aug. 25,
  2014) ............................................................................................ 21, 26

*Hooper Assocs., Ltd. v. AGS Computers, Inc.*,
  74 N.Y.2d 487 (1989) ........................................................... 11, 20, 24

*Interpharm, Inc. v. Wells Fargo Bank, N.A.*,
  655 F.3d 136 (2d Cir. 2011) .................................... 14, 30, 31, 32, 45

*Interpharm, Inc. v. Wells Fargo Bank, N.A.*,
  No. 08-cv-11365, 2010 U.S. Dist. LEXIS 32318 (S.D.N.Y. Mar.
  31, 2010) ............................................................................................ 32

*Kashi v. Gratsos*,
  790 F.2d 1050 (2d Cir. 1986) .......................................................... 19

*Kingdom 5-KR-41, Ltd. v. Star Cruises PLC*,
  01 Civ. 2946, 2005 U.S. Dist. LEXIS 15981 (S.D.N.Y. Aug. 8,
  2005) .................................................................................................. 21

*In re Lyondell Chem. Co.*,
  544 B.R. 75 (Bankr. S.D.N.Y. 2016) .......................................... 33, 41

*In re MarketXT Holdings Corp.*,
  361 B.R. 369 (S.D.N.Y. Bankr. 2007) .............................................. 32

*Matsushita Elec. Co. v. Zenith Radio Corp.*,
  475 U.S. 574 (1986) .......................................................................... 18

*McNichol v. Falco*,
  No. 16-cv-2119, 2020 U.S. Dist. LEXIS 179267 (S.D.N.Y. Sept.
  28, 2020) ............................................................................................ 30

*Metro. Life Ins. Co. v. Noble Lowndes Int'l*,
  84 N.Y.2d 430 (1994) ........................................................................ 34

*Mid-Hudson Catskill Rural Migrant Ministry, Inc. v. Fine Host Corp.*,
418 F.3d 168 (2d Cir. 2005) ...................................................................20, 21, 23

*Millea v. Metro-North R.R.*,
658 F.3d 154 (2d. Cir. 2011) ...................................................................27

*Morgan Stanley & Co. Inc. v. Peak Ridge Master SPC Ltd.*,
930 F. Supp. 2d 532 (S.D.N.Y. 2013) ....................................................41

*Net2Globe Int'l v. Time Warner Telecom of N.Y.*,
273 F. Supp. 2d 436 (S.D.N.Y. 2003) .....................................................34

*Powell v. Nat'l Bd. of Med. Exam'rs*,
364 F.3d 79 (2d Cir. 2004) .................................................................18, 38

*Process Am., Inc. v. Cynergy Holdings, LLC*,
839 F.3d 125 (2d Cir. 2016) ...............................................................34, 36

*Promuto v. Waste Mgmt., Inc.*,
44 F. Supp. 2d 628 (S.D.N.Y. 1999) .......................................................21

*Rivera v. Rochester Genesee Reg'l Transp. Auth.*,
743 F.3d 11 (2d Cir. 2014) .......................................................................38

*Sabella v. Scantek Med., Inc.*,
No. 08-cv-453, 2009 U.S. Dist. LEXIS 88170 (S.D.N.Y. Sept. 21,
2009) ..........................................................................................................35

*Scholem v. Acadia Realty Ltd. P'ship*,
45 Misc. 3d 562 (N.Y. Sup. Ct. Suffolk Cnty. 2014) .........................35

*Schron v. Troutman Sanders LLP*,
20 N.Y.3d 430 (2013) ...............................................................................36

*Shannon v. N.Y. City Transit Auth.*,
332 F.3d 95 (2d Cir. 2003) .........................................................17, 18, 38

*Sherry v. Wal-Mart Stores East, L.P.*,
67 A.D.3d 992 (2d Dep't 2009) ...........................................................21, 22

*Sosnoff v. Carter*,
165 A.D.2d 486 (1st Dep't 1991) .............................................................30

*Square Mile Structured Debt (One), LLC v. Swig*,
110 A.D.3d 449 (1st Dep't 2013) ....................................................................21

*United States v. Assa Co.*,
774 F. App'x 51 (2d Cir. 2019) ......................................................................19

*VKK Corp. v. NFL*,
244 F.3d 114 (2d Cir. 2001) ....................................................................14, 29

*Wells Fargo Bank N.A. v. Webster Business Credit Corp.*,
113 A.D.3d 513 (1st Dep't 2014) ...............................................................27, 28

**Rules**

Fed. R. Civ. P. 56(c)...................................................................................18

## PRELIMINARY STATEMENT

After Ronald Dana and his company Dana Transport, Inc. (together "Dana") voluntarily dismissed a federal RICO action ("*Dana I*") filed against their lenders, the Lenders brought this suit seeking contractual indemnification for the attorneys' fees they expended in defending Dana's aborted lawsuit.[1]  Based on its analysis of the lending history and the applicable indemnification provision, the district court granted summary judgment in the Lenders' favor.  The court's reasoning is thorough, on point, and correct on the record and the law.  Dana was a sophisticated borrower represented by experienced legal and financial advisors, who negotiated and executed a series of commercial loan agreements that included a broad contractual provision indemnifying the Lenders "from and against any and all liabilities."  By its terms, and when read in context, the provision unambiguously covers the fees at issue in this inter-party dispute.

On appeal, Dana roundly criticizes that construction, but the court's ruling is based on the provision's plain language and properly credits all of its terms.  As for Dana's defenses, the court analyzed the record and found no evidence to support any of them, whether related to duress, willful misconduct, or other alleged wrongdoing

---

[1] The Borrowers include Defendant Dana Transport, Inc. and other Dana-affiliated entities.  Consistent with the district court's usage, "Dana" will refer both to each Defendant and also to all of the Borrowers, except where specifically noted. The Lenders are the appellees here and plaintiffs below. *See infra* at 3-4 (describing the Lenders).

on the part of the Lenders.  Dana nevertheless asserts that fact issues abound. But these assertions are unsupported, irrelevant, or legally ineffectual for reasons that were articulated by the district court and resonate just as strongly now.  Here, the relevant record shows nothing more than the Lenders exercising their post-default contractual rights, which are equally clear and not in dispute.

The parties' decade-long lending relationship was structured to provide a significant line of credit—well over $100 million—to various companies owned and operated by Mr. Dana.  As events unfolded, the relationship was defined by Dana's repeated and acknowledged defaults on the loan obligations.  In each instance, the Lenders accommodated Dana by renegotiating.  As is typical, additional terms were added relating to default interest rates and fees, and Dana concomitantly provided the Lenders with broad releases from liability.  In each refinancing, Dana was represented by experienced legal counsel, financial advisors, and accountants.

In retrospect, Dana may be unhappy with the arms-length bargains it made to obtain the financing it needed.  But, as the district court correctly held, that dissatisfaction does not relieve Dana of its "unmistakably clear" legal obligation to reimburse the Lenders for their attorneys' fees. This Court should affirm the result below.

## THE ISSUES PRESENTED FOR REVIEW

(1) Whether the district court's ruling that the controlling indemnification provision requires Dana to indemnify the Lenders for fees incurred in defending *Dana I* should be affirmed?

SUGGESTED ANSWER: Yes.

(2) Whether the district court's ruling that Dana cannot assert a duress defense should be affirmed?

SUGGESTED ANSWER: Yes.

(3) Whether the district court's ruling that there was no willful misconduct should be affirmed?

SUGGESTED ANSWER: Yes.

(4) Whether the district court's ruling that Dana's other affirmative defenses were inapplicable should be affirmed?

SUGGESTED ANSWER: Yes.

(5) Whether the pendency of *Dana II* provides any basis to overturn the district court's ruling?

SUGGESTED ANSWER: No.

## STATEMENT OF THE CASE

## I.   THE PARTIES' LENDING RELATIONSHIP

This case concerns a lending relationship spanning nearly a decade.  The Lenders included PNC Bank, N.A., Wells Fargo Capital Finance, LLC and Wells

- 3 -

Fargo Bank, N.A., BMO Bank, N.A. (f/k/a BMO Harris Bank), The Huntington National Bank, Cathay Bank, and Bank Leumi, USA. (A-2576, ¶ 79). PNC served as the agent for the lending group (A-2535, ¶ 4; A-2576, ¶ 78), with each Lender holding a specified percentage interest in the loans. (A-2577, ¶ 80).

The borrowers included a group of affiliated companies in the liquid transport trucking industry: Dana Transport, Inc., Dana Container, Inc., Suttles Truck Leasing, LLC, International Equipment Logistics, Inc., Flagship Services of West Virginia, LLC, Kentucky Flagship Services, LLC, Flagship Services of Ohio, LLC, and Liquid Transport, LLC. (A-2535, ¶ 5; A-4967).

The transport companies' principal, Ronald Dana, is a sophisticated businessman whose net worth during the relevant timeframe was close to $500 million. (A-3032, T:114:22-115:12). Mr. Dana signed the loan agreements in his capacity as President of Dana Transport and as the sole member of each of the other borrowers. (A-1742 to A-1744; A-4141 to A-4143; A-5077 to A-5078). He also signed personal guarantees related to the loans. (A-2192; A-5119; A-5086).

### A. 2004 to 2009: The Lenders Provide More Than $100 Million in Financing and The Lending Terms Are Renegotiated as a Result of Dana's Multiple Defaults

The lending relationship began in March 2004, when Dana Transport entered into a $20 million line of credit with PNC. (A-2534, ¶ 1; A-3405). Two years later, that line of credit was superseded by a $135 million syndicated loan facility, secured

by Dana's receivables and rolling stock.  (A-1642).  A year and a half after that, the parties renegotiated again, entering a Second Amended Loan Agreement.  (A-4038).  For each of these lending agreements, Dana consulted with experienced lawyers, financial advisors, and accountants.  (A-2538, ¶ 19; A-2584, ¶ 95; A-2586, ¶ 97; A-2587, ¶ 99).  Dana's CFO, Rudy Deseo, testifying individually and as Dana's corporate representative, confirmed that none of the terms of these agreements were unfair or unusual.  (A-2206 to A-2208, T77:17-79:22; A-2213 to A-2215, T77:17-79:22; A-2163 to A-2165, T:85:15-87:19).

In 2006, and later in 2007, Dana entered into separate agreements with PNC involving interest-rate swap transactions.  (A-2276; A-2309).  The swap transactions provided the equivalent of fixed-rate (as opposed to variable-rate) financing in connection with both the 2006 and 2007 loans.  (A-2276; A-2310).  With respect to these transactions, Dana expressly agreed that PNC was not acting as a fiduciary or financial advisor, disclaimed any reliance on communications from PNC relating to the transactions, and represented that Dana had made an independent decision to enter into them after consulting with its own advisors.  (A-2301; A-2309).

As the lending relationship progressed, problems emerged relating to Dana's loan obligations.  Most notably, Dana repeatedly defaulted on specific provisions of the Second Amended Loan Agreement, including covenants that required Dana to maintain certain financial ratios in Sections 6.5 and 6.6, which, at the Lenders' option,

made all obligations "immediately due and payable," with an accompanying right to terminate the agreement. (A-1049; A-1052; A-1055; A-4106; A-4120; A-4122). In response to these defaults, in February 2009, the parties entered into a Forbearance and Amendment Agreement. (Dkt. No. 168-21; A-2567, ¶ 64). As before, Dana was advised by legal counsel and financial experts. (A-2568, ¶ 66; A-2569, ¶¶ 67-68).

In this agreement, Dana acknowledged that: (i) defaults had occurred; (ii) any cure periods had expired; (iii) Dana was obligated to pay all obligations owed to the Lenders; and (iv) the Lenders had no obligation to make further advances and all obligations would incur default interest rates. (A-2570, ¶ 69; A-2571, ¶ 70). Dana also provided the Lenders with a broad release, covering "any and all" obligations relating to their course of dealing. (A-2573, ¶ 73).

Finally, in connection with this renegotiation, Dana agreed to hire a turnaround consultant, (A-2572, ¶ 72), ultimately selecting Realization Services, Inc. ("RSI"). Dana agreed that RSI could communicate directly with the Lenders on topics that included RSI's progress, as well as Dana's operations. (A-4815; A-4820; A-4901).

**B.   April 2009: The Defaults Persist and the Lenders and Dana Enter into Their Operative Third Amended Loan Agreement That Includes a Broad Indemnification Provision**

Two months later, in April 2009, the parties entered into a Third Amended and Restated Revolving Credit, Term Loan and Security Agreement (the "TALA").

(A-4968).[2]  Once again, Dana received advice from multiple law firms, a financial advisor, and accountants.  (A-2584, ¶ 95; A-2586, ¶ 97; A-2587, ¶ 99).  In total, Dana's advisors performed nearly 900 hours of work as part of the renegotiation.  (A-2585, ¶ 96; A-2586, ¶ 98; A-330; A-455; A-464; A-527).

The TALA controlled the remainder of the parties' lending relationship and is the agreement at the heart of this lawsuit.  It set the credit limit at $125 million, had a maturity date of June 29, 2012, and set interest paid on advances at 4.25% LIBOR, with a 3% LIBOR floor.  (A-4984; A-4989; A-4995; A-4997; A-5061; A-5015).  It also includes the indemnification provision that gave rise to this appeal.  The provision reads:

> Each Borrower shall indemnify Agent, each Lender and each of their respective officers, directors, Affiliates, employees and agents from and *against any and all liabilities*, obligations, losses, damages, penalties, actions, judgments, suits, *costs, expenses and disbursements of any kind or nature whatsoever (including, without limitation, fees and disbursements of counsel*) which may be imposed on, incurred by, or asserted against Agent or any Lender *in any claim, litigation, proceeding or investigation instituted or conducted by* any Governmental Body or instrumentality or *any other Person with respect to any aspect of*, or any transaction contemplated by, or referred to in, *or any matter related to, this Agreement* or the Other Documents, whether or not Agent or any Lender is a party thereto, except to the extent that any of the foregoing arises out of the willful misconduct of the party being indemnified (as determined by a court of competent jurisdiction in a final and non-appealable judgment).

(A-5070 to A-5071) (emphasis added).

---

[2] The TALA is contained at A-4968 to A-5085.

The TALA again included financial covenants in Sections 6.5 and 6.6, and likewise required Dana to hire a turnaround consultant. (A-5037; A-5040). Dana also was obligated to deliver certain documents relating to the real estate collateral (as additional collateral securing the loan). (A-5057). Lastly, it contained the same broad release language in favor of the Lenders for any and all claims. (A-5075).

### C. January 2013: Following Further Events of Default, the Parties' Relationship Ends When Dana Pays Off the Loan and Releases the Lenders from All Liability

Under the TALA, past was prologue. To start, Dana failed to timely deliver the real estate documents. (A-2597, ¶¶ 117-121). Later, Dana breached Sections 6.12, 9.18(a), and 10.20 by variously failing to deliver other specified documents, pledges, or a lien waiver. (A-2598, ¶¶ 123-124; A-2599, ¶¶ 125-126). The Lenders advised Dana of all these defaults and further noted that, pursuant to Section 3.1, Dana's obligations would now bear interest at the default rate. (A-1072).

Seven months later, in June 2010, the Lenders again agreed to waive further events of default, in exchange for Dana making several additional agreements, (A-5195), and providing another broad release from liability. (A-5203). Nevertheless, in the nearly two years that followed, the problems persisted. Dana repeatedly failed to comply with the TALA's terms. (A-1082; A-1086; A-1095; A-1105; A-1113; A-1122; A-1131; A-1140; A-1149). Moreover, as of June 29, 2012 (the maturity date), Dana had not repaid the loan obligations in full. (A-2623, ¶ 175). As a result, the

parties entered into yet another forbearance agreement, (A-5264), with Dana again being advised by legal and financial experts. (A-2627, ¶¶ 181-182).

In connection with this forbearance agreement, Dana acknowledged it was in default under Sections 6.6, 9.7, and 4.13 and agreed unconditionally to pay all liabilities and obligations owed to the Lenders. (A-5263; A-5291). But nothing changed. Instead, seven additional waiver agreements followed between September 2012 and January 2013, (A-5292; A-1155; A-1177; A-1198; A-1220; A-1241; A-1262), with Dana making the same broad release from liability in each one. (A-5270; A-5296; A-1158; A-1180; A-1201; A-1222; A-1243; A-1264). In January 2013, Dana obtained new financing through different lenders. (A-5461). A payoff letter was executed that included another broad release encompassing all the past conduct. (A-5464). With that, the parties' relationship concluded.

## II. THE DISTRICT COURT'S COMPREHENSIVE LEGAL RULINGS RELATING TO THE PARTIES' INDEMNIFICATION AGREEMENT

More than two and a half years after the parties' relationship ended, in October 2015, Dana filed a lengthy complaint against the Lenders, *Dana I*, in the Southern District of New York. (A-589 to A-686). An initial case conference was held in December before the Honorable Colleen McMahon, who expressed skepticism about Dana's claims. (A-2650, ¶ 231; Dkt. No. 164 ¶ 7). Four days later, Dana voluntarily dismissed the case. (A-2650 to A-2651, ¶ 232). By that time, the Lenders had incurred significant legal fees and expenses, particularly relating to researching

and drafting a detailed motion to dismiss. (A-1036, ¶¶ 4-7). They accordingly demanded reimbursement under the TALA's indemnification provision. (A-1039). Dana rejected the demand and the Lenders filed this lawsuit. (A-39 to A-55).

Several months after dismissing *Dana I*, Dana filed another action against the Lenders in New Jersey state court ("*Dana II*").[3] Dana then responded to the Lenders' indemnification suit with a motion to dismiss, which the district court denied, and the Lenders moved for summary judgment, which the court granted.

## A. The District Court Holds that the Negotiated Indemnification Provision Applies to Fees Incurred in Inter-Party Litigation

Dana's motion to dismiss maintained that the TALA's indemnification clause did not apply to inter-party disputes and that the case should be stayed in light of *Dana II*. (Dkt. No. 25-1). In denying that motion, the district court ruled from the bench and found that "it [is] unmistakably clear . . . that Section 16.5 requires borrowers to indemnify agent and lenders for attorney's fees incurred by them in litigation instituted by Dana Transport Incorporated." (A-97 to A-98).[4]

The court began by acknowledging that "[a] promise by one party to a contract to indemnify the other for attorney's fees incurred in litigation between them is

---

[3] *Dana II* presently is on appeal concerning the TALA's forum selection provision, which requires all lawsuits to be filed in the state or federal courts of New York County. *See Dana Transport, Inc. et al. v. PNC Bank, Nat'l Assoc. et al.*, No. A-000295-23 (N.J. Sup. Ct. App. Div.).

[4] The district court's motion to dismiss ruling is contained in the September 22, 2017 Hearing Transcript at A-56 to A-103.

contrary to the well-understood rule that the parties are responsible for their own attorney's fees." (A-95 to A-96). "Thus, the New York Court of Appeals has instructed that the Court should not infer a party's intention to waive the benefit of the rule, unless the intention to do so is unmistakably clear from the language of the promise." (A-96) (citing *Hooper Assocs., Ltd. v. AGS Computers, Inc.*, 74 N.Y.2d 487, 492 (1989)).

In making this assessment, the court also noted that it must "take into account the language and purpose of the entire agreement and the surrounding facts and circumstances." *Id.* And, "[a]t least in contexts in which contracting parties could have anticipated that they would be subject to third-party claims, courts apply a presumption against concluding that indemnification clauses cover litigation costs incurred in the course of resolving non-third-party claims." *Id.* (citing *Goshawk Dedicated Ltd. v. Bank of N.Y.*, 2010 WL 1029547, at *7 (S.D.N.Y. Mar. 15, 2010)).

With this guidance in hand, the court then considered the indemnification clause, which is quoted in full above, *see supra* at 7, and broadly provides indemnity for the Lenders, including for fees and expenses incurred "in any claim, litigation, proceeding or investigation instituted or conducted by any [G]overnmental [B]ody or instrumentality or any other [P]erson." (A-97).[5]

---

[5] The stenographic transcript of the hearing and the court's oral ruling does not reflect the capitalization of defined terms from the TALA. In quoting the transcript

In looking at the provision's terms, the court pointed out that "Person" is a defined term, broadly extending to individuals, corporate entities, and others.[6]  (A-97).  And while the definition of "Person" does not specifically include the word "Borrower," the court pointed out that the TALA's definition of "Borrowers" expressly describes them as "Persons."[7]  *Id.*  The court further observed that the TALA's preamble identifies Dana Transport, Inc. (a defendant in this lawsuit), among other Dana-affiliated entities that were parties to the TALA.  *Id.*; (A-4976).

After making this contextual examination, the court found that "the contract clearly establishes that [B]orrowers, and Dana Transport Incorporated, specifically, are [P]ersons."  (A-97).  With that construction in hand, the court then held that it is "unmistakably clear . . . that Section 16.5 requires borrowers to indemnify agent and lenders for attorney's fees incurred by them in . . . [*Dana I*]."  (A-97 to A-98).  As

---

here, capitalizations are supplied for clarity and accuracy, as noted in square brackets, consistent with the language of the TALA.

[6] Specifically: "'Person' shall mean any individual, sole proprietorship, partnership, corporation, business trust, joint stock company, trust, unincorporated organization, association, limited liability company, institution, public benefit corporation, joint venture, entity or Governmental Body (whether federal, state, county, city, municipal or otherwise, including any instrumentality, division, agency, body or department thereof)."  (A-4993).

[7] Specifically: "'Borrower' or 'Borrowers' shall have the meaning set forth in the preamble to this Agreement and shall extend to all permitted successors and assigns *of such Persons*."  (A-4978) (emphasis added).

it also noted, that clarity persisted, notwithstanding Dana's erroneous claims that the court's construction rendered other provisions in the TALA superfluous. (A-98).

Finally, after analyzing Dana's argument, the court exercised its discretion and declined to stay this case based on the pendency of *Dana II* in New Jersey. (A-98 to A-102).

### B. The District Court Grants Summary Judgment and Holds that the Indemnification Provision Is Enforceable Notwithstanding Dana's Purported Defenses

Following this ruling, and after full discovery, the Lenders moved for summary judgment to establish their right to indemnity under the district court's construction of the controlling provision. (Dkt. Nos. 157 & 160). In response, Dana argued that the "willful misconduct" exception in the indemnification provision precluded its enforcement and asserted various affirmative defenses, most notably economic duress. (Dkt. No. 181). After another thorough analysis, however, the court granted the Lenders' motions and found Dana liable for contractual indemnification. (SPA-2 to SPA-28).[8]

The district court initially rejected Dana's economic duress defense, as a matter of law and undisputed fact. (SPA-11 to SPA-14). To start, it found that Dana had waived a duress defense by not promptly seeking to repudiate the TALA. (SPA-11). As the court explained:

---

[8] The district court's summary judgment ruling is contained at SPA-2 to SPA-28.

> A party may ratify a contract or release entered into under duress by intentionally accepting benefits under the contract, by remaining silent or acquiescing in the contract for a period of time after he has the opportunity to avoid it, or by acting upon it, performing under it, or affirmatively acknowledging it.

*Id.* (citing *VKK Corp. v. NFL*, 244 F.3d 114, 123 (2d Cir. 2001)).  To underscore the point, the court cited to this Court's observation that "[d]elays as short as six months have been held to constitute a forfeiture of the claim."  *Id.* (citing *VKK Corp*, 244 F.3d at 123); *see also Di Rose v. PK Mgmt. Corp.*, 691 F.2d 628, 633-34 (2d Cir. 1982) (delays ranging from six months to two years constituted waiver).

As the court explained, the undisputed facts demonstrated that Dana accepted the benefits of the TALA.  (SPA-11).  Further, the parties' lending relationship ended in January 2013, when Dana refinanced with new lenders, but Dana did not assert "duress" until it filed the *Dana I* complaint more than two years later.  *Id.*  The court thus held that "[t]his two-year gap, without any explanation for such delay, constitutes a forfeiture of any duress defense."  *Id.*  It nevertheless went on to consider the merits and concluded that there were no material disputes of fact that could ultimately support this defense.  (SPA-12 to SPA-14).  In particular, the district court reviewed this Court's decision in *Interpharm, Inc. v. Wells Fargo Bank, N.A.*, 655 F.3d 136 (2d Cir. 2011), which it found to be on point and controlling.  (SPA-12 to SPA-14); *see infra* at 31-32.

- 14 -

The court proceeded to address Dana's argument that the indemnification provision did not apply because the Lenders engaged in willful misconduct. It recognized that there was "some uncertainty as to the full scope of behavior that is captured by the term 'willful misconduct' under New York law." (SPA-15). But the court rejected Dana's argument that willful misconduct is "a factual question that cannot be resolved at this stage." *Id.* To the contrary, it found that, "'willful misconduct,' as used in a contractual limitation of liability provision, is frequently capable of interpretation by courts" and "requires, at the very least, an intentional breach of contract." *Id.* The court then reviewed authority from New York state and federal courts demonstrating the high degree of wrongfulness those courts have required to establish willful misconduct. (SPA-15 to SPA-16) (collecting cases).

In opposing summary judgment, Dana urged the court to adopt a lower standard, equating willful misconduct with gross negligence. (SPA-17). On analysis, however, the court labelled this as a "distinction without a difference." *Id.* The court explained that "even if the Court were to agree with Dana that 'willful misconduct' . . . may be satisfied through gross negligence [. . . ] none of the conduct of which Dana accuses Lenders meets any of these standards." *Id.*

With this less demanding standard in mind, the court determined that Dana failed to raise a material dispute of fact: "In brief, [the Lenders'] actions and statements are either unsupported by the record or are irrelevant to willful

misconduct because they do not suggest intentional breaches of any contract, including the TALA." (SPA-18). Nevertheless, it carefully considered each allegation "[o]ut of an abundance of caution," and explained why each one was irrelevant to willful misconduct. (SPA-22 to SPA-26).

The court lastly rejected Dana's remaining affirmative defenses (including lack of consideration, public policy, and fraud) as irrelevant, unsupported, or both. (SPA-26 to SPA-27). After granting the Lenders' motions, and with further briefing, the district court entered an opinion and order on January 17, 2024 awarding the Lenders $216,541.17 in attorneys' fees and expenses. (SPA-29 to SPA-47). This appeal followed.

## SUMMARY OF THE ARGUMENT

The district court's comprehensive and dispositive rulings get very little attention in Dana's opening brief. Instead, Dana principally rehashes the same arguments it made below, but their merits have not improved. Dana's repeated incantation that a complex dispute like this one is not amenable to summary judgment does not change the calculus. The series of arms-length agreements entered in this case are not atypical by any means, nor are the defaults by Dana that precipitated them. Simply put, wherever one looks, there is no basis to disturb the district court's rulings.

The indemnity agreement, by its terms, and as read in context, clearly and unmistakably provides for the award of fees here. On duress, Dana makes no attempt to explain the lengthy delay in seeking to repudiate the TALA, confirming that the defense has been waived. And Dana fares no better on the merits, relying only on threadbare accusations of wrongful threats, without any evidentiary support. As for willful misconduct, Dana argues the court applied the wrong legal standards, but its opinion belies that assertion. Instead, and at Dana's urging, the court applied a lower standard of wrongfulness than is required by the great weight of New York authority. Even under that less-demanding standard, and making all reasonable inferences in Dana's favor, there are no relevant factual disputes, only Dana's hand-wringing over a course of events that its own conduct set in motion.

Finally, there is no reason to reverse the district court's ruling simply because the parties are involved in other litigation in New Jersey. Any hypothetical future ruling in that case is irrelevant to the Lenders' right to indemnification and does not provide an avenue for Dana to escape its express obligations.

## ARGUMENT

### I.    STANDARD OF REVIEW

This Court "review[s] a district court's decision granting summary judgment *de novo*, viewing all evidence in the light most favorable to the non-moving party." *Shannon v. N.Y. City Transit Auth.*, 332 F.3d 95, 98 (2d Cir. 2003) (citation omitted).

"Summary judgment is appropriate only where the record shows 'that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.'" *Id.* (citing Fed. R. Civ. P. 56(c)). To defeat summary judgment, "the nonmoving party must come forward with specific facts showing that there is a genuine issue of material fact for trial." *Id.* at 99 (citing *Matsushita Elec. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986)). "[T]he existence of a mere scintilla of evidence in support of nonmovant's position is insufficient" to defeat summary judgment, and the non-movant "must 'demonstrate more than some metaphysical doubt as to the material facts.'" *Powell v. Nat'l Bd. of Med. Exam'rs*, 364 F.3d 79, 84 (2d Cir. 2004) (citation omitted). "Conclusory allegations, conjecture, and speculation . . . are insufficient to create a genuine issue of fact." *Shannon*, 332 F.3d at 99 (citation omitted).

While the Court "must resolve all ambiguities and draw all reasonable inferences against the movant," "[t]hat does not mean, however, that a party can successfully oppose summary judgment on the basis of an unreasonable view of the facts." *Berk v. St. Vincent's Hosp. & Med. Ctr.*, 380 F. Supp. 2d 334, 342 (S.D.N.Y. 2005). "[T]he court is not required to draw *all* inferences in the nonmovant's favor, but only all *reasonable* inferences." *Casciani v. Nesbitt*, 392 F. App'x 887, 888 (2d Cir. 2010).

This Court "review[s] a district court's decision denying a motion to stay for abuse of discretion." *United States v. Assa Co.*, 774 F. App'x 51, 51 (2d Cir. 2019) (citing *Kashi v. Gratsos*, 790 F.2d 1050, 1057 (2d Cir. 1986)); *see also Bethlehem Contracting Co. v. Lehrer/McGovern, Inc.*, 800 F.2d 325, 327 (2d Cir. 1986) ("The decision whether to stay or dismiss a federal suit under the *Colorado River* doctrine is committed to the discretion of the district court.").

Finally, in reviewing the district court's decision, this Court "is 'free to affirm an appealed decision on any ground which finds support in the record, regardless of the ground upon which the trial court relied.'" *Garcia v. Hartford Police Dep't*, 706 F.3d 120, 130 (2d Cir. 2013) (citation omitted).

Application of these standards supports affirmance.

## II. THE CONTROLLING INDEMNIFICATION PROVISION REQUIRES DANA TO INDEMNIFY THE LENDERS FOR FEES INCURRED IN DEFENDING *DANA I*

The district court held, as a matter of law, that the TALA's indemnification provision applies to the fees the Lenders incurred in defending *Dana I*. (A-95 to A-98). The court incorporated its holding in its opinion granting summary judgment. (SPA-8, SPA-10 & n.5). The court's ruling on the scope of the indemnification provision was correct and Dana's appeal provides no basis for reversal.

**A.     The Indemnification Provision Plainly Applies to Inter-Party Disputes**

The district court cited and applied the correct legal standards in ruling on Dana's motion to dismiss, including citing the New York Court of Appeals' *Hooper* decision for the proposition that an indemnification clause should only be interpreted to provide for inter-party indemnification when "the intention to do so is unmistakably clear from the language of the promise."  (A-96) (citing *Hooper*, 74 N.Y.2d at 492).  The court found such an unmistakably clear intent here based on the explicit language and definitions of the TALA.  *See supra* at 10-13; (A-95 to A-98).  Specifically, Section 16.5 requires the Borrowers to indemnify the Lenders for lawsuits filed by, among others, "any other Person."  (A-97).  Under the TALA's clear terms and definitions, "Borrowers" are "Persons," and accordingly Section 16.5 does apply to inter-party lawsuits, including *Dana I*.  (A-97 to A-98).  The court's construction also follows from the TALA's commercial context, as endorsed by more recent decisions from this Court.

Thus, in the decades since *Hooper* was decided, New York courts have departed from *Hooper*'s strict constructionist theory in favor of considering such provisions more expansively in the context of the contract as a whole and in its commercial context.  *See, e.g.*, *Mid-Hudson Catskill Rural Migrant Ministry, Inc. v. Fine Host Corp.*, 418 F.3d 168, 178-79 (2d Cir. 2005) (reading indemnification provision applicable to "actions of any kind or nature" as applying to actions

between the parties "when read in conjunction with [an earlier] provision"); *Gramercy Advisors, LLC v. Ripley,* 13 Civ. 9070, 2014 U.S. Dist. LEXIS 118233, at *28 (S.D.N.Y. Aug. 25, 2014) (holding that the contract provided for indemnification of direct claims in part because "the intent of the parties . . . is evident from the entirety of the transaction," even without language that "applies *only* to suits between the parties").[9]  This more holistic analysis provides further support for the district court's straightforward holding.

First, Section 16.5 sweeps broadly, applying to "any and all" claims by "any other Person."  The provision covers claims "of any kind or nature whatsoever," and excludes only claims arising from willful misconduct of the indemnitees.  "Person" likewise is broadly defined to include the Borrowers.  And such broadly worded clauses evince the "unmistakably clear" intent of the parties that the indemnification provision applies to inter-party actions.  *See, e.g.*, *Mid-Hudson*, 418 F.3d at 178-79; *Gramercy Advisors*, 2014 U.S. Dist. LEXIS 118233 at *27-28; *In re Bridge Constr.*

---

[9] *See also, e.g.*, *Kingdom 5-KR-41, Ltd. v. Star Cruises PLC*, 01-cv-2946, 2005 U.S. Dist. LEXIS 15981, at *23 (S.D.N.Y. Aug. 8, 2005) (same, drawing on "the context of the commercial arrangement to which [the indemnification clause] was addressed"); *Promuto v. Waste Mgmt., Inc.*, 44 F. Supp. 2d 628, 650-52 (S.D.N.Y. 1999) (distinguishing *Hooper* based on the terms of the contract as a whole); *Square Mile Structured Debt (One), LLC v. Swig*, 110 A.D.3d 449, 449 (1st Dep't 2013) ("The indemnification clause at issue provides for coverage of extremely broad claims, and is consistent with other clauses that have been held to provide for indemnification of attorney's fees for intra-party disputes."); *Sherry v. Wal-Mart Stores East, L.P.*, 67 A.D.3d 992, 995-96 (2d Dep't 2009) (requiring inter-party indemnification where "the indemnification clause was not limited").

*Servs. of Fla.*, 12 Civ. 3526, 2016 U.S. Dist. LEXIS 120088, at *12-13 (S.D.N.Y. Sep. 5, 2016); *Crossroads ABL LLC v. Canaras Capital Mgmt., LLC,* 105 A.D.3d 645, 645-46 (1st  Dep't 2013); *Sherry*, 67 A.D.3d at 994-96.

Second, the TALA lacks any provisions suggesting that the parties had intended to limit indemnification to third-party claims, such as common provisions that would: (1) require the Lenders to notify the Borrowers of any litigation that may trigger the indemnification clause; (2) allow the Borrowers to assume the defense of any indemnified claims, or limit the Lenders' discretion to litigate or settle indemnified claims; or (3) limit the Lenders' remedies against the Borrowers if the Borrowers assumed their indemnification obligations.

Third, Section 16.9 provides that the Lenders could charge to the Borrowers' account any attorneys' fees they incur in defending lawsuits arising out of the lending relationship.  *See* (A-5073).  While this provision is not applicable to the present situation because the loan was paid off, it shows that the parties considered the possibility of litigation among themselves and that the Lenders could charge Dana for its attorneys' fees in such a situation.

Fourth, apart from Section 16.5, the TALA includes three other clauses that provide for indemnification of the Lenders in certain specific situations.  In that regard, this Court has held that the presence of both narrow and broader

- 22 -

indemnification provisions supports an expansive reading of the more broadly worded one.[10]  *See Mid-Hudson*, 418 F.3d at 178.

Fifth, the multiple indemnification provisions, together with multiple releases of liability, all point to a commercial context that supports a broad reading of the indemnification provision.[11]  The language in these freely negotiated provisions shows that the Lenders intended to insulate themselves against any and all liabilities and losses in connection with the significant risk of providing $125 million in financing.  This included the protection provided by comprehensive indemnification rights, with no claims excluded.

In sum, by both its plain terms and in context, the TALA is unmistakably clear in requiring indemnification for inter-party lawsuits.  The district court's ruling providing for indemnification accordingly should be affirmed.

---

[10]  Dana argued below that these other clauses were inconsistent with the court's interpretation of Section 16.5.  But as the court noted, each imposes different and additional obligations.  (A-98).  Section 2.16 provides for indemnification with regard to Letters of Credit, by its own terms "[i]n addition to amounts payable as provided in Section 16.5."  (A-5008 to A-5009).  Section 4.13 concerns tax payments.  (A-5024).  And Section 4.19(h) relates to liabilities incurred due to hazardous substances.  (A-5029).

[11]  *See* (A-5001 to A-5002, § 2.2(e) & (f)); (A-5004, § 2.9(b)); (A-5006 to A-5007, § 2.13); (A-5009 to A-5010, § 2.17); (A-5026, § 4.15(f) & (g)); (A-5027, § 4.18); (A-5074, § 16.11); (A-5075, § 16.20).

- 23 -

**B.    There Is No Colorable Basis to Reverse the Indemnification Ruling**

On appeal, Dana largely repeats the same arguments concerning inter-party indemnification that the district court conclusively rejected.  Although raised up an octave, none has improved with age.  The reasons for rejecting each argument remain under the record and controlling law.

**1.    The Indemnification Provision "Unmistakably" and "Clearly" Applies to *Dana I***

The district court acknowledged and applied the New York Court of Appeals' direction in *Hooper* that the indemnification provision to cover attorneys' fees must be unmistakably clear and found that standard satisfied.  For its part, Dana misrepresents both the ruling and the indemnification provision, while arguing that "with some creativity, cross-referencing of various defined terms and disregard of others," the parties and court are left with only the "mere possibility" that the provision applies to inter-party suits.  Dana Br. at 12.  This is wrong.

The indemnification provision applies to suits filed by "any other Person"—a defined term under the TALA.  As noted above, Dana, as the Borrower, clearly falls into the category of "Persons" for two reasons.  First, the definition of Person is broad enough to encompass Borrowers.  Second, the definition of "Borrowers" itself defines the Borrowers to be "Persons."  Far from a "mere possibility," since the "Borrowers" are "Persons," the indemnification provision applies to the lawsuit they

filed.  This straightforward conclusion is, indeed, "unmistakably clear," just as the district court held.

Further, other provisions of the contract confirm that the indemnification provision should be applied to Borrowers, like Dana, and not simply "any person on earth," as it glibly suggests.  Dana Br. at 16.  For example, Section 2.11(e), which relates to reimbursements for Letters of Credit, includes a term related to "all Persons (other than the Borrowers)."  (A-5006).  And Section 7.5, which is one of several negative covenants applicable to the Borrowers, refers to "any Person, specifically excluding any other Borrower hereunder."  (A-5041).  These provisions also make clear that the term "Person" does and was intended to include "Borrowers."  In fact, where the TALA intended a term to apply to all "Persons" *other than* the "Borrowers" the TALA said just that by expressly carving out the Borrowers.  The indemnification provision, of course, did no such thing.

Dana cites several cases for the proposition that "unmistakable clarity" requires more than a "rational" or "reasonable interpretation one way or another." Dana Br. at 12-13.  But here, the relevant provision is not subject to a reasonable interpretation "one way or another."  The only interpretation that is consistent with

the TALA is that lawsuits filed by Borrowers, who are "Persons," are covered by the indemnification provision.[12]

Dana also is wrong to suggest that the indemnification provision must, by its clear terms, "exclusively" apply to suits between the parties. Dana Br. at 13. For example, in *Gramercy Advisors*, 2014 U.S. Dist. LEXIS 118233, at *28, the court held that a contract provided for indemnification of direct claims in part because "the intent of the parties . . . is evident from the entirety of the transaction," even though "there is no language" that "applies *only* to suits between the parties." Indeed, courts have explained that "the requirement that parties express their intent with 'unmistakable clarity' is not the same as a 'magic words' test, and courts have interpreted indemnification provisions to cover litigation expenses between the parties even where that coverage was not explicitly mandated in such words but, nonetheless, the intent was clear." *Carbonyx License & Lease LLC v. Carbonyx*

---

[12] Dana's arguments based on hypothetical interpretations of Sections 16.5 and 16.11 do not require a different result. It suggests that Section 16.5 is too broad to apply to inter-party disputes because it could require Dana to indemnify the Lenders for a judgment against them. Dana Br. at 19. But there is nothing per se impermissible about such a clause, especially because Section 16.5 includes a carve-out for willful misconduct by the Lenders. And, Dana cites no authority to suggest there is.

Apart from that, the district court specifically considered and rejected Dana's argument related to Section 16.11 (which relates to consequential damages), explaining that the two provisions cover separate topics and do not conflict. (A-98). A hypothetical example readily illustrates how these provisions can operate harmoniously. If there had been a finding of willful misconduct in *Dana I*, the Lenders would not be able to seek indemnification pursuant to Section 16.5, but still could not be liable for consequential damages, pursuant to Section 16.11.

*Inc.*, No. 19-cv-1540, 2019 U.S. Dist. LEXIS 212158, at *20 (S.D.N.Y. Dec. 8, 2019) (citations omitted).

In sum, none of Dana's arguments provides any basis to reverse the district court's holding that the indemnification provision is unmistakably clear in its application to the fees the Lenders incurred in defending *Dana I*.

### 2. Judicial Estoppel Does Not Support Reversal of Any Ruling in this Case

Dana advances a new argument on appeal that Wells Fargo (and only Wells Fargo) should be judicially estopped from seeking indemnification based on the decision in *Wells Fargo Bank N.A. v. Webster Business Credit Corp.*, 113 A.D.3d 513 (1st Dep't 2014). Dana Br. at 12-15. Since this argument was not raised below, it is waived. *See Millea v. Metro-North R.R.*, 658 F.3d 154, 163 (2d. Cir. 2011) ("Arguments raised for the first time on appeal are deemed waived."). But more tellingly, the argument also is legally flawed and based on a recitation of *Webster* that is incomplete, inaccurate, and misleading.

*Webster* concerned litigation between two lenders in the same syndicate: Wells Fargo and Webster, another lender that served as the agent bank in a lending relationship. 113 A.D.3d at 514. After the borrower encountered financial problems, each lender filed claims and counterclaims against each other, including for indemnification of attorneys' fees. *Id.* Thus, *Webster* is distinguishable for a

- 27 -

reason Dana fails to acknowledge—it does not involve litigation between a lender and a borrower.

Even more critically, the contract at issue in *Webster* had two separate indemnification clauses and Dana's brief quotes the wrong clause. Section 15.7 applied to indemnification obligations as between the lenders and thus was the clause at issue. *Webster*, 113 A.D.3d at 515. It did not include a provision for attorneys' fees. *Id.* By comparison, Section 17.7, the clause excerpted and quoted by Dana, required the borrowers—who were not parties to the lawsuit—to indemnify the lenders and included a provision for attorneys' fees. *See id.* at 515; Dana Br. at 14-15 (comparing Section 16.5 of the TALA with "the indemnity provision in *Webster* found in Section 17.7"). Thus, on its face, *Webster* does not present the same factual or legal issues as this case, and would not estop anyone, including Wells Fargo, from arguing in favor of indemnification under this contract.

## III. DANA'S PURPORTED DEFENSES TO THE ENFORCEABILITY OF THE INDEMNIFICATION AGREEMENT ARE MERITLESS

The district court's summary judgment ruling focused on whether there were any material disputes of fact related to Dana's various defenses to enforcement of the indemnification provision. The court correctly rejected each of Dana's defenses on the law and facts. There is no basis to depart from that reasoning on appeal.

### A. Dana's Duress Defense Has Been Waived and Is Factually and Legally Unsupported

The law is clear: a party seeking to repudiate a contract must do so promptly or the defense is waived. *See* (SPA-11) (citing *VKK Corp.*, 244 F.3d at 123); *see also Di Rose*, 691 F.2d at 633-34 ("A contract or release, the execution of which is induced by duress, is voidable, not void, and the person claiming duress must act promptly to repudiate the contract or release or he will be deemed to have waived his right to do so."). "Delays as short as six months have been held to constitute a forfeiture of the claim." *VKK Corp.*, 244 F.3d at 123. Applying this standard, there is no debate that Dana waived its duress defense by waiting more than two and a half years after the lending relationship concluded to raise it. On appeal, Dana still has no factual explanation or legal justification for its delay. Instead, Dana's brief demonstrates why the district court's holding was correct.

In particular, Dana argues that it could not assert duress sooner because "the wrongful economic duress . . . lasted until Borrowers were finally able to obtain alternative financing and begin to recover from the extortionist scheme perpetrated by the Lenders." Dana Br. at 49. Yet, Dana provides no explanation whatsoever for the years that passed between the refinancing in January 2013 and the filing of *Dana I* in October 2015. Dana Br. at 49-50. Dana's claim of "continuing duress" thus is

irrelevant because Dana itself admits the supposed duress ended in 2013—more than two and a half years prior to filing suit.[13]

While it could have stopped there, the district court nevertheless carefully considered Dana's alleged facts supporting its duress defense under the relevant legal standards and found them insufficient. That ruling, too, should be affirmed. "To void a contract on the ground of economic duress, the complaining party must show that its agreement was procured by means of (1) a wrongful threat that (2) precluded the exercise of its free will." *Interpharm*, 655 F.3d at 142. "[A] mere demonstration of financial pressure or unequal bargaining power will not, by itself, establish economic duress." *Id.* Instead, the "law demands threatening conduct that is 'wrongful,' i.e., outside a party's legal rights." *Id.* (citation omitted). "Accordingly, a 'threat to exercise a legal right' in order to 'compel the other party to submit to new demands' cannot constitute a wrongful threat." (SPA-12) (citing *Interpharm*, 655 F.3d at 142).

---

[13] The cases Dana cites do not change this conclusion. Indeed, in *Austin Instrument v. Loral Corp.*, 29 N.Y.2d 124, 133 (1971), the party asserting duress waited a mere three days after the relationship ended to repudiate the contract. *McNichol v. Falco*, No. 16-cv-2119, 2020 U.S. Dist. LEXIS 179267, *25 (S.D.N.Y. Sept. 28, 2020), concerned parties that waited five and six months after signing releases. And *Sosnoff v. Carter*, 165 A.D.2d 486, 492 (1st Dep't 1991), simply states that a party does not need to repudiate the contract until the duress has ceased. None of the cases provides any suggestion, much less any reasoning, on how or why the district court should not have found a waiver on the record here.

As the district court's analysis reveals, this Court's *Interpharm* decision is "not only instructive, but conclusive." *Id.* On analysis, *Interpharm* presents the same basic fact pattern: a borrower who repeatedly defaulted on its obligations under a loan agreement and a lender who agreed to multiple forbearances with increasingly stricter terms instead of exercising its contractual right to terminate the agreement and accelerate the borrower's obligations. (SPA-12 to SPA-13); *Interpharm*, 655 F.3d at 138-40. The borrower later filed suit, which the lender moved to dismiss based on releases contained in each forbearance agreement. (SPA-13); *Interpharm*, 655 F.3d at 140-41. The borrower argued the releases were void because they were the product of economic duress—an argument both the district court and this Court rejected. (SPA-13 to SPA-14); *Interpharm*, 655 F.3d at 141, 143-44.

Specifically, both this Court in *Interpharm* and the district court in this case concluded that the record here "cannot, as a matter of law, plausibly support a wrongful threat" because "the lender never 'exceed[ed] its contract rights.'" (SPA-13) (citing *Interpharm*, at 144-45). In *Interpharm*, this Court explained that it did not matter that the borrower felt it had "little choice but to agree" to the more restrictive terms or that it allegedly had communicated to the lender that the new financial covenants were "highly uncertain and unreasonable." 655 F.3d at 144-45. Here, too, the court correctly rejected as irrelevant Dana's assertions that it believed or even told the Lenders that it would not be able to meet certain terms. (SPA-13).

Dana's argument that it had no alternative other than to agree to the Lenders' terms following its defaults because Mr. Dana testified that "filing for bankruptcy would not have been a viable option" also fails, regardless of whether that evidence was "uncontroverted." Dana Br. at 48. The borrower in *Interpharm* made the same argument. *See* 655 F.3d at 141 ("This allegedly left Interpharm with no choice but to agree to the terms of the forbearance agreements or file for bankruptcy, which would have made it 'impossible to continue in business.'"). There, the district court rejected this contention head-on: "For a business in default of its credit agreement, without the money to pay bills as they come due, voluntary bankruptcy is actually a quite reasonable remedy." *Interpharm, Inc. v. Wells Fargo Bank, N.A.*, No. 08-cv-11365, 2010 U.S. Dist. LEXIS 32318, at *36 (S.D.N.Y. Mar. 31, 2010).[14]

This makes sense. A party unable to meet its financial obligations and on the verge of bankruptcy cannot choose instead to simply repudiate its contracts under a theory of economic duress. To hold otherwise would allow borrowers in default— including sophisticated borrowers represented and advised by experienced counsel and financial consultants—a "get out of jail free" card, depriving lenders of the

---

[14] Not surprisingly, and for similar reasons, bankruptcy courts have reached the same conclusion. *See In re MarketXT Holdings Corp.*, 361 B.R. 369, 401 (S.D.N.Y. Bankr. 2007) ("The allegations of the Complaint, assumed to be true, do not demonstrate that the Debtor had no alternative, at any time, than to accede to Softbank's demands. For example, the Debtor could have chosen to file for bankruptcy at an earlier point.").

benefit of their bargain, including the financial protections that were the necessary foundation for the willingness to loan money in the first place. The district court rejected that outcome and this Court should too.

### B. Dana's Willful Misconduct Defense Is Factually and Legally Unsupported

As also highlighted above, the district court performed an equally thorough analysis on both the relevant legal standards and the evidentiary record relating to willful misconduct. Dana takes issue with the court's approach, claiming that it failed to apply the correct standard for willful misconduct or on summary judgment or to properly assess the evidence. Dana again is wrong at every turn.

### 1. The Court Applied the Correct Standard for Willful Misconduct

The district court provided a detailed analysis of the legal authority from New York state and federal courts concerning what is required to establish willful misconduct. At a minimum, as the court explained, willful misconduct requires "an intentional breach of contract." (SPA-15). In that regard, the court also recognized that the breach of contract itself must be wrongful, as contrasted with some broader allegation of wrongfulness. (SPA-16 to SPA-17) (quoting *In re Lyondell Chem. Co.*, 544 B.R. 75, 88 (Bankr. S.D.N.Y. 2016) ("[T]he defendant must have acted with malice or reckless indifference *in breaching the contract specifically*.")). Indeed, it noted that even courts that have applied a less demanding standard of wrongfulness

have recognized that "actions taken out of 'legitimate economic self-interest,' as opposed to 'the intent to inflict economic harm,' do not amount to willful misconduct." (SPA-17) (citing *Banc of Am. Sec. LLC v. Solow Bldg. Co. II, L.L.C.*, 47 A.D.3d 239, 250 (1st Dep't 2007)).

Beyond that, the court also reviewed the ample authority for the proposition that willful misconduct requires a high degree of culpability. *See, e.g.*, *Metro. Life Ins. Co. v. Noble Lowndes Int'l*, 84 N.Y.2d 430, 438 (1994) (willful misconduct is "tortious in nature, i.e., wrongful conduct in which defendant willfully intends to inflict harm on plaintiff at least in part through the means of breaching the contract"); *Net2Globe Int'l v. Time Warner Telecom of N.Y.*, 273 F. Supp. 2d 436, 454 (S.D.N.Y. 2003) (New York courts "demand[] nothing short of . . . a compelling demonstration of egregious intentional misbehavior evincing extreme culpability: malice, recklessness, deliberate or callous indifference to the rights of others, or an extensive pattern of wanton acts").[15]

---

[15] *See also Process Am., Inc. v. Cynergy Holdings, LLC*, 839 F.3d 125, 140 (2d Cir. 2016) (affirming summary judgment where the non-moving party failed to raise a question of fact as to whether a party's "conduct 'extended well beyond a simple breach of the [contract,]'" much less whether it "willfully intend[ed] to inflict harm" through any such breach); *Gardner v. Owasco River Ry., Inc.*, 142 A.D.2d 61, 64 (3d Dep't 1988) (requiring "an intentional act of unreasonable character performed in disregard of a known or obvious risk so great as to make it highly probable that harm would result").

On appeal, as it did below, Dana argues for a lower standard, akin to gross negligence. But Dana's argument is not based on some nascent split in relevant authority. Instead, Dana faults the district court for not considering extrinsic evidence, arguing that it should have denied summary judgment because there "is a genuine dispute of material fact regarding the parties' understanding of [the term willful misconduct]." Dana Br. at 44. Not so.

First, Dana identifies no facts that allegedly are in dispute. Instead, Dana notes that the term "willful misconduct" is not defined in the TALA, and then asserts without further citation that "the parties are vigorously disputing the meaning of the term." *Id.* at 44-45. While it may be true that the parties disagree about what conduct should constitute willful misconduct, that does not mean that the parties dispute the meaning of the term or that the evidentiary record presents any material factual dispute.

Second, as the district court recognized, the term "willful misconduct" is not ambiguous. (SPA-17 n.8); *see also Sabella v. Scantek Med., Inc.*, No. 08-cv-453, 2009 U.S. Dist. LEXIS 88170, at *86 (S.D.N.Y. Sept. 21, 2009) (citations omitted) ("The parties to the Escrow Agreement do not define 'willful misconduct.' But there is no suggestion that the term is ambiguous. Accordingly, 'willful misconduct' will be given its ordinary meaning, which is 'Misconduct committed voluntarily and intentionally.'"); *Scholem v. Acadia Realty Ltd. P'ship*, 45 Misc. 3d 562, 567 (N.Y.

- 35 -

Sup. Ct. Suffolk Cnty. 2014) ("Contrary to the plaintiff's contentions, the term 'willful misconduct' is not ambiguous.").

Third, it is blackletter law that "[p]arol evidence—evidence outside the four corners of the document—is admissible only if a court finds an ambiguity in the contract." *Schron v. Troutman Sanders LLP*, 20 N.Y.3d 430, 436 (2013). "As a general rule, extrinsic evidence is inadmissible to alter or add a provision to a written agreement." *Id.* In this case, because there is no ambiguity, consideration of extrinsic evidence is unnecessary and summary judgment is appropriate. *See, e.g.*, *Process Am.*, 839 F.3d at 141 (affirming district court's ruling at summary judgment that a willful misconduct carve-out very similar to the provision here did not apply).

Dana further argues that the court's analysis of willful misconduct was "unfair" because other provisions in the TALA refer to "gross negligence." Dana Br. at 46. Dana asserts that Section 14.7, which governs indemnification among the Lenders, is "particularly instructive." *Id.* Dana is correct that this provision is instructive—but only because it serves to undercut Dana's position. Specifically, while Section 16.5 (the indemnification provision at issue here) includes a carve-out only for "willful misconduct," Section 14.7 (the indemnification provision between the Lenders) includes a carve-out for "gross (not mere) negligence or willful misconduct." *See id.* There is nothing unfair about enforcing what the contract requires, in crystal clear language. If anything, this eliminates any possibility that

- 36 -

Section 16.5 should be interpreted to require only gross negligence. Where the TALA intended to apply that standard, it did so expressly.

And, just as critically, while the district court noted extensive support in the case law for the more demanding standard (i.e., conduct that is tortious, wrongful, or evinces extreme culpability), it nevertheless applied Dana's preferred standard:

> Regardless of which precise standard the Court uses here—and, in particular, *even if the Court were to agree with Dana that "willful misconduct" as the term is used in the TALA does not require a showing of malice and may be satisfied through gross negligence*—none of the conduct of which Dana accuses Lenders meets any of these standards of willful misconduct, because *Dana has failed to raise a genuine dispute that Lenders* intentionally breached any contract between the parties, or *committed any other conduct that amounts to* intentional infliction of harm or *gross negligence.*

(SPA-17) (emphasis added).

Thus, whatever the standard, none of Dana's allegations demonstrated any material dispute of fact as to whether the Lenders breached their contact with Dana— let alone any actions that could be considered willful misconduct. (SPA-18).

### 2. The Court Applied the Correct Standard for Summary Judgment

Dana also asserts that the district court applied the wrong summary judgment standard in assessing the willful misconduct exception because the court "failed to draw factual inferences in the non-moving parties' favor." Dana Br. at 21. Not so. There were no reasonable or relevant inferences to draw because Dana's evidence

came up short. Apart from that, Dana once again misrepresents what the law requires and what the court concluded.

Rather, as its ruling reveals, the district court knew the standard for summary judgment: "The Court must 'constru[e] all the evidence in the light most favorable to the non-movant and draw[] all reasonable inferences in that party's favor.'" (SPA-10) (citing *Rivera v. Rochester Genesee Reg'l Transp. Auth.*, 743 F.3d 11, 19 (2d Cir. 2014)). But, contrary to Dana's contortions, that does not mean "that a party can successfully oppose summary judgment on the basis of an unreasonable view of the facts." *Berk*, 380 F. Supp. 2d at 342 (citation omitted). "[T]he court is not required to draw *all* inferences in the nonmovant's favor, but only all *reasonable* inferences." *Casciani*, 392 F. App'x at 888. This is the very distinction drawn by the district court after examining the record.

Further, "the existence of a mere scintilla of evidence in support of nonmovant's position is insufficient" to defeat summary judgment, and the non-movant "must 'demonstrate more than some metaphysical doubt as to the material facts.'" *Powell*, 364 F.3d at 84 (citation omitted). Similarly, "[c]onclusory allegations, conjecture, and speculation . . . are insufficient to create a genuine issue of fact." *Shannon*, 332 F.3d at 99 (citation omitted). The district court understood this principle as well.

- 38 -

Thus, even after repeatedly drawing inferences in Dana's favor, the court concluded that Dana had not raised a dispute of material fact that would defeat summary judgment. *See, e.g.*, (SPA-19) ("But while the cited deposition testimony could support the proposition that the 2006 swap agreement was terminated because the associated loan agreement was amended, it does not support the proposition that PNC *made any representations* to Dana that the swap agreement had to be terminated for that reason."); (SPA-23 to SPA-24) ("But while there is certainly evidence that titles may have been incorrectly excluded during the third-party appraisals of Dana's collateral that PNC ordered, Dana raises no evidence that this exclusion was intentional, as opposed to inadvertent error."); (SPA-25) ("Although Ron Dana's deposition testimony supports this statement . . . Dana fails to establish how such conduct was not authorized under the various loan agreements following its repeated defaults."). Simply put, there is no error in the court's application of the summary judgment standards or its determination of the result they required here.

### 3. The Court Correctly Found that There Are No Material Disputes of Fact on Willful Misconduct

With the proper legal standards in hand, the district court found that Dana did not present any material issues of fact that would preclude summary judgment in the Lenders' favor. In fact, as the court took pains to point out, many of Dana's allegations were and are unsupported by the record. (SPA-19 to SPA-21). For example, alleged misrepresentations about the 2006 and 2007 swap transactions

- 39 -

lacked evidentiary support. (SPA-19 to SPA-20). The court likewise rejected Dana's arguments related to Mr. Dana's Personal Guaranty, finding no evidence that the Lenders either improperly refused to release the Guaranty or removed it from the borrowing base. (SPA-19 to SPA-21). The record also contained no evidence to support Dana's allegations about the Lenders' refusal to provide the $25 million real estate loan or accusing Wells Fargo of "usurping" PNC's role as agent. (SPA-20 to SPA-21).

The court also explained why other allegations, even if they had some evidentiary support, did not raise any dispute of material fact about whether the Lenders engaged in willful misconduct, and accordingly were irrelevant. *See id.* (SPA-22 to SPA-26). For example, Dana's most inflammatory allegations were irrelevant because they predated or were not related to the TALA. *See, e.g.*, (SPA-19) (explaining that the 2007 swap transaction is "irrelevant to willful misconduct that might implicate the carveout clause in the TALA, a contract that postdated the 2007 swap by two years").[16] Similarly, with respect to the parties' dispute over why certain vehicle titles were excluded during a collateral appraisal, the court found that

---

[16] The court also explained that Dana was represented by counsel in connection with the 2007 swap and agreed in writing that each party was "fully informed of and capable of evaluating, and has evaluated, the potential financial benefits and risks" of the transaction and that "neither party shall have any liability whatsoever in respect of any advice of such nature given, or views expressed, by it or any such persons to the other party." (SPA-23).

the evidence—including Mr. Dana's own testimony—suggested this was at most due to "mistake or ordinary negligence," which the court recognized is not enough to establish willful misconduct.  *See* (SPA-23 to SPA-24).

Moreover, those allegations that did relate to the TALA demonstrated nothing more than the Lenders acting within their rights as conferred under the various agreements.  This included Dana's claim it was charged "exorbitant fees," which the court rejected because it was "entirely within [the] Lenders' rights" under the contracts to charge higher fees and impose other such conditions after Dana had defaulted on its obligations.  (SPA-22).  As the court also observed, "[c]onduct that advances legitimate economic self-interest, even when it is 'commercially unreasonable,' 'self-serving[,] and aimed at maximizing . . . profits,' does not constitute 'a compelling demonstration of egregious intentional misbehavior.'"  *Id.* (citing *Morgan Stanley & Co. Inc. v. Peak Ridge Master SPC Ltd.*, 930 F. Supp. 2d 532, 545 (S.D.N.Y. 2013)).

The "examples" Dana provides of purported "willful misconduct" in Sections II.A and B of its brief are just a repackaged version of the same contentions that the district court considered and properly rejected.  None creates any basis for reversal.

First, all of the alleged conduct that occurred prior to the execution of the TALA *is* irrelevant to whether the willful misconduct exception to the TALA

applies.[17]  "New York courts have . . . clarified that to invalidate an exculpatory clause, it is insufficient for the plaintiff to allege or show that the defendant acted with malice or reckless indifference *in the general course of conduct* between the parties.  Rather, the defendant must have acted with malice or reckless indifference *in breaching the contract specifically*."  *In re Lyondell*, 544 B.R. at 88.

Second, with regard to the allegations that do relate to the TALA, *see* Dana Br. at 40-44, the Lenders' actions *were* contractually authorized—including imposing higher interest rates, charging fees, and requiring the retention of a turnaround consultant.  Dana likewise is wrong that its lengthy history of defaults should be excused or ignored because "it was the Lenders who first breached the loan agreements."  *Id.* at 36-37.  To the contrary, as the court found there *is no* evidence that the Lenders had intentionally breached "any contract, including the TALA" and that "without such an intentional breach, a willful misconduct claim cannot lie."  (SPA 17 to SPA-18).  If more were needed, the court also noted that

---

[17] This catalogue of irrelevant allegations includes: the 2006 and 2007 swap transactions; whether Mr. Dana's personal guaranty was part of the borrowing base for the 2007 loan agreement; and issues related to the vehicle titles in the 2007/2008 collateral appraisal.  *See* Dana Br. at 24-31, 38-40.  Moreover, even if there was any evidence the Lenders had engaged in any wrongdoing with regard to these allegations—which there is not—Dana repeatedly provided broad releases to the Lenders as part of multiple waiver and forbearance agreements, including in the February 27, 2009 Forbearance Agreement (executed prior to the TALA), and several times thereafter.

Mr. Dana was "unable, during his deposition, to identify a single action Lenders took that breached any of the loan agreements." (SPA-18 n.9).

Third, several of Dana's examples are based on demonstrably false misstatements of fact. Dana asserts that Mr. Dana's Personal Guaranty was removed from the borrowing base to "intentionally[] manufactur[e] a collateral shortfall." Dana Br. at 27. But the Guaranty never was part of the borrowing base—as Dana's corporate representative testified. (A-5699 to A-5703). In any event, the Lenders never declared a default based on a collateral shortfall, so this allegation is doubly irrelevant. (A-2562, ¶ 56; A-2344, T150:10-13).

The same is true for the allegations related to the missing vehicle titles. *See id.* at 29-31. PNC had determined that because titles for over 1,000 units of rolling stock lacked sufficient documentation in order to be perfected, they could not be included as part of the collateral borrowing base formula. (A-2560, ¶ 55; A-2360 to A-2369, T145:23-154:22; A-2167 to A-2175, T112:8-120:14; A-2331 to A-2343, T113:13-145:9). Dana is critical of PNC's analysis, but notably, Dana's financial consultant placed part of the blame for the breakdown on Dana. (A-2560, ¶ 55; A-2360 to A-2369, T145:23-154:22). Dana's consultant further acknowledged that it was Dana's responsibility to provide proper documentation. (A-5663, T165:15-22; A-5664, T166:19-25). Moreover, there is no plausible inference of willful

misconduct because the Lenders never declared a default based on any purported collateral shortfall. (A-2562, ¶ 56; A-2344, T150:10-13).

Fourth, Dana relies heavily on unsupported innuendo, which plainly is not sufficient to create a dispute of material fact. For example, it insists the exclusion of the vehicle titles from the collateral appraisal was "intentional" simply because it was "based on the express instructions of" Sari Garrick, PNC's relationship manager for the facility. Dana Br. at 29. But the issue is not whether any action itself was "intentional" as opposed to inadvertent; the issue is whether that action was taken with wrongful intent. Even if Ms. Garrick instructed that the titles should not be included (because of the numerous issues with the titles, as noted above), that does not establish that she did so for any wrongful purpose or that it was a breach of any agreement. Instead, the record demonstrates the opposite: during discovery, Dana's liability expert testified that he had seen no evidence that Ms. Garrick was motivated by any intent to injure Dana. (A-2347 to A-2348, T198:25-199:12).

Fifth, Dana raises several other purported disputes of fact that the district court found amount to nothing more than "rhetoric," including "various communications in which Lenders expressed disapproval of other Lenders' conduct in connection with the loan agreements, or in which Lenders used certain language when discussing their options under the loan agreements." (SPA-25 to SPA-26). Dana takes the same tack on appeal, arguing that the Lenders "jammed" and "pound[ed]"

Dana with "obnoxious" and "unjustified" fees. Dana Br. at 42-44. But as the district court observed, consistent with this Court's binding case law, "Dana provides no support, however, for the inference that 'hard bargaining' of this sort rises to the level of willful misconduct." (SPA-26) (citing *Interpharm*, 655 F.3d at 145). No such authority exists.

In short, Dana's appeal provides no basis to depart from the district court's thorough, sound ruling that there was and is no willful misconduct.

## C. Dana's Remaining Affirmative Defenses Also Are Factually and Legally Unsupported

The district court also correctly found that none of Dana's remaining affirmative defenses precluded entry of summary judgment. Dana's briefing on appeal does not provide any basis to disturb that finding.

**Fraud.** As far as Dana's allegations of fraud are concerned, it resorts to misrepresenting the district court's opinion through incomplete quotation. Dana argues that the court incorrectly found that Dana had "not identified any material false representation by Lenders on which Dana relied." Dana Br. at 50. But the opinion actually states that Dana did not identify "any material false representation by Lenders on which Dana relied *in connection with the TALA*." (SPA-26) (emphasis added). Alleged misrepresentations related to the swap transaction are irrelevant to the TALA, in addition to being insufficient for other reasons. *See supra* at 40.

- 45 -

**Good Faith and Fair Dealing.** The same is true for Dana's "good faith and fair dealing" defense, which Dana also claims is supported by alleged misrepresentations related to the 2007 swap. (SPA-27).

**Public Policy.** As the district court correctly explained, Dana's public policy defense fails because it was subsumed in Dana's willful misconduct defense. (SPA-26 to SPA-27). On appeal, Dana tries to distinguish the authority cited by the court on factual grounds. Dana Br. at 51-53. But the cited cases simply stand for the basic legal proposition that "[i]ndemnification agreements are unenforceable as violative of public policy only to the extent that they purport to indemnify a party for damages flowing from the intentional causation of injury." *Austro v. Niagara Mohawk Power Corp.*, 66 N.Y.2d 674, 676 (1985). Dana cites no authority to the contrary, and instead resorts to the illogical and circular argument that the Lenders are attempting "to protect themselves against *all* liability for their misconduct." Dana Br. at 53. To the contrary, the Lenders have never disputed that the indemnification provision includes a carve-out for willful misconduct. They instead have argued that the indisputable evidence shows they did not engage in any such misconduct. The district court agreed.

## IV. THE PENDENCY OF *DANA II* IS IRRELEVANT TO THIS PROCEEDING

Dana's final argument is that the court's summary judgment ruling was improper in light of the pendency of *Dana II*. As Dana would have it, because the

- 46 -

New Jersey court in *Dana II* conceivably could address (at some unknown point) the issue of willful misconduct, it was "premature" for the district court to address it here and a stay should have issued. *See* Dana Br. at 55-57. This argument borders on the nonsensical.

The district court plainly had jurisdiction to consider the Lenders' summary judgment motions, including arguments related to willful misconduct. Nor was there any reason to delay making a ruling. This lawsuit concerns indemnification for fees incurred in defending *Dana I*. That issue is not raised in *Dana II*. And the court had the record in this litigation to support the indemnity judgment it rendered—including on its finding that the Lenders did not engage in willful misconduct. Nothing that happens in *Dana II* will change that. Moreover, by the TALA's plain terms, the New Jersey court is not a "court of competent jurisdiction" authorized to make findings relevant to the indemnity issue. Instead, the TALA clearly requires that all lawsuits be filed in the state or federal courts of New York County. (A-5066, § 16.1).[18] Thus, contrary to Dana's argument, delaying its indemnity obligations based on anything that happens in *Dana II* would violate the TALA, not comport

---

[18] The forum selection clause states: "Any judicial proceeding by any Borrower against Agents or any Lender involving, directly or indirectly, any matter or claim in any way arising out of, related to or connected with this Agreement or any related agreement, shall be brought only in a federal or state court located in the County of New York, State of New York." *Id.*

with it.  Under the circumstances, there plainly is no abuse of discretion in refusing to grant a stay.

Beyond that, it would be bad law and worse public policy to allow Dana to avoid its contractual indemnification obligations based on its strategic decision to abandon a New York forum in favor of New Jersey.  Dana was, by all appearances, engaged in forum shopping when it abandoned New York.  It should not be rewarded for its gamesmanship.  More globally, it simply cannot be the case that a contracting party can avoid its contractual promise to indemnify for attorneys' fees it caused to be incurred by filing successive lawsuits in some other court.  Dana's evasion tactics, if endorsed, would frustrate settled principles that bind parties to their freely negotiated and arms-length agreements.  Here, Dana's argument related to *Dana II* rings hollow and provides no basis to reverse the district court's opinion.

## CONCLUSION

For the reasons set forth above, this Court should affirm the district's court's entry of summary judgment against Dana.

Dated:  April 16, 2024                    Respectfully submitted,

                                     */s/ Robert A. Nicholas*
                                     Robert A. Nicholas
                                     Anne Rollins Bohnet
                                     Joseph J. Mahady
                                     Joshua M. Peles
                                     REED SMITH LLP
                                     Three Logan Square,

1717 Arch Street, Suite 3100
Philadelphia, Pennsylvania 19103
(215) 851-8100

James C. Martin
REED SMITH LLP
225 Fifth Avenue, Suite 1200
Pittsburgh, PA 15222
(412) 288-3131

*Attorneys for Plaintiffs-Appellees*
*PNC Bank, National Association, Cathay*
*Bank, and Bank Leumi USA*

Stephen M. Dollar
Felice B. Galant
NORTON ROSE FULBRIGHT US LLP
1301 Avenue of the Americas
New York, New York 10019
Tel: (212) 318-3000

*Attorneys for Plaintiffs-Appellees*
*BMO Bank, N.A. (f/k/a BMO Harris Bank)*
*and The Huntington National Bank*

Richard Haddad
Pauline McTernan
OTTERBOURG P.C.
230 Park Avenue, 30th Floor
New York, New York 10169
Tel: (212) 661-9100

*Attorneys for Plaintiffs-Appellees Wells*
*Fargo Bank, National Association and*
*Wells Fargo Capital Finance, LLC*

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limitations of Rule 32(a)(7)(B) of the Federal Rules of Appellate Procedure because it contains 11,518 words, excluding the parts of the brief exempted by Rule 32(f). This brief complies with the typeface requirements of Rule 32(a)(5) because it has been prepared in a proportionally spaced typeface using Microsoft Word Times New Roman 14-point font.

/s/ Robert A. Nicholas
Robert A. Nicholas

## CERTIFICATE OF SERVICE

I hereby certify that, on April 16, 2024, the Brief for Plaintiffs-Appellees was served on all counsel of record via the CM/ECF system.

*/s/ Robert A. Nicholas*
Robert A. Nicholas